REPLACEMENT EXHIBIT P
TO PLAINTIFFS' MOTION FOR RULE 23 CLASS
CERTIFICATION
(ECF NO.  37-17)

FULL TRANSCRIPT OF DEPOSITION OF
PLAINTIFF ARNULFO GARCIA-RAMOS

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2           FOR THE MIDDLE DISTRICT OF GEORGIA

3                  VALDOSTA DIVISION

4    _____

5    ARNULFO GARCIA-RAMOS and PABLO

6    CASTILLO-OLGUIN, and All Others

7    Similarly Situated,

8            Plaintiffs,

9        v.                          Civil Action

10   SOUTHERN VALLEY FRUIT &          File No.

11   VEGETABLE, INC.; HAMILTON        7:24-cv-00054-WLS

12   GROWERS, INC.; KENT HAMILTON;

13   HAMILTON PRODUCE, L.P.; KENDA

14   PROPERTIES L.P.; WK HOLDINGS

15   LLC; and WKW, LLC,

16           Defendants.

17   _____

18          DEPOSITION OF ARNULFO GARCIA-RAMOS

19   DATE:          Wednesday, April 23, 2025

20   TIME:          10:01 a.m.

21   LOCATION:      Radford Scott LLP

22                  125 Clairemont Avenue, Suite 380

23                  Decatur, GA 30030

24   REPORTED BY:   Jasmine Applewhite

25   JOB NO.:       7326506

Page 2

```
 1              A P P E A R A N C E S
 2    ON BEHALF OF PLAINTIFFS ARNULFO GARCIA-RAMOS and
 3    PABLO CASTILLO-OLGUIN:
 4        DAWSON MORTON, ESQUIRE
 5        JIM KNOEPP, ESQUIRE
 6        Dawson Morton, LLC
 7        1808 Sixth Street
 8        Berkeley, CA 94710
 9        dawson@dawsonmorton.com
10        jim@dawsonmorton.com
11        (404) 590-1295
12
13    ON BEHALF OF DEFENDANTS SOUTHERN VALLEY FRUIT &
14    VEGETABLE, INC.; HAMILTON GROWERS, INC.; KENT
15    HAMILTON; HAMILTON PRODUCE, L.P.; KENDA PROPERTIES
16    L.P.; WK HOLDINGS LLC; AND WKW LLC:
17        MARTIN B. HELLER, ESQUIRE
18        DAVID P. LERNER, ESQUIRE
19        Fisher & Phillips LLP
20        1230 Peachtree Street NE
21        Atlanta, GA 30309
22        mheller@fisherphillips.com
23        dlerner@fisherphillips.com
24        (404) 240-4146
25        (404) 240-4143
```

Page 3

1              A P P E A R A N C E S (Cont'd)

2      ALSO PRESENT:

3              Pablo Castillo-Olguin, Plaintiff

4              Chandler Grimes, Southern Valley Representative

5              Timothy Hendrick, Southern Valley Representative

6              Catherine McCabe, Spanish Interpreter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                          I N D E X

2    EXAMINATION:                                    PAGE

3          By Mr. Heller                              10

4          By Mr. Morton                             100

5          By Mr. Heller                             110

6

7                        E X H I B I T S

8    NO.              DESCRIPTION                    PAGE

9    Exhibit 1        Written Responses to Defendants'

10                    First Interrogatories            14

11   Exhibit 2        Hamilton Growers Work Form Signed

12                    by Arnulfo Garcia-Ramos 2018     34

13   Exhibit 3        Hamilton Growers Work Form signed

14                    by Arnulfo Garcia-Ramos 2019     43

15   Exhibit 4        Hamilton Growers Work Form Signed

16                    by Arnulfo Garcia-Ramos 2020     43

17   Exhibit 5        Hamilton Growers Work Form Signed

18                    by Arnulfo Garcia-Ramos 2021     43

19   Exhibit 6        Hamilton Growers Work Form Signed

20                    by Arnulfo Garcia-Ramos 2022     43

21   Exhibit 7        Copy of Spreadsheet Data for

22                    Travel Pay for Mr. Garcia-Ramos

23                    and Mr. Castillo-Olguin (2018-

24                    2020)                            45

25

Page 5

1                    E X H I B I T S (Cont'd)

2    NO.              DESCRIPTION                    PAGE

3    Exhibit 8        Copy of Spreadsheet Data for

4                     Travel Pay for Mr. Garcia-Ramos

5                     and Mr. Castillo-Olguin (2021-

6                     2023)                          45

7    Exhibit 9        Arnulfo Garcia-Ramos Wage

8                     Statement                      77

9    Exhibit 10       Diego Luna Wage Statement      77

10

11              D O C U M E N T S   R E Q U E S T E D

12    NO.              DESCRIPTION                    PAGE

13    1               Facebook Private Messages

14                    Re: Employment                 23

15    2               WhatsApp Messages Re: Employment  24

16    3               Messages with Castillo-Olguin  97

17    4               Messages with Reyes            98

18    5               Messages with A. Villareal     99

19    6               Messages with E Villareal      99

20    7               Messages with Urtado           99

21

22           I N F O R M A T I O N   R E Q U E S T E D

23    NO.              DESCRIPTION                    PAGE

24    1               Name of Spouse/Family Members

25                    in District                    22

Page 6

1                    P R O C E E D I N G S

2                    THE REPORTER:  Good morning.  My name

3        is Jasmine Applewhite; and I'm the reporter assigned

4        by Veritext to take the record of this proceeding.  We

5        are now on the record at 10:01 a.m.

6                         And this is the deposition of Arnulfo

7        Garcia-Ramos taking in the matter of Arnulfo Garcia-

8        Ramos, et al., vs. Southern Valley Fruit & Vegetable,

9        Inc., et al., on Wednesday, April 23, 2025, at

10       125 Clairemont Avenue, Suite 380, Decatur, Georgia

11       30030.

12                         I'm a notary authorized to take

13       acknowledgements and administer oaths here in Georgia.

14       Parties agree that I will swear in the witness.

15                         Additionally, absent an objection on

16       the record before the witness is sworn, all parties

17       and the witness understand and agree that any

18       certified transcript produced from the recording of

19       this proceeding:

20                              - is intended for all uses permitted

21                                   under applicable procedural and

22                                   evidentiary rules and laws in the

23                                   same manner as a deposition recorded

24                                   by stenographic means; and

25                              - shall constitute written stipulation

Page 7

1              of such.

2              At this time, will everyone in

3    attendance, starting with my taking attorneys, please

4    identify yourself for the record.

5              MR. MORTON:  Is it not recorded --

6              MR. HELLER:  I'm Marty Heller, and I am

7    attorney on behalf of the defendants.

8              MR. LERNER:  David Lerner, attorney on

9    behalf of defendant.

10             MR. MORTON:  I'm Dawson Morton.  I'm an

11   attorney for the plaintiffs.

12             MR. KNOEPP:  James Knoepp, attorney for

13   the plaintiffs.

14             MR. MORTON:  Can I --

15             THE REPORTER:  Yes?

16             MR. MORTON:  Is it -- is it not being

17   recorded by stenographic means?

18             THE REPORTER:  It's being recorded.

19   Stenographic usually means I'm taking everything

20   verbatim at this moment, and I'm not.  I'm taking down

21   notes and speaking notes, but everything is being

22   recorded verbatim.

23             MR. HELLER:  It's the difference

24   between -- yeah.

25             MR. MORTON:  Okay.

Page 8

1                    THE REPORTER:  We have two gentlemen in
2      the back.  Can we -- can we have you guys say your
3      names, please?
4                    MR. HENDRICK:  Timothy Hendrick.
5                    MR. GRIMES:  Chandler Grimes.
6                    THE REPORTER:  Thank you very much.
7      And we also have the other plaintiff.
8                    MR. MORTON:  (Speaking in Spanish.)
9                    MR. CASTILLO-OLGUIN:  Pablo
10     Castillo-Olguin.
11                   THE REPORTER:  Thank you very much.
12     Hearing no objections at this time, I will now swear
13     in the witness.
14                   Mr. Garcia-Ramos, please raise your
15     right hand.
16                   Oh, I'm sorry.  I'm going to swear in
17     the interpreter first.  Sorry about that.
18                   Please raise your right hand.
19                   (Interpreter Catherine McCabe sworn to
20                   translate between English and Spanish.)
21                   THE REPORTER:  Thank you very much.  I
22     will now swear in the witness.
23     //
24     //
25     //

Page 9

```
 1    WHEREUPON,
 2                        ARNULFO GARCIA-RAMOS,
 3    called as a witness and having been first duly sworn
 4    to tell the truth, the whole truth, and nothing but
 5    the truth, was examined and testified as follows:
 6                        THE REPORTER:  Thank you very much.
 7                        Counsel, you may now take it away.
 8                        MR. HELLER:  Thank you.
 9                        This will be the deposition of Arnulfo
10    Garcia-Ramos being taken by oral examination pursuant
11    to notice.  It's going to be taken for all purposes
12    permitted by the Federal Rules of Civil Procedure and
13    the Federal Rules of Evidence.
14                        Before we get started, just put on the
15    record that as long as it's okay with you, we'll
16    reserve all objections except as to the form of the
17    question until the time of the deposition's actual
18    use.
19                        MR. MORTON:  Yeah, I would like to do
20    that.
21                        MR. HELLER:  Okay.
22                        MR. MORTON:  And if we can just say now
23    we'd like to reserve the right to read and sign, so we
24    don't forget later.
25                        Should I translate that --
```

1            MR. HELLER:  No, that's okay.

2                      EXAMINATION

3   BY MR. HELLER:

4        Q    Good morning.

5        A    Good morning.

6        Q    My name is Marty Heller.  I'll be taking

7   your deposition today.  Is it okay if I call you

8   Arnulfo?

9        A    Yes.

10       Q    I represent the defendants in this case, and

11  I'm here today to ask you some questions.  Have you

12  ever had your deposition taken before?

13       A    No.

14       Q    Okay.  So there's going to be a few rules

15  that I'll tell you about right now that'll help make

16  the day go by a little quicker.

17            We have a court reporter here who's taking

18  down and recording everything you're saying.  We do

19  not have a video.  And so there are certain answers

20  that we naturally tend to say, like "uh-huh" or "nuh-

21  uh" or shaking our head that can't be taken down on a

22  recording.  So if I ask a question, if you can try to

23  give a verbal response of yes or no.  Does that sound

24  okay?

25       A    Yes.

1      Q    Thank you.  I'm going to ask you a lot of

2    questions today, but I'll try not to take up too much

3    of your time.  One thing that can happen because we're

4    speaking in different languages today is it's possible

5    you might not understand my question.  If you don't

6    understand something I ask, can you make sure to tell

7    me that you don't understand, so I can rephrase the

8    question?

9      A    Okay.

10     Q    And is it fair that if you do answer a

11   question that I can assume that you did understand the

12   question that you were being asked?

13     A    Yes.

14     Q    At some point you may want to take a break,

15   whether it's to get a drink or go to the bathroom.  If

16   you need a break, we can stop at any time.  This is

17   not intended to be torture by any means.  But if you

18   can just answer any question that's pending before we

19   take a break, and then we'll take a break.  Does that

20   sound fair?

21     A    Okay.

22     Q    Okay.  There will be times today when your

23   counsel may pose an objection to my question, but

24   under the Rules of Civil Procedure, you still have to

25   answer unless you're directed not to answer.  Do you

Page 12

```
 1    understand that?
 2                    MR. MORTON:  I think if there's an
 3    objection, we can just resolve that issue at that
 4    time.
 5                    MR. HELLER:  It's fine.
 6                    THE INTERPRETER (FOR THE WITNESS):
 7    Okay.
 8                    MR. HELLER:  And just for purposes of
 9    the record, I'm not going to have a concern if you
10    raise form objections.  My point is just that if there
11    are form objections, that's fine, but he still answers
12    the question.
13                    THE INTERPRETER (FOR THE WITNESS):
14    Yes.
15    BY MR. HELLER:
16         Q    Are you on any medications today?
17         A    No.
18         Q    Okay.  Do you have any physical, emotional,
19    or personal problems that might interfere with your
20    ability to answer questions truthfully?
21         A    No.
22         Q    Okay.  Are you aware of any issues you may
23    have with your memory that might impact your ability
24    to answer questions truthfully?
25         A    Well, certain times I don't remember things.
```

Page 13

1          Q    Have you ever been diagnosed with any

2     problems with your memory?

3          A    No.

4          Q    Okay.  Do you believe the memory issues that

5     you may have would impact your ability to testify

6     truthfully?

7                    MR. MORTON:  Objection,

8     mischaracterizes.

9                    MR. HELLER:  Just to form.  You don't

10    have to say the basis of the form.

11                   MR. MORTON:  Yeah.

12                   THE INTERPRETER (FOR THE WITNESS):  No,

13    it doesn't affect me.

14    BY MR. HELLER:

15         Q    Okay.  And you do understand you're under

16    oath today?

17                   MR. MORTON:  Objection.

18                   THE INTERPRETER (FOR THE WITNESS):

19    Yes, I'm aware of that.

20    BY MR. HELLER:

21         Q    I'm going to show you a document that's

22    going to be in English, but I'm going to mark it as

23    Exhibit A.  And, actually, I'm going to mark it

24    Exhibit Uno, 1.

25    //

Page 14

```
 1                    (Exhibit 1 was marked for
 2                    identification.)
 3            All right.  I will represent to you that
 4     although this document is in English, this is your
 5     written responses to our interrogatories that we
 6     submitted to your counsel and your counsel's
 7     responses.
 8          A    Yes.
 9                    MR. HELLER:  Can we stipulate for the
10     record that these are his written interrogatory
11     responses?
12                    MR. MORTON:  Yes.  And I would just add
13     that, I mean, he gave them to us in Spanish.
14                    MR. HELLER:  I figured, and that part
15     of the -- I don't have the Spanish one, so ...
16                    MR. MORTON:  Okay.  And I'm willing to
17     stipulate he gave his counsel answers in Spanish,
18     right, which his counsel wrote into the English
19     responses.
20                    MR. HELLER:  That's fine.
21                    MR. MORTON:  Yeah.
22                    MR. HELLER:  I just want to make sure
23     we have in the record that --
24                    MR. MORTON:  Right.  We don't disagree
25     that these are his responses.
```

Page 15

```
 1                    MR. HELLER:  Yeah.
 2      BY MR. HELLER:
 3           Q    Okay.  Can you state your full name for the
 4      record?
 5           A    Arnulfo Garcia-Ramos.
 6           Q    What is your date of birth?
 7           A    The 13th of November of 1986.
 8           Q    Have you ever gone by any names other than
 9      Arnulfo Garcia-Ramos?
10           A    Yes.
11           Q    Okay.  And what other names have you gone
12      by?
13           A    My other name is Diego Luna.
14           Q    Okay.  And when did you first --
15                    MR. MORTON:  I think I would just -- on
16      the translation, I think he said, "The other name is
17      Diego Luna."
18                    THE INTERPRETER (FOR THE WITNESS):
19      Yes.
20      BY MR. HELLER:
21           Q    Okay.  When did you first go by or use the
22      name Diego Luna?
23                    MR. MORTON:  Objection.
24                    THE INTERPRETER (FOR THE WITNESS):  I
25      don't have the date real well.
```

```
 1    BY MR. HELLER:
 2         Q    Okay.  Do you have a rough idea of the first
 3    date you might have gone by or used the name Diego
 4    Luna?
 5                   MR. MORTON:  And objection --
 6    objection.
 7                   THE INTERPRETER (FOR THE WITNESS):  I
 8    think the first time I used it was like in 2016.
 9    That's an approximate date.  That's not exact.
10    BY MR. HELLER:
11         Q    Okay.  Aside from Anulfo Garcia-Ramos and
12    Diego Luna, have you ever gone by or been known by any
13    other names?
14                   MR. MORTON:  Objection.
15                   THE INTERPRETER (FOR THE WITNESS):  No.
16    BY MR. HELLER:
17         Q    All right.  Can you state your current
18    address?
19                   MR. MORTON:  And objection.  I'm going
20    to ask the client not to answer.
21                   Marty, we have -- we have real concerns
22    about retaliation in this case.  We have current and
23    actual concerns about it.  There's representatives
24    from the employer here.  We're extremely concerned
25    about the employer's desire to interfere with the
```

Page 17

1    plaintiffs.

2                    If counsel needs some kind of sealed

3    information, we're willing to provide that.  We do not

4    want the plaintiff testifying to his present address

5    because of actual and real concerns about the

6    defendants' actions against plaintiffs.

7                    MR. HELLER:  Okay.  Let's go off the

8    record for a minute.

9                    You two mind walking outside for just

10   two seconds?

11                    THE REPORTER:  We are now off the

12   record at 10:16 a.m.

13                    (Off the record.)

14                    THE REPORTER:  We are now back on the

15   record at 10:21 a.m.

16   BY MR. HELLER:

17        Q    All right.  For the limited purposes of our

18   current agreement on a stipulation, I will not ask you

19   about your current address.

20        A    Perfect.

21        Q    Okay.  But I am going to ask you, are you

22   currently working in the United States?

23        A    Yes.

24        Q    Okay.  And are you in the United States

25   pursuant to an H-2A Visa?

Page 18

```
 1              MR. MORTON:  And I'm going to object
 2      and instruct him not to answer on this, because I
 3      think it can be used for purposes of retaliation.
 4              MR. HELLER:  Okay.  I think I know why
 5      you're objecting to that, so I will withdraw the
 6      question momentarily, and we can discuss at a break.
 7              MR. MORTON:  Okay.
 8      BY MR. HELLER:
 9         Q    All right.  At your current job in the
10      United States, are you working for an agricultural
11      employer?
12              MR. MORTON:  And I'm going to --
13              (Speaking in Spanish.)
14              THE INTERPRETER (FOR THE WITNESS):  I'm
15      not going to answer.
16              MR. MORTON:  I'm --
17      BY MR. HELLER:
18         Q    It's not an option.
19              MR. MORTON:  I'm going to just instruct
20      him to not give the name of his current employer.
21              MR. HELLER:  That's fine.
22              MR. MORTON:  And then he can answer.
23              MR. HELLER:  Absolutely.
24              MR. MORTON:  Okay.  Maybe I
25      should -- I'll say it in English, so that you can
```

Page 19

```
 1    translate.
 2                 Okay.  So as your counsel, I'm
 3    instructing you that we have an agreement with defense
 4    counsel that we're not going to give the name of your
 5    current employer, but you can -- but you can answer
 6    the question in a way that does not give the name of
 7    your current employer.
 8                      THE INTERPRETER (FOR THE WITNESS):  I
 9    can't answer.
10    BY MR. HELLER:
11        Q    That's -- so I'm going to ask the question
12    again.
13                 Does your current job involve working for an
14    agricultural employer?
15        A    No.
16        Q    Okay.  Does your current job involve driving
17    a forklift?
18        A    Can I say something to him?
19        Q    Not in the middle of a question.  You can
20    answer the question, and then we can go off the
21    record.
22                      MR. MORTON:  And I'll just say to the
23    plaintiff that you can answer the question without
24    giving the name of your current -- if you can do it.
25    //
```

Page 20

```
 1                    THE INTERPRETER (FOR THE WITNESS):
 2     Well, I'm going to answer that we came to talk about
 3     that, but not about my personal life.
 4                    MR. HELLER:  Okay.  Let's go off the
 5     record.  You can get the judge on the --
 6                    THE REPORTER:  We are now off the
 7     record at 10:25 a.m.
 8                    (Off the record.)
 9                    THE REPORTER:  We are now back on the
10     record at 10:30 a.m.
11                    MR. HELLER:  Thank you.
12     BY MR. HELLER:
13         Q    All right.  We are back on the record.  So
14     my question for you when we left was, does your job
15     currently involve you driving a forklift?
16         A    Yes, I drive a forklift.
17         Q    Okay.  And are you currently paid overtime
18     when you work over 40 hours in a workweek?
19         A    Yes.
20         Q    Okay.  All right.  When was the last time
21     you -- well, strike that.
22              Do you have a home address in Mexico?
23         A    Yes.
24         Q    Okay.  And is that home address accurately
25     represented in Exhibit 1 as ...
```

Page 21

1                    MR. MORTON:  And I just state for the
2    record that Exhibit 1 is in English.
3                    MR. HELLER:  Yeah, I know.  So I'll
4    just ask the question a different way.
5    BY MR. HELLER:
6        Q    Can you tell me your current home address in
7    Mexico?
8        A    Yes, that's fine.  I'll tell you.  It's
9    right here.
10       Q    And can you say it out loud for the record?
11                   MR. MORTON:  And let the record reflect
12   the witness is --
13                   MR. HELLER:  Yeah.
14                   MR. MORTON:  -- pointing to second page
15   of Exhibit 1.
16                   THE INTERPRETER (FOR THE WITNESS):
17   Terrerito, San Martin Chalchicuautla, San Luis Potosi.
18   BY MR. HELLER:
19       Q    Thank you.  When was the last time you were
20   at your home?
21       A    The last -- the last time I was there was in
22   2023.
23       Q    Okay.  Thank you.  Are you married?
24       A    Yes.
25       Q    Do you have any children?

Page 22

1         A     Yes.

2         Q     How long have you been married?

3         A     I just got married, it's been a year, but

4    with the relationship five years.

5                     MR. HELLER:  Okay.  All right.  For

6    purposes of the deposition transcript, can we

7    stipulate that you'll provide the name of a spouse and

8    any children if they're above the age of 21, just so

9    we can make sure if they are in Georgia they're not

10   included in any potential jury pool or anything like

11   that?

12                    MR. MORTON:  Yes.

13                    MR. HELLER:  Or confirm that they

14   couldn't be, whatever it may be.

15                    MR. MORTON:  We can also stipulate

16   there's no children over 21.

17                    MR. HELLER:  Okay.  Perfect.

18                    THE INTERPRETER:  Do you want me to

19   translate all that?

20                    MR. HELLER:  You could tell him we're

21   agreeing to stipulate that they may provide me

22   information for your spouse or any family members that

23   could be potential jury members, just so we make sure

24   they're not on a jury.  And if there are no potential

25   jury members within the district, they'll tell me.

Page 23

```
 1              MR. MORTON:  And I'll just say for the
 2    record, because it would be unfair to defense counsel
 3    to not know if somebody was a relative in the jury
 4    pool.
 5    BY MR. HELLER:
 6         Q    All right.  Do you have any social media
 7    like Facebook or Instagram?
 8         A    I have Facebook.
 9         Q    Okay.  Have you posted anything or
10    communicated with anyone via Facebook about this case?
11         A    No.
12         Q    Have you posted anything on Facebook or
13    communicated with anyone on Facebook about your
14    employment with any of the defendants?
15         A    I haven't put anything.  I haven't posted
16    anything.
17         Q    Okay.  And no private messages?
18         A    Well, yes, I do have private messages.
19         Q    Okay.  Can we agree that if you have any
20    private messages related to your employment that
21    you'll provide them to your counsel for production?
22         A    Yes.  It's with the same coworkers that
23    we're with.
24         Q    Okay.  And you can agree to provide that to
25    your counsel?
```

1        A    Yes, I can give it to him.

2        Q    Okay.  All right.  Do you have any text

3    messages or WhatsApp messages related to this lawsuit?

4                    MR. HELLER:  And I know it's an

5    overbroad.

6                    THE INTERPRETER (FOR THE WITNESS):

7    It's that there are several of us coworkers who are in

8    this, and we have chatted.

9    BY MR. HELLER:

10       Q    Okay.  So can we state for the record that

11   any WhatsApp messages you have related to your

12   employment with defendants or this lawsuit will be

13   provided to your counsel for production?

14                   MR. MORTON:  I'll just say for the

15   record that there are messages that would be subject

16   to claims of privilege.

17                   MR. HELLER:  And ...

18                   THE INTERPRETER (FOR THE WITNESS):

19   Yes.

20                   MR. HELLER:  Okay.  And we can deal

21   with that separately.  I just want to make sure you

22   have whatever messages he has.  And then if you're

23   claiming some are privileged, we can discuss the

24   privilege claim.

25   //

Page 25

1    BY MR. HELLER:

2        Q    All right.  Have you ever been party to any

3    lawsuit other than the current lawsuit that you're

4    filed against the defendants?

5        A    No, I didn't participate.

6        Q    Okay.  Have you ever received a payment or

7    settlement payment as a result of a previous lawsuit

8    against Hamilton Growers, Southern Valley, or any of

9    the defendants?

10                    MR. MORTON:  Objection.

11                    THE INTERPRETER (FOR THE WITNESS):  You

12   mean now?

13   BY MR. HELLER:

14       Q    No, at any time.

15       A    Well, yes, I did receive.

16       Q    Okay.  So can you tell me what your

17   understanding of what you received payment for?

18       A    Well, it was just that we received some

19   paperwork, and that's what they sent to us.

20       Q    Okay.  And it was related to a different

21   lawsuit?

22                    MR. MORTON:  Objection.

23                    THE INTERPRETER (FOR THE WITNESS):  No,

24   the paperwork said that it was Southern Valley.

25   //

Page 26

 1    BY MR. HELLER:

 2         Q    Okay.  I don't think we're maybe talking

 3    about the same thing, or you're not understanding the

 4    question.

 5              Did you receive payment, a settlement

 6    payment as a result of a previous lawsuit filed

 7    against some or all of the defendants in this matter?

 8                        MR. MORTON:  Objection.

 9                        THE INTERPRETER:  I'm sorry.  Because

10    he said objection --

11                        MR. MORTON:  I'll wait until next time.

12                        THE INTERPRETER:  No, no.  I'm sorry,

13    no.

14    BY MR. HELLER:

15         Q    Did you receive a settlement payment or a

16    payment as a result of a previous lawsuit filed

17    against one or more of the defendants in this matter?

18                        MR. MORTON:  Objection.

19                        THE INTERPRETER (FOR THE WITNESS):

20    Yes.  Yes, I did receive.

21    BY MR. HELLER:

22         Q    Okay.  And are you aware that as a result of

23    receiving a previous payment, you released some claims

24    in return for receiving the payment?

25                        MR. MORTON:  Objection.

Page 27

```
 1              THE INTERPRETER (FOR THE WITNESS):
 2    Well, it was just that I received -- and I received it
 3    from them, and they said that I could receive it.
 4    BY MR. HELLER:
 5        Q    Okay.  And would you agree with me that the
 6    most accurate reflection of any release or waiver you
 7    may have as a result of a previous settlement would be
 8    the records from that matter?
 9              MR. MORTON:  Objection.
10              THE INTERPRETER (FOR THE WITNESS):  If
11    you wouldn't mind asking the question again clearly.
12              MR. MORTON:  Marty, just -- I mean,
13    we're deposing someone who drove a forklift, and we're
14    now asking about legal releases.  I don't think we're
15    going to argue with you about --
16              MR. HELLER:  Well, then --
17              MR. MORTON:  -- this subject matter.
18              MR. HELLER:  Okay.  So can we stipulate
19    for the record without having to ask further
20    questions, that to the extent he participated in any
21    previous settlement that had a waiver or release, that
22    that waiver or release is effective as stated in the
23    agreement?
24              MR. MORTON:  From a prior court case.
25              MR. HELLER:  Correct.
```

```
 1              MR. MORTON:  Yeah.  Yeah.
 2              MR. HELLER:  I believe he was a
 3   participant in one of the previous matters that we
 4   resolved in 2020, and he received payment.  And so I
 5   want on the record to the extent he did receive a
 6   payment that he's subject to any release that's in
 7   that.
 8              MR. MORTON:  We're not going to argue
 9   with you about the terms of any prior settlement.  So
10   we'll stipulate to any prior settlement.
11              MR. HELLER:  Okay.
12              MR. MORTON:  I think we might dispute
13   with you about the dates.  Well, I mean not what's
14   shown in the court records, but your recollection of
15   the dates and mine might be different.
16              MR. HELLER:  Understood, but that would
17   be in the records.
18   BY MR. HELLER:
19        Q    Okay.  All right.  Have you ever filed a
20   formal complaint with the U.S. Department of Labor?
21        A    No.
22        Q    Okay.  Have you ever filed for bankruptcy?
23        A    No.
24        Q    What did you do to prepare for today's
25   deposition?
```

```
                                              Page 29
  1        A    Well, to be honest, we aren't very

  2    evaluated, we aren't very prepared, but I did have

  3    counsel.

  4        Q    Okay.  Did you review any documents prior to

  5    today's deposition in preparation for the deposition?

  6        A    No, I didn't review anything.

  7        Q    Okay.  All right.  Don't tell me about any

  8    communications you had with your attorney.  I'm not

  9    asking about those.  Did you talk with anyone in

 10    preparation for today's deposition aside from your

 11    counsel?

 12        A    No.

 13        Q    Okay.  Did you tell anyone that you were

 14    being deposed today, other than your counsel?

 15        A    No, no one.

 16        Q    Okay.  All right.  Let's talk about your

 17    employment with Hamilton Growers.

 18        A    All right.

 19        Q    All right.  Who did you consider to be your

 20    employer during the time period of 2018 to 2023?

 21                   MR. MORTON:  Objection.

 22                   MR. HELLER:  What's that objection?

 23                   MR. MORTON:  Calls for a legal

 24    conclusion.

 25                   MR. HELLER:  No, it doesn't.  I have
```

```
                                                        Page 30
 1    every right to ask -- that's not a valid form
 2    objection.
 3                     Continue.  You can answer the question.
 4                     MR. MORTON:  Maintain the objection.
 5                     MR. HELLER:  That's fine.
 6                     THE INTERPRETER (FOR THE WITNESS):  Who
 7    was my supervisor?
 8    BY MR. HELLER:
 9         Q    No, who was your employer?  What company was
10    your employer?
11                     MR. MORTON:  Objection.
12                     THE INTERPRETER (FOR THE WITNESS):  Oh,
13    the company.
14    BY MR. HELLER:
15         Q    Huh?
16         A    Oh, the company.
17         Q    Yes.
18         A    Hamilton.  Hamilton, Southern Valley.
19         Q    Okay.  Do you have any idea who Kenda
20    Properties is?
21         A    Kendra?
22         Q    Kenda.
23         A    No, I honestly don't know.
24         Q    Do you have any idea who WK Holdings is?
25         A    No, not them, either.
```

```
                                                    Page 31
 1                  MR. MORTON:  I want to caution the
 2      witness just to wait for the translation.
 3                  THE INTERPRETER (FOR THE WITNESS):
 4      Okay.  Yes.
 5      BY MR. HELLER:
 6          Q    I should have said that in my instructions.
 7               All right.  When do you recall first working
 8      for Hamilton Growers?
 9                  MR. MORTON:  Objection.
10                  THE INTERPRETER (FOR THE WITNESS):
11      What I remember is 2009.
12      BY MR. HELLER:
13          Q    Okay.  How did you first learn about an
14      employment opportunity to work for Hamilton Growers?
15                  MR. MORTON:  Objection.
16                  THE INTERPRETER (FOR THE WITNESS):
17      Honestly, I found out about it through a family
18      member.
19      BY MR. HELLER:
20          Q    Okay.  And do you remember who that was?
21          A    Yes, I do remember.
22          Q    Okay.  And who was that?
23          A    It's a nephew whose name is -- a nephew.
24          Q    Did this nephew work for Hamilton Growers?
25          A    He worked.
```

Page 32

1          Q    Is that a yes?

2          A    The nephew worked.  He doesn't work there.

3          Q    He previously worked for Hamilton Growers

4    but no longer works for them?

5                    MR. MORTON:  Objection.

6                    THE INTERPRETER (FOR THE WITNESS):

7    Yes.

8                    MR. HELLER:  Okay.  And state for the

9    record, I assume your objection is that I'm saying

10   Hamilton Growers, and you're taking the position that

11   it's joint employment here?

12                   MR. MORTON:  That's right.

13                   MR. HELLER:  And can we just say that

14   we accept that as your continuing objection to my use

15   of Hamilton Growers --

16                   MR. MORTON:  Yes.

17                   MR. HELLER:  -- and avoid that

18   objection moving forward?

19                   MR. MORTON:  Yes.  We can -- we can

20   just have a standing objection.

21                   MR. HELLER:  I accept that standing

22   objection, and we can continue.

23   BY MR. HELLER:

24         Q    All right.  When you worked for Hamilton

25   Growers, did you work through the H-2A Visa Program?

Page 33

1          A     Yes, through the H-2A Visa.

2          Q     Okay.  And how did you first learn about the

3     H-2A Visa Program?

4          A     Well, it was through my nephew who

5     recommended me.

6          Q     Okay.  All right.  In 2018, which is the

7     first year relevant to the lawsuit you filed, did you

8     work at Hamilton Growers pursuant to the H-2A Visa

9     Program?

10          A     Yes, I was.

11          Q     Okay.  Were you aware at the time of 2018

12     that you would be working for Hamilton Growers

13     pursuant to the H-2A Visa Program, but that you would

14     not be paid overtime for hours worked over 40?

15          A     That if I knew that?  No.

16          Q     Well, you worked there in 2017; right?

17                    MR. MORTON:  Objection.

18                    MR. HELLER:  I understand.  That's

19     fine.

20                    THE INTERPRETER (FOR THE WITNESS):

21     Yes, I did work in 2017.

22     BY MR. HELLER:

23          Q     Okay.  To the best of your knowledge, were

24     you ever paid overtime for working over 40 hours in a

25     workweek in 2017?

Page 34

1          A     No.

2          Q     Okay.  So what is your understanding, your

3     personal understanding as to why you were not paid

4     overtime?

5                     MR. MORTON:  Objection.

6                     THE INTERPRETER (FOR THE WITNESS):

7     Well, no, I mean, I didn't know real well, because I'm

8     not real informed about the laws.

9     BY MR. HELLER:

10         Q     Okay.  That's fair.  Did you ever read the

11    job order that was provided to you, the job contract

12    that was provided to you as part of your employment

13    from 2018 to 2023?

14                    MR. MORTON:  Objection.

15                    THE INTERPRETER (FOR THE WITNESS):

16    That if we read the sheets?  Well, yes, we read them.

17                    MR. HELLER:  Okay.  And why don't you

18    hand me 18?  I am going to mark this as Exhibit 2.

19                    (Exhibit 2 was marked for

20                    identification.)

21    BY MR. HELLER:

22         Q     Do you recognize these documents?

23         A     Well, yes, I remember, more or less.

24         Q     Okay.  And when would you have been provided

25    with these documents?

Page 35

```
1        A    Well, they never gave them to us.  We just
2    filled them out.
3        Q    I'm not sure I understand that.  How did you
4    fill them out if they didn't give them to you?
5                    MR. MORTON:  Objection.
6                    THE INTERPRETER (FOR THE WITNESS):
7    Well, they just gave them to us for us to fill out,
8    but they never handed them over to us.
9    BY MR. HELLER:
10       Q    So you didn't get to keep a copy?
11       A    No.
12       Q    When did you fill these out?  When do you
13   recall receiving these in order to complete them?
14                   MR. MORTON:  Objection.
15                   THE INTERPRETER (FOR THE WITNESS):
16   They give us this sheet every time we arrive from
17   Mexico.
18   BY MR. HELLER:
19       Q    Okay.  so you would've received it at
20   Hamilton Growers at the farm?
21       A    Over there at the office, at their offices.
22       Q    Okay.  So let's sort of walk through the
23   steps of coming from Mexico to Hamilton Growers.
24       A    Okay.
25       Q    Okay.  Did you -- prior to each season, did
```

Page 36

1    you go home to Mexico?

2        A    No.

3        Q    Okay.  So I guess let's ask it this way.  In

4    March of 2018, at the beginning of the work contract,

5    were you already in Georgia?

6        A    Yes, I was already.

7        Q    Okay.  And where were you living at that

8    time?

9        A    Well, over there at the warehouse, next to

10   the warehouse.

11               MR. MORTON:  And I would just add he

12   added Norman Park.

13               THE INTERPRETER:  Okay.  Thank you.

14   BY MR. HELLER:

15       Q    Do you know your address you lived at during

16   that time?

17       A    I don't remember the address, but I know

18   where it is.

19       Q    Okay.  Do you know the street it was off of?

20       A    No, I don't remember what the street name

21   is.

22       Q    Do you remember any nickname for it?

23       A    It was called the Red Field --

24       Q    Red Camp?

25       A    -- Campo Rojo.

```
                                                    Page 37

 1                  MR. MORTON:  And I would say for the

 2      record, it might be translated as Red Camp.

 3                  THE INTERPRETER:  Okay.  Thank you.

 4      BY MR. HELLER:

 5          Q    All right.  Did you live at the Red Camp,

 6      Campo Rojo, for the entire time you were employed by

 7      Hamilton Growers?

 8          A    Yes.

 9          Q    Okay.

10                  MR. MORTON:  Marty, do you mind if we

11      open the door?

12                  MR. HELLER:  Oh, yeah.  Go ahead.

13                  MR. MORTON:  Just for air circulation.

14                  MR. HELLER:  Not a problem.  This is

15      not super confidential.

16      BY MR. HELLER:

17          Q    All right.  Do you have any personal

18      knowledge about how Hamilton Growers or Southern

19      Valley or any other defendant applied for workers

20      through the H-2A Visa Program?

21          A    You mean to hire us?

22          Q    Yeah.  Do you have -- do you have any

23      personal knowledge of their applications to use the H-

24      2A program?

25                  MR. MORTON:  Objection.
```

```
                                               Page 38
 1                    THE INTERPRETER (FOR THE WITNESS):  No,
 2      just that they would make a list for us to be in
 3      Monterrey -- Monterrey, to go.
 4      BY MR. HELLER:
 5           Q    Okay.  How did you get to Monterrey prior to
 6      coming to Hamilton Growers each year?  Actually,
 7      strike that.
 8                    Did you go to Monterrey to the consulate
 9      prior to coming to Hamilton Growers each March?
10                    MR. MORTON:  Marty, can we just state
11      for the record that we're talking about Monterrey,
12      Mexico?
13                    MR. HELLER:  Sure.
14                    THE INTERPRETER (FOR THE WITNESS):  No.
15      From 2018 on, it wasn't for us to go to the consulate
16      in Monterrey.
17      BY MR. HELLER:
18           Q    Okay.  So you never went back to the
19      consulate in Monterrey from 2018 to 2023?
20                    MR. MORTON:  Objection.
21                    MR. HELLER:  That's fine.
22                    THE INTERPRETER (FOR THE WITNESS:  I
23      would go back to Mexico, but we didn't have to go to
24      the consulate.
25      //
```

Page 39

1    BY MR. HELLER:

2         Q    Okay.  Did you have to do anything, did you

3    have to participate in any process as part of the H-2A

4    Visa process in Mexico before coming to Hamilton

5    Growers each year?

6         A    Yes.  For the Visa, there was a process of

7    five days.

8         Q    Okay.  Can you tell me about that process?

9    What did you have to do?

10        A    To arrive in Monterrey, hand over -- hand

11   over the paperwork, like the passport, and they take

12   it over to the consulate.  And then the consulate says

13   who can go and who already has the Visa approved.

14        Q    Okay.  And did that always take five days?

15        A    Six days, seven days.

16        Q    Okay.  Where did you stay during that time?

17        A    In Monterrey, waiting.

18        Q    In a hotel?

19        A    A hotel.

20        Q    Did you ever stay with friends?

21        A    I don't remember real well.

22        Q    Okay.  If you stayed in a hotel, how would

23   you have paid for it?

24        A    Well, with my savings.

25        Q    Did you use cash?

Page 40

1          A      Yes, cash.

2          Q      Do you have any receipts showing you stayed

3    in a hotel in Monterrey during the Visa process?

4          A      Receipts?  No, they don't give out many

5    receipts in Mexico.

6          Q      Okay.  And you're not sure where you

7    would've stayed each year?

8                      MR. MORTON:  Objection.  Objection.

9    BY MR. HELLER:

10         Q      And I'm asking about the timeframe of 2018

11   to 2023.

12         A      I don't remember real well the hotels.

13         Q      Okay.  And you don't remember whether or not

14   you stayed with friends?

15                     MR. MORTON:  Objection.

16                     THE INTERPRETER (FOR THE WITNESS):  No.

17   BY MR. HELLER:

18         Q      Okay.  After the five to six to seven days

19   you spent in Monterrey, what happened next?

20         A      They will give us the Visa and then that

21   same day come here.

22         Q      And how did you come to Georgia from

23   Monterrey?

24         A      Either a private car, or we would pay for a

25   van.

```
                                         Page 41
 1        Q    Was there a bus available that was provided
 2   by Hamilton Growers?
 3        A    Yes, there was.
 4        Q    And you chose not to take that bus?
 5             MR. MORTON:  Objection.
 6             THE INTERPRETER (FOR THE WITNESS):
 7   Yes, I opted to not travel there.
 8   BY MR. HELLER:
 9        Q    Because you preferred taking a van or a car?
10        A    You mean why?
11        Q    No, just that it was -- I guess let me re-
12   ask the question.  You didn't take the bus because it
13   was your preference to take a private van or a car; is
14   that correct?
15             MR. MORTON:  Objection.
16             THE INTERPRETER (FOR THE WITNESS):  The
17   buses were full.
18   BY MR. HELLER:
19        Q    Okay.  But you had the opportunity to take
20   the bus; is that correct?
21             MR. MORTON:  Objection.
22             THE INTERPRETER (FOR THE WITNESS):  We
23   had the opportunity, but the buses, well, they weren't
24   in good condition.
25   //
```

```
                                                Page 42
 1    BY MR. HELLER:
 2         Q     Okay.  So I'm going to re-ask the question,
 3    because I think you said something different than what
 4    the real answer is.
 5                   MR. MORTON:  Objection.
 6    BY MR. HELLER:
 7         Q     You took --
 8                   MR. HELLER:  It's not even a question
 9    to object.
10                   MR. MORTON:  Okay.  But you're arguing
11    with the witness.
12                   MR. HELLER:  That's -- okay.  It's not
13    a form objection.
14    BY MR. HELLER:
15         Q     It was your preference to take the van or a
16    car versus taking the boss; correct?
17                   MR. MORTON:  Objection.
18                   THE INTERPRETER (FOR THE WITNESS):
19    Yes.  How can I explain it to you?  Yes, it was the
20    preference -- was the preference because -- to go in
21    that, because either the buses were full or not in
22    good and condition, so it really wasn't a preference.
23                   MR. HELLER:  Okay.  All right.  I'm
24    just going to -- will you get me C through F?
25                   MR. MORTON:  I'm going to ask him if he
```

Page 43

1    wants a water.  Do you want one?

2                    MR. HELLER:  I've got one.  You want a

3    break?  Off the record?

4                    THE INTERPRETER (FOR THE WITNESS):

5    Yes.

6                    THE REPORTER:  We are now off the

7    record at 11:10 a.m.

8                    (Off the record.)

9                    THE REPORTER: We are now back on the

10   record at 11:16 a.m.

11                   Counsel, you may proceed.

12                   MR. HELLER:  All right.

13   BY MR. HELLER:

14       Q    I'm going to hand you documents that I have

15   marked as Exhibits 3, 4, 5, and 6.

16                   (Exhibit 3 through Exhibit 6 were

17                   marked for identification.)

18           Do you recognize these documents?

19       A    Yes.  Yes, I do recognize them.

20       Q    Okay.  And did you sign and complete the

21   documents that are marked as Exhibit 3, 4, 5, and 6,

22   where it appears that you signed or wrote your name?

23       A    Yes, yes.

24       Q    Okay.  And you were provided with these

25   documents in the years 2019, 2020, 2021, and 2022, to

Page 44

1    the best of your recollection?

2                    MR. MORTON:  Objection.

3                    THE INTERPRETER (FOR THE WITNESS):  The

4    same as a while ago.  We filled them out, but they

5    never handed them over to us.

6    BY MR. HELLER:

7         Q    So you did receive them to complete them, in

8    order to fill them out, but they didn't give you a

9    copy; is that correct?

10                    MR. MORTON:  Objection.

11                    THE INTERPRETER (FOR THE WITNESS):

12   That's right.

13   BY MR. HELLER:

14        Q    But to the best of your knowledge, those

15   appeared to be the documents you completed each year?

16        A    Yes.  They were the ones that they would

17   give us every year.  Yes, yes.

18                    MR. HELLER:  All right.  Will you give

19   me the spreadsheet that has just travel pay?

20                    All right.  For purposes of using this,

21   I'll represent to Dawson and Jim that this spreadsheet

22   shows the columns that we could fit.  It doesn't show

23   all columns of a spreadsheet that has been produced in

24   this matter, just in case you have questions.  It is

25   certainly not the exact same as a workbook in Excel,

Page 45

1    but we're going to use this document, and we're going

2    to mark it as exhibit --

3                    MR. MORTON:  Okay.  I mean, if we're

4    asking the witness to testify to a document --

5                    MR. HELLER:  I'm not going to ask him

6    whether this document is his document.

7                    Why don't I make these two separate

8    ones?  What number are we on?

9                    THE REPORTER:  7.

10                    MR. KNOEPP:  7.

11                    MR. HELLER:  This is 7?

12                    MR. KNOEPP:  So make that one 8.

13                    THE REPORTER:  7 and 8.

14                    (Exhibit 7 and Exhibit 8 were marked

15                    for identification.)

16                    MR. KNOEPP:  The second one would be 8.

17    Sorry.

18                    MR. MORTON:  All right.  Second one is

19    8?  Okay.

20    BY MR. HELLER:

21        Q    Going to hand you documents I've marked as

22    Exhibit 7 and 8.

23                    MR. MORTON:  I'll just state for the

24    record, we object to asking the witness about a

25    document he hasn't previously seen.

                                                    Page 46

 1              MR. HELLER:  That's fine.  You can make
 2     that objection.  I will ask him that question on the
 3     record.
 4     BY MR. HELLER:
 5          Q    Have you ever seen this document before?
 6          A    This document?  No, I haven't seen it.
 7          Q    Okay.  And that's okay.  I didn't expect
 8     that you would have.
 9               For the year -- well, strike that.
10               Do you understand that part of your lawsuit
11     alleges that you were not reimbursed for what I will
12     call your travel expenses, but that could include
13     costs of staying in Monterrey, traveling to the United
14     States, and your subsistence costs for each year?
15          A    Yes.
16          Q    Okay.  So I'm going to ask you about the
17     year 2018.  And specifically when I say "travel
18     costs," I'm referring to all of those things we just
19     discussed:  the cost of staying in Monterrey, the cost
20     of traveling from Monterrey to Georgia, your
21     subsistence costs, and any other travel that you are
22     claiming you were not paid but are entitled to as part
23     of the lawsuit.  Is it okay if I call that "travel
24     costs"?
25          A    Yes, that's fine.

Page 47

```
 1          Q    Okay.  Do you know what your travel costs
 2     were for 2018?
 3          A    If I knew?
 4          Q    Do you know?
 5          A    If I know the cost?
 6          Q    Do you know the exact cost for your travel
 7     costs as we just defined it for the year 2018?
 8          A    Yes, more or less I know.
 9          Q    Okay.  What is -- what were your travel
10     costs for 2018?  What was the total amount?
11          A    Here to Monterrey, from when arriving in
12     Monterrey?
13          Q    No, from Monterrey -- from wherever you
14     began, whether at your home or in Monterrey, to the
15     United States of America.
16          A    Yes, yes.  I know, more or less.
17          Q    Okay.  So tell me, for the year 2018, what
18     was your travel costs?
19          A    It was like $300.
20          Q    Tell me how you calculate that.
21          A    Because we rented the van, and that's what
22     you spend on gasoline to get here.
23          Q    Okay.  How much was the van?
24          A    Well, there were several of us.
25          Q    Okay.  So how -- that doesn't answer my
```

Page 48

1    question.  How much was the van?

2         A    And we were all charged 300 to 350.

3         Q    Okay.  Do you have a receipt for that?

4         A    No, no.  No receipt.

5         Q    Do you have any record whatsoever that

6    indicates the cost you paid for your travel costs for

7    the year 2018?

8                   MR. MORTON:  And I just want to object

9    to the translation real quick that it said -- he said

10   they don't give receipts, which did not get

11   translated.

12                  MR. HELLER:  Okay.

13                  THE INTERPRETER:  I didn't hear that.

14   Thank you, Counsel.

15                  MR. HELLER:  You want me to re-ask the

16   question?

17                  THE INTERPRETER (FOR THE WITNESS):  At

18   the moment, no.  It was like seven years ago.  But

19   they never -- they never gave us receipts.

20   BY MR. HELLER:

21        Q    Okay.  Do you know the exact amount that you

22   paid in 2018 for travel costs?

23        A    2018, it's -- it's $300, but that's

24   approximate.  It's always approximate.  But they -- it

25   was more.  Sometimes it was more.  But it's an

Page 49

1    approximation of 300 to 350 dollars.

2         Q    Okay.  And just to make sure we're on the

3    same page, you think it was approximately $300 for

4    2018, but you don't remember exactly what the travel

5    costs were; correct?

6                   MR. MORTON:  Objection.

7                   THE INTERPRETER (FOR THE WITNESS):  Uh-

8    huh.

9    BY MR. HELLER:

10        Q    All right.  Now, I know you've never seen

11   this document before, so I will represent to you that

12   this is a document we produced as part of discovery in

13   this case.

14                  MR. MORTON:  I just --

15                  MR. HELLER:  You can object to the --

16                  MR. MORTON:  I have a continuing

17   objection about asking the witness about a document

18   he's not seen.

19                  MR. HELLER:  Again, that's literally

20   not a valid objection under the Federal Rules of Civil

21   Procedure.  I can ask him about any document -- I

22   could draw a picture and ask him about it.

23                  I understand your objection.  It's on

24   the record.

25   //

Page 50

1    BY MR. HELLER:

2         Q    For the year 2018, this document reflects

3    that you were paid $194.35 in travel costs.  Do you

4    see that?

5         A    Well, yes, I see that it's here.

6         Q    Okay.  Do you have any reason to dispute

7    that you were, in fact, paid $194.35 for travel costs

8    in the year 2018 on or about March 1, 2018?

9         A    Did I have something that I don't remember

10   or ...

11        Q    Yeah, I guess that's my question.  Do you

12   have any reason to dispute that you were, in fact,

13   paid the amount that this document indicates you were

14   paid?

15        A    Oh, yes.

16        Q    And what's the basis of your dispute?

17        A    Because it's not the fare, that one.

18        Q    What's not fair?

19        A    The amount that they would give us.

20        Q    Okay.  And so I just am trying to make sure

21   I understand what your claim is.  All right.  So I'm

22   going to tell you what I think your claim is.  Is that

23   okay?

24        A    Yes.

25        Q    Okay.  I think you're saying that you should

Page 51

1    have been paid approximately $300 for 2018, but

2    instead you were paid $194.34; is that right?

3        A    Yes, that they're not paying us the fair

4    amount.

5        Q    Okay.  And so it's your position that the

6    amounts that you were paid as reflected on Exhibit 7

7    were paid but are unfair because they weren't enough?

8                    MR. MORTON:  Objection.

9                    THE INTERPRETER (FOR THE WITNESS):

10   Yes.  They -- it was paid, but it wasn't the fare.

11   BY MR. HELLER:

12       Q    Okay.  Did you ever provide -- in 2018, did

13   you ever provide anyone with Hamilton Growers with

14   records indicating that your travel costs were more

15   than $194.35?

16       A    We -- we never gave a receipt, but they did

17   ask us, but they never took on the expenses.

18       Q    Okay.  So it's your position that you told

19   them that your travel costs exceeded $194.35?

20       A    Yes, 'cause they would ask who would come

21   separately, who would come together, and then for the

22   reimbursement, but it was never that.

23       Q    Okay.  Who did you tell?

24       A    The same people, the ones who would give us

25   this paper.

Page 52

1      Q    Okay.  And who was that?

2      A    I don't remember, but I have the names.  But

3  like it says here, maybe it was Emma or Anna.  There

4  would be several people who would hand these out,

5  because there were a lot of people.

6      Q    Okay.  All right.  Just to speed this up a

7  little bit, you have in Exhibit 7 and Exhibit 8 a

8  number of different travel costs that the records show

9  you were paid for 2018 all the way to 2023.

10     A    Yes, it's the list here.

11     Q    Okay.  And you don't have any reason to

12  dispute that these amounts were, in fact, paid?

13     A    That they paid us these?  Yes, they did.

14     Q    Okay.  And it's your position that for each

15  year these are insufficient to cover your actual

16  travel costs?

17     A    The costs.

18     Q    But it would be accurate to say that you

19  don't know exactly what your travel costs were for

20  each year from 2018 to 2023; correct?

21              MR. MORTON:  Objection.

22              THE INTERPRETER (FOR THE WITNESS):

23  Well, yes, I know that the amount is 300.

24  BY MR. HELLER:

25     Q    But you told me that's an approximate

Page 53

1    amount; correct?

2        A    When I said 350, it was 300, 350

3    approximately.

4        Q    So just to be clear, it is some number that

5    you approximate to be between 300 and 350, but you

6    don't know exactly what the travel costs were?

7                MR. MORTON:  Objection.

8                THE INTERPRETER (FOR THE WITNESS):

9    Well, then, could I say that they were 310?  I can't

10   give you an exact number, because it's like 300, 350.

11   BY MR. HELLER:

12       Q    That's fine.  All right.  Let's talk about

13   your costs, travel costs from Hamilton Growers, from

14   the United States, Hamilton Growers, to your home.

15   How did you get from Hamilton Growers home?  How did

16   you travel?

17       A    I would go in a van, the same, or in a

18   private car.

19       Q    And just like traveling from Monterrey to

20   the United States, you had the opportunity to take a

21   bus provided by Hamilton Growers; correct?

22                MR. MORTON:  Objection.

23                THE INTERPRETER (FOR THE WITNESS):  No.

24   From here?  No.

25       //

```
                                                    Page 54

 1    BY MR. HELLER:

 2         Q    Okay.  So it's your testimony that there

 3    were no buses that would take workers from the United

 4    States to Mexico?

 5                    MR. MORTON:  Objection.

 6                    MR. HELLER:  And that's fine.  Jim, I'd

 7    really appreciate it if you don't shake your head and

 8    give answers to the witness when you disagree or don't

 9    like the question.  You have every right to say you

10    don't think it's the correct question or you don't

11    like the way I'm asking a question, but if you're

12    outwardly displaying your distaste or your disbelief

13    that the question is accurate, you're telling the

14    witness how to answer.

15                    MR. KNOEPP:  Well, he isn't looking at

16    me.

17                    MR. HELLER:  It doesn't matter.

18                    MR. MORTON:  Okay.  But the

19    objection -- the objection is that you're

20    mischaracterizing.

21                    MR. HELLER:  That's fine.  You can

22    object to the question however you want.  You've

23    objected to form.  He can answer.

24    BY MR. HELLER:

25         Q    Is it your testimony that there was no bus
```

Page 55

1    that took workers from the United States back to
2    Mexico at the end of the season?
3         A    Yes, that for us there wasn't.
4         Q    Okay.  And when you say "for us," who do you
5    mean?
6         A    The ones who worked at the warehouse, the
7    fork -- the people who drove forklifts.
8         Q    Okay.  So it's your testimony that for all
9    forklift drivers there was no bus home?
10        A    No, there weren't any buses for them.
11        Q    Okay.  So what were your travel costs from
12   Hamilton Growers back to Mexico for 2018?
13        A    Well, it comes out more expensive that way,
14   because we have to pay a fee for baggage at that
15   border.
16        Q    That's okay.  That doesn't answer my
17   question.  What were your travel costs for the year
18   2018 to travel from Hamilton Growers home to Mexico?
19                  MR. MORTON:  Marty --
20                  THE INTERPRETER (FOR THE WITNESS):  It
21   was 450.
22   BY MR. HELLER:
23        Q    Okay.  And is that an approximation?
24        A    No, that's exactly, 450.
25        Q    Okay.  And do you have any receipts or

Page 56

1    records to support that cost?

2         A    No, I don't have any receipts, either.

3         Q    How do you know the exact number?

4         A    Because that's what they would charge us for

5    the trip, 'cause it was 350 for the trip and a hundred

6    for the baggage.

7         Q    Who did you pay?

8         A    And we would pay the person from the van and

9    at the border.

10        Q    Okay.  And who drove you?  What is the

11   van -- was it a company?  Was it a service?

12        A    It was a service that we hired.

13        Q    Okay.  And what was the name of that

14   service?

15        A    Well, he's an acquaintance of our -- who

16   would come up here and he -- we would ask him the

17   favor to take us.

18        Q    Okay.  And who is that?

19        A    He lives in Monterrey.

20        Q    What is his name?

21        A    I don't remember his name real well.

22   They're just nicknames.

23        Q    How did you get in contact with him?

24        A    I contacted him because my brother lives in

25   Monterrey.

Page 57

```
 1        Q    Okay.  So did your brother contact him and
 2    ask him to come drive you?
 3        A    Yes.
 4        Q    Did he -- did he drive a van?
 5                  MR. MORTON:  Objection.
 6                  THE INTERPRETER (FOR THE WITNESS):  My
 7    brother?  No.
 8    BY MR. HELLER:
 9        Q    Okay.  In 2018, when did you travel from
10    Hamilton Growers to Mexico?
11        A    In 2018?  I honestly don't remember the date
12    well.
13        Q    Okay.  Do you remember approximately when
14    you traveled from Hamilton Growers to Mexico in 2018?
15        A    Well, the -- the hiring was in March, so in
16    February.  More or less in February.
17        Q    Okay.  And what were your travel costs to
18    travel from Hamilton Growers to -- strike that.
19             Did you travel to Monterrey in February?  Is
20    that where you went, or did you go home?
21        A    I traveled to Monterrey.
22        Q    Is that the only time you recall traveling
23    from Hamilton Growers to Mexico in 2018?
24        A    Yes, just that, that I traveled to
25    Monterrey.
```

Page 58

1          Q    Yeah, but I'm asking a broader question than
2     that, not just Monterrey.  Is that the only time you
3     recall traveling from Hamilton Growers to Mexico in
4     2018?
5          A    What I remember is, yes, that I traveled to
6     Monterrey and I was in Monterrey.
7          Q    Okay.  Did you ever go home to your personal
8     residence in Mexico in 2018?
9          A    In 2018?  I don't remember well if I
10    traveled that year to Mexico.
11         Q    Okay.  And what were the travel costs from
12    Hamilton Growers to Monterrey for 2018?
13                   MR. MORTON:  Objection.
14                   THE INTERPRETER (FOR THE WITNESS):
15    From Hamilton to Monterrey?  Was 450.
16    BY MR. HELLER:
17         Q    Okay.  And what is the name of the service
18    that drove you from Hamilton Growers to Mexico?
19         A    It's -- it's just a van that comes and picks
20    up the people that my brother had contacted, and then
21    he comes and picks up the people.
22         Q    How many people fit in the van?
23         A    In one van, 12 fit.
24         Q    Okay.  And did all 12 of you pay $450 to
25    travel from Hamilton Growers to Monterrey each?

Page 59

1          A     Yes, yes.

2          Q     Other than the 12 of you that fit in that

3     van, do you have any idea what the travel cost might

4     be for other workers to travel from Hamilton Growers

5     to Monterrey?

6          A     That if I knew how much they paid, too?

7          Q     Yeah.  Do you know how much every single

8     worker paid to travel from Hamilton Growers to

9     Monterrey?

10         A     The ones that were left at Hamilton, all of

11    us paid 450.

12         Q     Every single one of you?  So there were 12

13    people left that fit in that van?  That is -- strike

14    that question.

15              Were there 12 people left at Hamilton

16    Growers at the time you traveled from Hamilton Growers

17    to Monterrey?

18         A     Your -- you asked how many people fit in the

19    van, and that was 12.  But not all of those -- all of

20    them were in the van.

21         Q     How many people were left at Hamilton

22    Growers at the time you traveled from Hamilton Growers

23    to Monterrey?

24         A     Well, I don't remember.  I mean, I just

25    traveled.  I don't remember how many people were still

```
                                        Page 60
 1    left.
 2         Q    That's fine.  I'm trying to understand, and
 3    I think it's a fair point, you say it costs $450 to
 4    travel back to Monterrey; right?
 5         A    Yes.
 6         Q    And this is because your brother arranged
 7    for this van driver; correct?
 8         A    He didn't make the arrangements.  He just
 9    passed -- he just gave me the contact, and we made
10    them.
11         Q    Okay.  How did you make the arrangements?
12              MR. MORTON:  And it's "The ones who
13    paid were us."
14              (Speaking in Spanish.)
15              That part didn't get translated.
16              THE INTERPRETER:  I'm sorry.
17    BY MR. HELLER:
18         Q    Okay.  How did you contact this individual?
19    Via phone?  Via WhatsApp?  How did you contact this
20    individual that drove the van?
21         A    Cell phone.
22         Q    Okay.  Do you have the individual's phone
23    number?
24         A    I don't remember if I have it.
25         Q    Okay.  Can you -- you have your phone in
```

Page 61

1    front of you?  Can you look?

2         A    I had this phone for three years, and that

3    was in 2018.

4         Q    Okay.  Did the same person drive you from

5    Hamilton Growers to Monterrey in 2023?

6         A    In 2023?

7         Q    Yes.

8         A    I don't remember.  They have a lot of

9    different drivers, and we went with different ones

10   each time.

11        Q    Okay.  Well, let's go through.  So you don't

12   remember the person's name in 2018 that drove the van

13   that drove you from Hamilton Growers to Monterrey?

14        A    No.  No, I don't remember it.

15        Q    Okay.  If I wanted to contact that

16   individual, how would I get in contact with them?

17        A    I -- I don't know.  I mean, I don't have his

18   phone number.  I don't know.  I mean, I don't know if

19   he's still there, because there are different ones all

20   the time.

21        Q    Okay.  Who drove you from Hamilton Growers

22   to Monterrey in 2019?

23        A    In 2019?  In 2019, because throughout those

24   years, it was either in a van or in a private car.

25        Q    So do you remember how you got home in 2019?

Page 62

1        A    I don't -- I don't remember really well if
2    we went back in the van.
3        Q    Okay.  Do you know the exact cost of your
4    travel costs to return to Monterrey in 2019?
5        A    From Hamilton to Monterrey?  Well, yeah, the
6    same.  It was $300 that we would pay always.
7        Q    Okay.  And was it the same cost whether you
8    took a van or a private car?
9        A    Yes, the same.
10       Q    Okay.  And was that cost the same for every
11   year from 2018 until 2023?
12       A    No.  It went up in 2022.  They charged us
13   400 then.
14       Q    Okay.  So it was the -- was that cost the
15   same for every year from 2018 to -- what year did he
16   say?
17                 MR. MORTON:  2022, he said, so ...
18   BY MR. HELLER:
19       Q    Okay.  So from 2018 to 2021, was the cost of
20   return travel the same?
21       A    Yes.  In those years it was.  It was 300,
22   350.
23       Q    Okay.  And for the van that held 12 people;
24   correct?
25       A    Twelve people would fit in the van.

1          Q     How many people would fit in the private

2     car?

3          A     Well, in the private car it would

4     be -- there would be four of us.

5          Q     Okay.  But it was the same cost?

6          A     Yeah, the same cost, all.

7          Q     Okay.  How did you hire the private car?

8                    MR. MORTON:  Objection.

9                    MR. HELLER:  That's fine.

10                   THE INTERPRETER (FOR THE WITNESS):

11    Well, we ourselves would drive.

12    BY MR. HELLER:

13         Q     Say that again?

14         A     When it was a private car, whoever it was

15    that wanted to drive would take the car.

16         Q     Okay.  You'd rent a car?

17         A     No, someone's own car.

18         Q     Someone's own car.  Okay.  So you'd drive a

19    car that someone owned.  One of the four occupants of

20    the car would own the car?

21         A     Yes.

22         Q     Okay.  So what are the costs, then?  Is it

23    gas money?

24         A     Well, it was gas and then whoever put the

25    car available, the cost.

Page 64

1      Q    Okay.  Did you ever drive -- you personally

2  drive the car from Hamilton Growers to Monterrey?

3      A    Seems to me that it was one time.  What I

4  remember is that one time I did.

5      Q    Okay.  And did people pay you because you

6  drove them?

7      A    Yes, because that was how the treatment was

8  for driving.

9      Q    Got it.  So they would pay you because you

10  drove them back to Mexico?

11      A    The only time that I drove, yes.

12      Q    Okay.  And do you remember what year that

13  was?

14      A    I don't remember real well, but it was after

15  2020, but I don't remember.

16      Q    Okay.  And just to be clear, you don't have

17  any records or receipts indicating your travel costs

18  from Hamilton Growers to Mexico during any of the

19  years of 2018 to 2023?

20              MR. MORTON:  Objection.

21              THE INTERPRETER (FOR THE WITNESS):  No,

22  I don't have any receipt.

23  BY MR. HELLER:

24      Q    Okay.

25              MR. MORTON:  Marty, it's 12.  Do you

Page 65

```
 1    want to go to like 12:30?
 2                  MR. HELLER:  Let me just get
 3    through -- sort of get through here.  It won't take
 4    long.  And then you guys decide.  I'm one of those
 5    weird people that just doesn't eat much during the
 6    day.  I know.  I don't require that anyone participate
 7    in my poor habits.  They are mocked by associates,
 8    including David, frequently.
 9    BY MR. HELLER:
10        Q    Who did you tell -- or strike that.
11             Did you tell anyone at Hamilton Growers what
12    your return travel costs were from Hamilton Growers to
13    Monterrey each year?
14        A    If I told someone?  No.
15        Q    Okay.  All right.  From the time period of
16    2018 to 2023, did you ever leave Hamilton Growers to
17    go home to your house in Mexico prior to the end of
18    the work contract?
19        A    If I went to Mexico during the contract
20    time, it would be because they gave me permission to.
21        Q    Okay.  But do you remember when that might
22    have happened?
23        A    When it was that I went?
24        Q    Mm-hmm.
25        A    When it was that I went?  It was in November
```

Page 66

1    of 2022 that I went to Mexico.

2          Q    Okay.  Is it possible that you traveled from

3    Hamilton Growers home to your house in Mexico at any

4    point other than in November 2022?

5                    MR. MORTON:  Objection.

6                    THE INTERPRETER (FOR THE WITNESS):

7    From there, I don't remember real well if before.  No,

8    no, I didn't go before.

9    BY MR. HELLER:

10         Q    Okay.  But you don't know for sure?

11                   THE INTERPRETER (FOR THE WITNESS):  No,

12   I didn't go.

13                   MR. MORTON:  Objection.

14   BY MR. HELLER:

15         Q    Do you remember who you asked permission --

16   from Hamilton Growers who you asked permission from to

17   leave early in 2022?

18         A    Yes.  I asked permission from my manager.

19         Q    And who was that?

20         A    Eduardo Garza.

21                   MR. MORTON:  And just the full

22   statement was Lalo Garza, Eduardo Garza.

23                   MR. HELLER:  He goes by Lalo.  It's a

24   nickname.

25                   THE INTERPRETER:  Oh, thank you.  Thank

Page 67

```
 1    you.  Okay.
 2    BY MR. HELLER:
 3         Q    And did Mr. Garza inform you that if you
 4    left early you would not be eligible for your travel
 5    costs for your return travel?
 6         A    They never -- they never pay those to you.
 7    It's a permission that you ask for to go to Mexico,
 8    like in an emergency or something.
 9                   MR. HELLER:  Okay.  Go off the record
10    for a second.
11                   THE REPORTER:  We are now off the
12    record at 12:06 p.m.
13                   (Off the record.)
14         BY MR. HELLER:
15         Q    Do you own a car?
16         A    Yes, I have a car.
17         Q    Okay.  When did you buy your car?
18         A    Two years ago.
19         Q    Okay.  So 2023?
20         A    When I bought it?
21         Q    Mm-hmm.
22         A    Yes, in 2023.
23         Q    Okay.  What kind of car do you have?
24         A    CRX [sic] Cadillac 2010.
25         Q    Prior to the 2010 CRX [sic], did you own a
```

Page 68

```
 1      vehicle at any point prior to 2023?
 2           A    Yeah, I've always had two cars.
 3           Q    Okay.  And when did you first buy -- let me
 4      ask a better question.  I was about to ask a terrible
 5      one.
 6                When you worked at Hamilton Growers from
 7      2018 to 2023, did you always own a vehicle?
 8           A    Yes.
 9           Q    Okay.  And you had the vehicle with you in
10      Norman Park?
11           A    Yes.
12           Q    Okay.  So why wouldn't you always take your
13      vehicle from Hamilton Growers back to Monterrey?
14           A    Well, honestly, nobody wants to put miles on
15      your car because of the condition of driving.
16                     MR. HELLER:  That's fair.  Okay.  We're
17      a good stopping point.
18                     MR. MORTON:  Okay.
19                     THE REPORTER:  We're now back off the
20      record at 12:10 p.m.
21                     (Off the record.)
22                     THE REPORTER:  We are now -- excuse me.
23      We are now back on the record at 1:07 p.m.
24                     MR. HELLER:  All right.  We are back on
25      the record, and we have our other guests returning.
```

Page 69

```
 1                  You guys are good.  Come on.
 2      BY MR. HELLER:
 3           Q    We just returned from a quick lunch break.
 4      Do you understand that you are still under oath?
 5           A    Yes.
 6           Q    Okay.  Is there anything from your previous
 7      testimony that you, upon reflection, believe is
 8      incorrect or that you need to change?
 9           A    No, it's fine.
10           Q    All right.  I want to talk about the time
11      period of January and February of the years 2018 to
12      2023.
13           A    Yes, that's fine.
14           Q    Okay.  So you remained employed with
15      Hamilton Growers during this time period; is that
16      correct?
17                     MR. MORTON:  And just our standing
18      objection.
19                     MR. HELLER:  I understand.  It's just
20      easier for me to pick a name.
21                     MR. MORTON:  Sure.
22                     MR. HELLER:  I don't want to say all
23      defendants, so ...
24                     MR. MORTON:  Okay.  Just that the
25      standing objection remains.
```

Page 70

```
 1              MR. HELLER:  Understood.
 2              THE INTERPRETER (FOR THE WITNESS):
 3    Yes, I would stay there.  I would stay in January and
 4    February.  Yes, I would stay.
 5    BY MR. HELLER:
 6        Q    Okay.  And you were paid the same pay rate
 7    in January and February that you were paid during the
 8    time period of March to December?
 9        A    No, no.
10        Q    Okay.  Would it surprise you to learn that
11    the pay records indicate that you were?
12        A    They didn't pay us the same, because they
13    would take taxes out.
14        Q    Okay.  That is a very fair answer.  But they
15    paid you the same rate per hour.  They just took taxes
16    out; is that correct?
17        A    Yes, it was.  It was like that.
18        Q    All right.  And is it your understanding
19    that taxes were taken out because you presented
20    paperwork to the company indicating that you were
21    lawfully allowed to be employed in the United States?
22              MR. HELLER:  You don't have
23    to -- there's no form-based objection there.  You
24    don't have to like the question, and you can object if
25    you want to.
```

Page 71

1              MR. MORTON:  Okay.

2              MR. HELLER:  Continue.

3              MR. MORTON:  Okay.  And I'm going to

4     state an objection and --

5              MR. HELLER:  You can state your

6     objection.  He can answer the question.

7              THE INTERPRETER:  Again, please.

8              MR. HELLER:  Yeah, sure.

9     BY MR. HELLER:

10         Q    Is it your understanding that taxes were

11    deducted from your pay during the time period of

12    January and February because you presented

13    documentation indicating that you were a domestic

14    employee lawfully allowed to be employed in the United

15    States during that time period.

16             MR. MORTON:  Okay.  And that ...

17             I'm going to object.

18             THE INTERPRETER (FOR THE WITNESS):  It

19    wasn't that I considered myself.  It was the paperwork

20    that they had about us.

21    BY MR. HELLER:

22         Q    Okay.  So let's start with digging a little

23    deeper into that.  You worked under the name Diego

24    Luna; is that correct?

25         A    That's right.

Page 72

1    Q    So how did you select that name?

2    A    Just randomly it came to mind is all.

3    Q    You liked the name?

4    A    Well ...

5    Q    Okay.  How did you get paperwork -- well,

6    let me ask it a different way.

7        Did you have a social security card under

8    the name Diego Luna?

9    A    Yes.

10   Q    Okay.  Did you have a birth certificate

11   under the name Diego Luna?

12   A    No.

13   Q    Okay.  Did you have any other government

14   paperwork, whether it's a passport, driver's license,

15   anything else under the name Diego Luna?

16   A    No.

17   Q    Okay.  So the only documentation you had is

18   the social security card?

19   A    Yes.

20   Q    How did you get a social security card in

21   the name of Diego Luna?

22   A    From there -- from there -- from right there

23   at work.

24   Q    Okay.  Who provided it to you?

25   A    I don't remember who the name came from, but

Page 73

1    right there at work, right there at work is where we
2    got -- we got the number.
3          Q    Okay.  Did you pay someone for it?
4          A    Yes, I ...
5          Q    Continue.
6          A    Yes, we paid.  I paid.
7          Q    Okay.  And what did they provide to you in
8    return for your payment?
9          A    That what we would pay them and then in
10   exchange they would give us an ID and the social
11   security.
12         Q    Okay.  And they both said the name Diego
13   Luna on it?
14         A    Yes, just those two.
15         Q    Okay.  Why did you want to stay working at
16   Hamilton Growers from January and February?
17                   MR. MORTON:  Objection.
18                   THE INTERPRETER (FOR THE WITNESS):
19   Well, we would stay -- I mean, how do you say it?
20   That they wouldn't bring you hired.
21                   MR. MORTON:  "Contratado" is translated
22   as hired.  It could also be translated as contracted.
23                   MR. HELLER:  Okay.
24   BY MR. HELLER:
25         Q    All right.  So you worked during that time

Page 74

1     when you weren't under contract?  Is that what you're

2     trying to say?

3                    MR. MORTON:  Objection.

4                    THE INTERPRETER (FOR THE WITNESS):

5     Well, you asked me why I stayed.  Well, sometimes

6     things would come up that maybe they weren't going to

7     hire you, and you needed work, so you stay.

8     BY MR. HELLER:

9          Q    You stayed because you wanted to receive the

10    additional pay?

11                   MR. MORTON:  Objection.

12                   THE INTERPRETER (FOR THE WITNESS):  No.

13    BY MR. HELLER:

14         Q    Okay.  Well, then, I don't think I

15    understand.

16         A    It wasn't because of the money, but rather

17    because of the job, because -- I would say because I

18    needed a job, and if I were to go back to Mexico in

19    December, then maybe I wouldn't be hired again.

20         Q    Got it.  So you were worried that you

21    wouldn't be hired again if you went home?

22         A    Yes, that's it.

23         Q    Okay.  But you know some people went home

24    and still returned the next year.

25         A    Not everyone.

```
                                                Page 75

 1        Q    Yeah, but some people.  I didn't say
 2   everyone.  I said some people.
 3        A    Some yes, some no.
 4        Q    Agreed.  Did you do this every single year
 5   from 2018 to 2023?
 6        A    To stay and work those two months?  Yes.
 7        Q    Did you do the exact same type of work for
 8   Hamilton Growers during January and February that you
 9   had done during March through December?
10        A    Yes, the whole year.  The whole year I
11   worked doing the same.
12        Q    Okay.  Did you always work on the Hamilton
13   Growers Farm, or did you sometimes work somewhere
14   else?
15                   MR. MORTON:  Objection.
16                   THE INTERPRETER (FOR THE WITNESS):
17   Since I started for two years, 2009, 2010, I worked in
18   the fields.  And after '11 I was in the warehouse
19   doing the same job.
20   BY MR. HELLER:
21        Q    Did you ever work in Tennessee?
22        A    Yes.
23        Q    Okay.  What was the name of the farm you
24   worked at in Tennessee?
25                   MR. MORTON:  Objection.
```

Page 76

```
 1              THE INTERPRETER (FOR THE WITNESS):
 2    Southern Valley.
 3    BY MR. HELLER:
 4         Q    So that's going to be my next question.  Is
 5    it your understanding that Hamilton Growers or
 6    Southern Valley operated the farm in Norman Park and
 7    the farm you worked at in Tennessee?
 8         A    Oh, from what we understood, yes, that it
 9    was the same company.
10         Q    Do you know what the adverse effect wage
11    rate is?
12         A    No, I don't know what that is.
13         Q    Have you ever heard of AEWR?
14         A    No, not that, either.
15         Q    Okay.  Would you agree that the best record
16    of the wage you were paid, the dollars per hour that
17    you were paid each year would be your paystubs?
18         A    I'm sorry, could you repeat that for me,
19    please?
20         Q    Yeah.  Do you agree that the best record of
21    the wages you were paid and the rate that you were
22    paid, the amount you were paid per hour is your
23    paystubs?
24         A    No.
25         Q    Why?
```

Page 77

1      A    Because we would do more time working, and

2    the hours were never complete.

3      Q    What do you mean?

4      A    That if you were asking if what was fair

5    what was on the stub, no.

6                MR. HELLER:  All right.  Can we go off

7    the record for a second?

8                THE REPORTER:  We are now off the

9    record at 1:23 p.m.

10                (Off the record.)

11                THE REPORTER:  We are now back on the

12    record at 1:27 p.m.

13    BY MR. HELLER:

14      Q    All right.  I'm going to mark two documents

15    for you.  One is going to be marked as Exhibit 9, and

16    one will be marked Exhibit 10.

17                (Exhibit 9 and Exhibit 10 were marked

18                for identification.)

19                All right.  I'm going to try to, sorry, make

20    these questions a little bit easier.

21      A    Okay.

22      Q    All right.  Do you recognize these

23    documents?

24      A    If I recognize them?  Yes.  They're the

25    payments.

Page 78

1           Q     Okay.  Does this accurately reflect the

2     payments you received for March 2018 through

3     March -- or through April 1st of 2019?

4                       MR. MORTON:  What -- sorry, objection.

5     I'm unclear on what we're talking about.

6                       MR. HELLER:  I said does this

7     accurately reflect the amounts he was paid, his pay

8     records from 2018, March 2018 through to April 2019.

9     BY MR. HELLER:

10          Q     To the best of your recollection.

11          A     Okay.  That if they're the payments?  Yes.

12    Yes, they are.

13          Q     Okay.  And the rates that are paid when it

14    says $10.95 an hour, that's the rate you were paid at

15    that time; correct?  To the best of your recollection.

16          A     Yes, yes, 10.95.

17          Q     Okay.  And these accurately reflect the

18    hours that you worked; correct?

19          A     Yes.

20          Q     Thank you.

21                      (Speaking in Spanish.)

22                      THE INTERPRETER:  It's okay.

23                      MR. MORTON:  Maybe we should translate

24    that for the record.

25                      MR. HELLER:  Yeah, sorry for me.

Page 79

1    Sometimes ...

2    BY MR. HELLER:

3        Q    All right.  So we just looked, I don't want

4    to have to put them all in the record, but I can.  We

5    just looked at these two documents.  But my question

6    for you before was just the company's wage records are

7    the most accurate reflection of what you were paid

8    while doing work for Hamilton Growers; correct?

9        A    Yes.

10       Q    Okay.  I'm just asking for your best

11   recollection for this question.

12       A    Yes.

13       Q    In November, let's just say of 2018, how

14   many forklift drivers do you think were working in the

15   receiving area at Hamilton Growers?

16       A    In November of 2022?

17       Q    2018.

18       A    Oh, 2018.  Well, they always -- there are 18

19   forklifts, 18 forklift drivers.

20       Q    Okay.  But not all forklift drivers do the

21   same thing; right?

22       A    Well, all of the forklift drivers at

23   that -- on that day -- 'cause I was talking about the

24   front area where I was working.  Well, I'd say that

25   there would've been about 26 approximately.

Page 80

1          Q    And did you say roughly 18 worked in the
2     receiving area where you worked?
3          A    Yes.
4          Q    All right.  So let's talk a little bit about
5     the setup of the -- let's just call it the receiving
6     area.
7          A    Yes.  All right.
8          Q    Okay.  So what did you call that area?  You
9     call it the loading docks?  What was the term that you
10    would use for that area?
11         A    The shipping area.
12         Q    Shipping?  Okay.
13         A    Shipping or receiving.
14         Q    Shipping and receiving?  Okay.  All right.
15    And so in that area, trucks would pull up and deliver
16    boxes of produce?
17         A    They would deliver and load.
18         Q    Okay.  And in that -- let's say in 2018,
19    let's pick a year.  All right.  You drove a forklift
20    as part of your job?
21         A    Yes.
22         Q    Okay.  And you would unload boxes from the
23    trucks when they arrived?
24         A    Yes.
25         Q    Okay.  And then you would go and take them

Page 81

```
 1    to the refrigerated area; right?
 2        A    Yeah.  They would be unloaded where the
 3    refrigeration was.
 4        Q    Right.  And that's a totally different area
 5    of the warehouse than the area where produce is taken
 6    when it's picked and packed and grown from Hamilton
 7    Growers; correct?
 8                    MR. MORTON:  Objection.
 9                    THE INTERPRETER (FOR THE WITNESS):
10    It's all there, but logically it has to be separate.
11    BY MR. HELLER:
12        Q    Totally the end of the other -- end of the
13    building; right?
14        A    No, it's right there in the building.
15        Q    Right.  The other end of the building.  It's
16    all one big building, and one end is where produce is
17    delivered, and the other one end is where produce
18    comes from the field; correct?
19                    MR. MORTON:  Marty, you're now arguing
20    with the witness?.
21                    MR. HELLER:  No, I'm not.  I'm asking
22    fair questions.  And that's a talking objection.
23                    MR. MORTON:  Objection.
24                    THE INTERPRETER (FOR THE WITNESS):
25    Yes, that's how it is.
```

Page 82

1    BY MR. HELLER:

2        Q    Okay.  Thank you.  When you were unloading

3    produce from the trucks and placing it in the

4    refrigeration unit, did you know where the produce

5    came from?

6        A    Yeah, I know where it was come from.

7        Q    And it could come from anywhere; right?

8        A    Any company.

9        Q    Could come -- but I mean from the state.  It

10   could be from Georgia.  It could be from Texas.  It

11   could be from anywhere; right?

12       A    Yeah, of anywhere.

13       Q    And the produce would need to be shipped

14   back out fairly quickly; correct?

15       A    If they were going to use it, yeah.  But if

16   not, it was there.  The product was there.

17       Q    Okay.  But, you know, produce -- a

18   strawberry, for example -- would go bad if they don't

19   move it to a store to sell it; right?

20                    MR. MORTON:  Objection.

21                    THE INTERPRETER (FOR THE WITNESS):

22   They have refrigeration, and also, how do you say it,

23   like freezing.

24   BY MR. HELLER:

25       Q    But most of the produce needed to be

Page 83

1    reshipped somewhere fairly quickly.

2                    MR. MORTON:  Objection.

3                    THE INTERPRETER (FOR THE WITNESS):  No,

4    no, no.

5    BY MR. HELLER:

6        Q    Do you have any idea how long the produce

7    typically would sit?

8        A    The product -- the produce can be there one

9    day, three days, five days.

10        Q    Okay.  That's fair.  And then as part of

11    your job, you would take the produce and load it onto

12    trucks to be delivered to stores; correct?

13        A    Yes.

14        Q    Okay.  And so that was a job that you

15    performed while you were a forklift driver; right?

16        A    Yeah, it is the forklift driver's job there.

17        Q    Right.  But not all forklift drivers do the

18    same thing.

19        A    Those of us who were in that area?  Yes.

20        Q    Exactly.  So that's for people that were

21    working in the same area as you; correct?

22        A    Yeah, in the shipping area.

23        Q    Right.  But there were other forklift

24    drivers that didn't do that; correct?

25        A    No.  Some -- some of them didn't do that.

Page 84

1          Q    Okay.  Thank you.  At some point, and I
2    think it was in 2021, did you become a shipping clerk?
3          A    I think it was 2020, maybe 2021 that I was
4    doing shipping.
5          Q    Okay.  And at that point, you drove -- you
6    stopped driving a forklift or drove a forklift much
7    less?
8                    MR. MORTON:  Objection.
9                    THE INTERPRETER (FOR THE WITNESS):
10   Yes.  I was driving it less because I was more in the
11   office then.
12   BY MR. HELLER:
13         Q    Yeah.  You were essentially an office worker
14   at that time?
15         A    Yes.
16         Q    Okay.  I want to talk about where you lived
17   while you were working for Hamilton Growers.  All
18   right.  You lived in Campo Rojo?
19         A    Uh-huh.
20                   MR. MORTON:  I just want to caution the
21   witness to wait for the full translation.
22   BY MR. HELLER:
23         Q    It's okay.  I know you can understand some
24   of what I'm saying, yeah.  And I know it's easy to
25   answer when you do.

Page 85

1          A     Yes.

2          Q     All right.  You allege in the complaint that

3     you paid for housing; is that correct?

4          A     Yes.

5          Q     But you understand that you didn't have to;

6     right?

7          A     Yes.

8          Q     And you could have lived in the barracks?

9          A     Well, yeah, I could have, but the way that

10    we worked it -- it wasn't comfortable.

11         Q     Got it.  Thank you.  And you did understand

12    the barracks were free of charge?

13         A     Yes, yes.

14         Q     And most people -- and I know "most" is a

15    hard term to define, so I'm just saying "most,"

16    meaning the majority of people lived in the barracks

17    that worked for Hamilton Growers; right?

18         A     The -- most of the field workers.

19         Q     Okay.

20         A     The warehouse people, they almost always

21    lived separately.

22         Q     Got it.  So -- and I didn't -- I didn't know

23    that, so thank you for telling me.

24              So the warehouse people generally preferred

25    to stay in housing that was not part of the barracks?

Page 86

1                    MR. MORTON:  Objection.

2                        THE INTERPRETER (FOR THE WITNESS):

3      Yes.

4      BY MR. HELLER:

5          Q    Do you know who -- well, let me ask this.

6              Who did you pay for your housing when you

7      lived in Campo Roja?

8          A    Can I say the name?

9          Q    Yes.

10         A    We would pay Mario Esparza.

11         Q    And is your understanding that those were

12     privately owned homes or houses?

13                   MR. MORTON:  Objection.

14                       THE INTERPRETER (FOR THE WITNESS):  The

15     barracks.  Yeah, we did know, but -- yeah, we did

16     know.  But were you -- what were you asking exactly?

17     BY MR. HELLER:

18         Q    Yeah.  It was your understanding that the

19     housing like Campo Rojo is privately owned housing.

20     It's not owned by Hamilton Growers.

21                   MR. MORTON:  Objection.

22                       THE INTERPRETER (FOR THE WITNESS):

23     When we started living there, they were Hamilton's,

24     and we weren't paying rent.

25     //

Page 87

1    BY MR. HELLER:

2        Q    Okay.  But that changed at some point?

3        A    Things changed, and whoever wanted to live

4    there, they would have to pay.

5        Q    Okay.  But you chose to stay because you

6    enjoyed having a little bit more of the freedom of

7    living in your own residence?

8        A    We opted to stay there, because we had been

9    living there for a good number of years, and we were

10   used to it.

11       Q    Yeah.  It felt like your -- felt like your

12   house?

13       A    Yes.

14       Q    Okay.  Did you live there the entire time

15   you worked at Hamilton Growers from 2018 to 2023?

16       A    Yes.  I was always living at the Red House,

17   the Campo Rojo, the Red Field.

18                 THE INTERPRETER:  Red Camp.  I'm sorry.

19   BY MR. HELLER:

20       Q    How many people lived there with you?

21       A    Sometimes there are four, sometimes two,

22   sometimes three.

23       Q    Okay.  And did you always pay the same

24   amount to live there?

25       A    Yes.  Yes, it always was.

Page 88

1        Q    Okay.  And how much was that?

2        A    We would pay, as far as I remember, 20.

3        Q    Is that per month or per week?

4        A    Per week.

5        Q    Okay.  Who did you live with?

6        A    With the coworkers from work right there.

7        Q    Were they sort of your friends?

8        A    Yes.

9        Q    Okay.  Do you remember who they were?

10       A    When I was living there, his name was Raul

11   Adali.

12       Q    Anyone else?

13       A    No.  It seems like no.

14       Q    Okay.  Did you ever have family members live

15   with you there?

16       A    I was -- I was living with my wife.  I was

17   there for a while with my wife.

18       Q    And did your children live with you as well?

19       A    My little girl.  My little girl was living

20   with us.

21       Q    Okay.  Do you have any records reflecting

22   what you paid for your housing?

23       A    No.  We would just go over to the office and

24   pay there, and then they would write it down there.

25       Q    And that's when you paid Lalo?

Page 89

1                    MR. MORTON:  Objection.

2                    THE INTERPRETER (FOR THE WITNESS):  No,

3     Mario, to Mario.

4     BY MR. HELLER:

5          Q    Oh, sorry.  I misheard.  Who did you pay?

6          A    Mario Esparza.

7          Q    Okay.  That's when you would pay Mario

8     Esparza.

9          A    Yes.

10         Q    And you always paid Mario Esparza?

11         A    Yeah.  He was the one you pay the rent to.

12         Q    Okay.  Do you know who owned the house you

13    lived in?

14         A    No.  They'd just say -- well, no, they just

15    charge us is all.

16                   MR. HELLER:  All right.  All right.

17    Let's go off the record real quick.

18                   THE REPORTER:  We are off the record at

19    1:53 p.m.

20                   (Off the record.)

21                   THE REPORTER:  We are now back on the

22    record at 2:05 p.m.

23                   Counsel, you may proceed.

24                   MR. HELLER:  Thank you.

25    //

Page 90

1    BY MR. HELLER:

2        Q    Do you believe that part of your job duties

3    included loading and transporting crops?

4        A    I would just load.

5        Q    Okay.  And did you ever have to stack boxes

6    onto pallets?

7        A    It would depend, depend on the orders that

8    had come.  But yes, yes, we would do it.

9        Q    Okay.  I know you talked about loading

10   and -- unloading and loading produce from the shipping

11   department.  Did you --

12                   THE INTERPRETER:  I'm sorry.

13                   MR. HELLER:  Sorry, go ahead.  No, go

14   ahead.

15   BY MR. HELLER:

16       Q    Did you also ever load and unload produce

17   that was grown by Hamilton Growers?

18       A    Well, that we would load, yeah, that it was

19   product -- I'm sorry, the question again?

20       Q    Yeah.  So you talked about loading and

21   unloading product in the shipping department that came

22   from other growers; correct?

23       A    Yes.

24       Q    Did your job also involve sometimes moving

25   and loading and unloading product that was grown by

Page 91

1    Hamilton Growers?

2         A    When the product would come from Yucata.

3         Q    Yucatan.  Yucatan.

4                   THE INTERPRETER:  Yucatan.  Okay.

5                   MR. HELLER:  Okay.

6                   THE INTERPRETER:  As in Mexico?

7                   MR. HELLER:  Mm-hmm.

8                   THE INTERPRETER:  Oh, okay.  That's

9    what got me confused.  Thank you.

10                   MR. HELLER:  Mm-hmm.

11   BY MR. HELLER:

12        Q    All right.  And what about a product that

13   came directly from the fields?

14        A    Yeah, it would also be loaded.  All that

15   product would be loaded there, too.

16        Q    So sometimes you would move that?

17        A    Yeah.  We would move it, because it was

18   there in the company.

19        Q    I have one other question about that.  In

20   part, you did that because you had the skillset to be

21   able to review the invoices, the bills of lading when

22   product comes in from other farms; right?

23        A    Yes.

24        Q    But not all forklift drivers had that skill;

25   right?

Page 92

```
 1          A     Yes.  All the drivers have that ability.
 2          Q     All the ones in your area, all the ones in
 3     the shipping area; correct?
 4          A     Yes.
 5          Q     Okay.  Do you know where the produce would
 6     go to when you loaded it to be shipped to a store?  Do
 7     you know the final destination?
 8          A     Yes, yes.  We knew.
 9          Q     And it could go anywhere; right?
10          A     Yeah, what the order said.
11          Q     Yeah.  Some -- it could be Georgia.  It
12     could be another state,
13          A     That's right.
14          Q     Do you know why you weren't paid overtime?
15          A     No.
16          Q     Did anyone ever explain it to you?
17          A     No.
18          Q     Okay.  Did you ever complain about not being
19     paid overtime?
20          A     No.
21          Q     Do you think the 18 forklift drivers that
22     worked with you in the shipping area, do you think
23     they were all doing roughly the same thing you were
24     doing?
25          A     Yes.  All of them -- all of them had the
```

Page 93

1    ability, the capacity to work in the forklift area.

2        Q    And for people that were operating forklifts

3    only on the receiving side, you didn't supervise or

4    know what they were doing day to day; right?

5        A    No, we had our supervisor.

6        Q    Yeah.

7                MR. MORTON:  And just -- I'm not

8    sure -- the question that was translated was whether

9    he was a supervisor.

10               MR. HELLER:  Okay.  No.

11               THE REPORTER:  Can you put your

12   microphone on for me, sir?

13               MR. HELLER:  All right.  I'm going to

14   re-ask the question.

15               THE INTERPRETER:  Thank you.

16               MR. HELLER:  Yeah.

17   BY MR. HELLER:

18        Q    With respect to the forklift drivers who

19   worked only in the receiving section, you didn't

20   oversee their work or know what they were doing all

21   the time; correct?

22               MR. MORTON:  Objection.

23               MR. HELLER:  You can keep asking.

24               THE INTERPRETER (FOR THE WITNESS):

25   When I was in the shipping area, yes.

Page 94

1    BY MR. HELLER:

2        Q    Yeah, but I'm asking about receiving.  For

3    the forklift drivers who only worked in the receiving

4    section, you didn't know what they were doing all the

5    time; right?

6                    THE INTERPRETER:  Let me just make sure

7    about the word "receiving," just to make sure we're

8    on -- okay.

9                    MR. MORTON:  And we should

10   just -- maybe we can just get that interaction.  Like,

11   can we just translate that for the record?

12                   There's an area called shipping, and

13   then the witness said it's shipping/receiving.

14                   MR. HELLER:  I'm not following.

15   BY MR. HELLER:

16        Q    There's a shipping area and a

17   receiving area, an area where the -- where the produce

18   that is grown on the farm is received by the packing

19   shed; correct?

20        A    It's the same thing, shipping and receiving.

21        Q    Right, but they're two different ends;

22   right?  In two different ends of the warehouse.

23   You've already testified to this.

24        A    We are the forklift area in the front, the

25   shipping/receiving, and then behind that there's

Page 95

1    another area that -- where the field produce comes.

2         Q    Okay.  What do you call that area?

3         A    Just the unloading area.

4         Q    Okay.  Unloading.  So there are forklift

5    drivers that only work in the unloading area; right?

6                    MR. MORTON:  Objection.

7                    THE INTERPRETER (FOR THE WITNESS):

8    Yes.

9    BY MR. HELLER:

10        Q    Thank you.  When you're moving -- and sorry

11   for the delays.  I'm trying to cross out as many

12   questions as possible to save time.

13             When you're moving produce in a forklift,

14   you're not physically touching the produce with your

15   hands; right?

16        A    No.  We just unload it and put it in place.

17        Q    On the forklift; right?

18        A    Yes, on the forklift.

19        Q    Thank you.  Have you ever seen an accident

20   happen in the warehouse because produce was loaded in

21   an unsafe way on a truck?

22        A    Yes, there have been accidents.

23        Q    So it's important to make sure the produce

24   is loaded in a safe manner.

25        A    What I understood as being the question is

Page 96

```
 1      if there have been accidents there.
 2           Q    My question was have there been accidents
 3      because of unsafe loading in trucks?
 4           A    Yes.  Yes, there have been.
 5           Q    Okay.  And so my next question was, it's
 6      important to make sure you safely load produce on
 7      trucks when you're shipping it out of the warehouse;
 8      correct?
 9           A    Yes.  It's important in all work.
10           Q    Okay.  All right.  Let's talk a little bit
11      about the complaint that you have filed as the
12      named -- one of the two named plaintiffs.
13           A    Yes.
14           Q    Did you review the complaint before it was
15      filed?
16           A    Yes, I had reviewed it.
17           Q    Okay.  And what is your understanding of the
18      claims that you're bringing?
19           A    That -- what has to do with overtime.
20           Q    Okay.  Do you think the company breached a
21      contract they had with you?
22           A    That if they not complied the contract?  No.
23           Q    Okay.  And if the complaint -- because I
24      don't want to go through the whole complaint.  That'll
25      take forever.  But if the complaint says something
```

Page 97

 1     different than what you testified to today, you've
 2     told me the truth today; correct?
 3          A    Yes.
 4          Q    Okay.  Have you spoken with -- and I'm going
 5     to ask you some questions about conversations or
 6     messaging electronically that you may have had with
 7     other people.  I'm not asking you for communications
 8     where your attorneys are copied.  Okay?
 9          A    Yes.
10          Q    And I'm not asking you about conversations
11     where your attorneys were present.
12          A    Yes.
13          Q    Okay.  Have you had any e-mails, text
14     messages, or WhatsApp messages that you've sent to and
15     from Pablo Castillo-Olguin regarding the allegations
16     you have raised in the complaint in this matter?
17          A    We have sent messages to each other, but it
18     was just yesterday and the day before about getting
19     together.
20          Q    Okay.  Will you agree to provide those to
21     your counsel so we can ensure that if they're
22     responsive to our discovery requests that they get
23     produced?
24          A    Yeah.  The ones from Pablo, yes.  I'll give
25     them to you.

Page 98

1          Q    Okay.  The same question as to -- so all of
2     my questions are going to be whether you've sent e-
3     mails, text messages, or WhatsApp messages, electronic
4     communications.
5               Have you had any such communications with
6     Jonathan Castillo Tovar?
7          A    No.  With Jonathan I haven't sent messaging.
8          Q    Okay.  What about with Rafael Joaquin
9     Guerrero?
10         A    Rafael Joaquin Guerrero?  Not him, either.
11         Q    Okay.  What about Alberto Amisdai Lopez
12    Delgado?
13         A    No.  With Alberto Amisdai?
14         Q    Yes.
15         A    No.  I don't know who it is.
16         Q    Okay.  What about with Jose Antonio Rivera
17    Reyes?
18         A    Yes.  With him we have sent messages,
19    because we're friends.
20         Q    Okay.  Can you please provide those to your
21    counsel so they can be reviewed to see if they're
22    responsive to discovery requests?
23         A    Yes.
24         Q    Okay.  What about with Arturo Sanchez
25    Villareal?

Page 99

```
 1        A    Yes.  I also send messages with him.
 2        Q    Okay.  Same thing, will you please give
 3   those to your counsel?
 4             And what about Emmanuel Sanchez Villareal?
 5        A    Yes.
 6        Q    Okay.  And same thing, you'll give those to
 7   your counsel?
 8        A    Okay.
 9        Q    Okay.  And -- I'm going to butcher this
10   name.  Iseal Sandoval Tapia?  Iseal?
11        A    No, not with him.
12        Q    Okay.  Alberto Padilla Urtado?
13        A    Yeah.  I mean, we've sent messages to -- to
14   each other.  We're friends.
15        Q    Okay.  So same thing, you'll provide those
16   to counsel?
17        A    Yes.
18        Q    All right.  Have you answered all the
19   questions I've asked today truthfully?
20        A    Yes.
21        Q    Okay.  Do you think you've understood all
22   the questions that you've answered?
23        A    Yes.
24             MR. HELLER:  Okay.  We'll go off the
25   record for a minute.
```

Page 100

1                    THE REPORTER:  We're now off the record
2       at 2:30 p.m.
3                    (Off the record.)
4                    THE REPORTER: We are now back on the
5       record at 2:39 p.m.
6                    MR. HELLER:  All right.  Mr. Garcia-
7       Ramos, I thank you very much for being here today.
8       That's all the questions I have for you.
9                    THE INTERPRETER (FOR THE WITNESS):
10      Okay.  Thank you.
11                   MR. MORTON:  I have just a couple of
12      questions.
13                            EXAMINATION
14      BY MR. MORTON:
15          Q    Mr. Garcia, I wanted to ask you for a minute
16      about forklifts in the warehouse.
17          A    Yes.
18          Q    You testified to Mr. Heller about moving
19      product into coolers, moving produce?
20          A    Yes.
21          Q    Does that product also get moved elsewhere
22      in the warehouse?
23          A    Yes.
24          Q    And are -- could any of the forklift drivers
25      who work in the warehouse move that product?

```
                                                    Page 101

 1                MR. HELLER:  Object to form.
 2                THE INTERPRETER (FOR THE WITNESS):
 3      Yes.  That's how it is.
 4      BY MR. MORTON:
 5           Q    And how, if a forklift driver -- can you
 6      explain to me the process of a forklift driver being
 7      sent to get, let's call it product or produce that's
 8      in a cooler?
 9           A    They would do it when we would unload it and
10      put it in place, and then afterwards from the other
11      area, they would come, and they'd ask us where the
12      produce was to move it over to repackage it.
13           Q    And simply because some people reading this
14      might not understand the idea of "repackage," could
15      you just explain, when you say "repackage" it, what
16      that means?
17           A    They were taken over to the lines to pack
18      it, to take out the good produce and put good produce,
19      bad produce.
20           Q    And if I'm understanding that right, is it
21      to sort produce so that you send good produce off to
22      customers?
23           A    Yes, that's how it is.
24           Q    And would that produce then get moved back
25      to the coolers or the freezers?
```

Page 102

1          A    That's how it is.

2          Q    Okay.  And that would -- that could be other

3     forklift drivers, not the 18 you talked about that you

4     worked with?

5          A    Yes.

6          Q    And wanted to clear up two other things.

7     You talked with Mr. Heller about asking permission and

8     going home in November of 2022?

9          A    Yes.

10         Q    Did you return to work after going home?

11         A    Yes.  I came back.  I asked for a week and a

12    half and then came back.

13         Q    Do you -- there's two individuals here today

14    not sitting with counsel at the table.  I just wanted

15    to know if you could identify them and indicate your

16    understanding of who they are.

17         A    Identify?

18         Q    Mm-hmm.

19         A    Yes.

20         Q    Could you do that for me?  Just tell me how

21    you know -- if you know them and how you know them and

22    the name you know them by.

23         A    Yes.  I know them through where I was

24    working.  Scott, and we would call him "Chancla."

25              MR. HELLER:  I think it's Clark.

1              THE INTERPRETER:  Clark.  Thank you.

2              MR. HELLER:  Yeah.

3    BY MR. MORTON:

4         Q    Okay.  So one was Clark and one you knew as

5    "Chancla"?

6         A    Yes.  Yes.  That's what we call him.

7         Q    Okay.  And to be -- just to be clear, is

8    Clark on my right wearing a blue shirt?

9         A    Yes.

10        Q    And do you have an understanding of

11   what -- were they supervisors?

12        A    Yes.

13        Q    Can you tell me, as best you understand, the

14   positions they had?

15        A    That my understanding is that Clark was head

16   of the repackaging department and everything that was

17   good.

18        Q    Okay.  And do you have an understanding of

19   the individual you referred to as "Chancla"?

20             MR. HELLER:  Object to form.

21             THE INTERPRETER (FOR THE WITNESS):

22   What he was doing?

23   BY MR. MORTON:

24        Q    Yes.

25        A    That he was in charge of the people who

Page 104

1    would check the produce.  They would call them the

2    QAs.

3         Q    Okay.  And was he a supervisor of yours?

4         A    Yeah.  It would cover everything.

5         Q    I have a quick question about the process of

6    paying rent.

7         A    Yes.

8         Q    You said that paying the rent occurred at

9    the office?

10                   MR. HELLER:  Object to form.

11                   THE INTERPRETER (FOR THE WITNESS):

12   Yes.

13   BY MR. MORTON:

14        Q    Okay.  And I have two questions.  Was this

15   the, like, Southern Valley/Hamilton Grower's office

16   where the warehouse is also located?

17        A    Yeah, it's inside the warehouse.

18        A    Okay.  And do you know whether other

19   warehouse workers paid rent?

20                   MR. HELLER:  Object to form.

21                   THE INTERPRETER (FOR THE WITNESS):

22   Yes.

23   BY MR. MORTON:

24        Q    How do you know that?

25        A    We would pay on Mondays, and Mondays when

Page 105

```
 1      all of us, the renters, would go to pay.
 2          Q    Okay.  And was there any way that your rent
 3      payment was recorded?
 4          A    No, just that Mario Esparza had the book,
 5      and he would mark it, and that was all.
 6          Q    And do you have that book?
 7          A    No.  He's the only one with it.
 8          Q    Okay.  And when you say "him," you're
 9      referring to Mario Esparza?
10          A    Yes.
11          Q    Okay.  And can you tell me, where does Mario
12      Esparza work?
13          A    He works at the other office.  They just
14      call it "Mario's office."
15          Q    Okay.  And is this at the Hamilton
16      Growers/Southern Valley facility?
17          A    Yeah, it's inside the warehouse.
18          Q    Okay.  And what position does he have?
19          A    He's in charge of the other forklift drivers
20      on the other side.
21          Q    Okay.  And those were the forklift drivers
22      that you and I talked about who could move product
23      around the warehouse from the cooler to lines?
24          A    Yes.
25          Q    Okay.  And have you seen those forklift
```

Page 106

1    drivers do this?

2          A    Yes.

3          Q    Does Mario Esparza have a daughter named

4    Emma Esparza?

5          A    Yes.  Yes.  She has a -- he has a daughter

6    whose name is that.

7          Q    Okay.  Does the process of moving product

8    around the warehouse also require being able to read

9    the labels of what's contained?

10         A    Yes.

11         Q    And so any forklift drivers would need to

12   have this skill?

13                  MR. HELLER:  Object to form.

14                  THE INTERPRETER (FOR THE WITNESS):

15   Yes.  They all have.

16   BY MR. MORTON:

17         Q    You talked with Mr. Heller about working in

18   the field a long time ago.

19         A    Yes.

20         Q    Right.  And I just wanted to be clear.  From

21   2018 until you left Hamilton Growers and Southern

22   Valley, did you work in the field?

23         A    No.

24         Q    That time when you worked in the field was a

25   long time ago when Mr. Heller and I were very young

```
                                            Page 107

 1    lawyers?

 2         A    That's right.

 3              MR. HELLER:  I'm going to object to the

 4    extent that it indicates that we're the same age.  I'm

 5    clearly younger.  Come on.

 6    BY MR. MORTON:

 7         Q    I guess one thing also I just wanted to

 8    clarify with you.  Mr. Heller talked about a period in

 9    which you drove a forklift, but also were, like, an

10    office worker in shipping.

11              MR. HELLER:  Object to form.

12              THE INTERPRETER (FOR THE WITNESS):

13    Yes.

14    BY MR. MORTON:

15         Q    Okay.  And I just wanted to make sure when

16    we -- because we're in an office now, but I wanted --

17    I wanted to make sure, when you were talking about

18    working in an office, was this a place in the

19    warehouse, or was it something separate like this

20    building?

21         A    No, it was inside the warehouse itself.

22         Q    Okay.  And you, after -- as I understand it,

23    you were working with labeling boxes.  Would that be

24    fair to say?

25              MR. HELLER:  Object to form.
```

1        THE INTERPRETER (FOR THE WITNESS):

2    Yes.  Yes, that ...

3    BY MR. MORTON:

4        Q    And did you return to being a forklift

5    driver at some point in time?

6        A    Yes.  I returned to that.

7        Q    Okay.  And when you left Hamilton Growers,

8    for example, in 2023, you were a forklift driver?

9        A    Yes.

10        Q    Okay.  And you have training as a forklift

11    driver?

12        A    No.

13        Q    Okay.  My point, I guess, was you don't have

14    training as a lawyer.

15        A    I didn't understand you.

16        Q    Okay.  Do you -- I mean, I guess what I want

17    ask is, do you have any training, have you ever gone

18    to school to be a lawyer, anything like that?  I know

19    it seems humorous.

20        A    No, I never received any training for that.

21        Q    Okay.  And you didn't write this lawsuit?

22        A    Well, I -- I'm doing it.

23        Q    You're the plaintiff?

24        A    Yes.

25        Q    And you understand in serving as a plaintiff

```
 1    that one claim is overtime?
 2                 MR. HELLER:  Object to form.
 3                 THE INTERPRETER (FOR THE WITNESS):
 4    Yes.
 5    BY MR. MORTON:
 6         Q    And do you also understand that another
 7    claim is that the defendants, Hamilton Growers and
 8    Southern Valley and the others, broke an agreement
 9    with you and the other workers to pay you correctly?
10                 MR. HELLER:  Object to form.
11                 THE INTERPRETER (FOR THE WITNESS):
12    Again, the question?
13    BY MR. MORTON:
14         Q    Sure.  And I wanted to use the -- do you
15    understand -- are you -- are you asserting a claim in
16    this lawsuit for being paid unfairly?
17         A    Yes.
18                 MR. MORTON:  Okay.  And can we go off
19    the record for just one minute?  I think --
20                 THE REPORTER:  We're off the record at
21    3 p.m.
22                 (Off the record.)
23                 THE REPORTER:  We are back on the
24    record at 3:02 p.m.
25                 MR. MORTON:  I don't have any further
```

```
                                                  Page 110
```

1       questions.

2                      MR. HELLER:  All right.  I have just

3       one topic to follow up on.

4                      THE INTERPRETER (FOR THE WITNESS):  I'm

5       sorry.

6                             EXAMINATION

7       BY MR. HELLER:

8           Q    All right.  During Dawson's redirect, you

9       talked about forklift drivers who move produce to the

10      repack room?

11                     MR. MORTON:  Objection.

12                     THE INTERPRETER (FOR THE WITNESS):

13      Yes.

14      BY MR. HELLER:

15          Q    The vast majority of the time, the drivers

16      who move produce in and out of the repack room were

17      the drivers from the crew you worked on; correct?

18          A    No.  No, Mario's crew, that was what he was

19      in charge of, that they moved on the side.

20          Q    Okay.  So they could move -- so either,

21      because you said you moved some in and out of there.

22      Either crew could move it?

23                     MR. MORTON:  Objection.

24                     THE INTERPRETER (FOR THE WITNESS):

25      Yes.

Page 111

1    BY MR. HELLER:

2        Q    Okay.  And you don't know who would be

3    moving it at any given time if you weren't on the

4    other crew?

5                    THE INTERPRETER:  I'm sorry?

6    BY MR. HELLER:

7        Q    You don't know who would be moving the

8    produce in and out of the repack crew from the other

9    crew, because you weren't on that crew; correct.

10       A    Well, we do know it, because we know the

11   people who move that.

12       Q    You would see them sometimes.

13       A    Well, we'd see them, but we knew it really

14   well, because all of us, all of us have our position.

15                   MR. HELLER:  Okay.  I don't have any

16   more questions.

17                   MR. MORTON:  Okay.

18                   THE REPORTER:  Okay.  Before we go off

19   the record -- before we go off the record, Mr. Morton,

20   you already said that your client would like to read

21   and sign; correct?

22                   MR. MORTON:  Yes.  Thank you for

23   asking.

24                   THE REPORTER:  All right.  And would

25   you like to order a copy of today's transcript?

Page 112

1                    MR. MORTON:  Yes.  I'm interested in

2      electronic copy.

3                    THE REPORTER:  Electronic.

4                    MR. HELLER:  Yes.  I am e-tran as well.

5      And I assume as the noticer. I must purchase the

6      original --

7                    THE REPORTER:  Yes.

8                    MR. HELLER:  -- which I will do so.

9                    THE REPORTER:  All right.  Thank you

10     very much.  That concludes this proceeding.  We are

11     now off the record at 3:05 p.m.

12                    (Signature reserved.)

13                    (Whereupon, at 3:05 p.m., the

14                    proceeding was concluded.)

15

16

17

18

19

20

21

22

23

24

25

Page 113

```
 1            CERTIFICATE OF DEPOSITION OFFICER
 2            I, JASMINE APPLEWHITE, the officer before
 3     whom the foregoing proceedings were taken, do hereby
 4     certify that any witness(es) in the foregoing
 5     proceedings, prior to testifying, were duly sworn;
 6     that the proceedings were recorded by me and
 7     thereafter reduced to typewriting by a qualified
 8     transcriptionist; that said digital audio recording of
 9     said proceedings are a true and accurate record to the
10     best of my knowledge, skills, and ability; that I am
11     neither counsel for, related to, nor employed by any
12     of the parties to the action in which this was taken;
13     and, further, that I am not a relative or employee of
14     any counsel or attorney employed by the parties
15     hereto, nor financially or otherwise interested in the
16     outcome of this action.

17                                JASMINE APPLEWHITE
18                                Notary Public in and for the
19                                State of Georgia
20
21     [X] Review of the transcript was requested.
22
23
24     Dated: May 7, 2025
25
```

Page 114

1                  CERTIFICATE OF TRANSCRIBER

2              I, LAURA MORIN, do hereby certify that this

3      transcript was prepared from the digital audio

4      recording of the foregoing proceeding, that said

5      transcript is a true and accurate record of the

6      proceedings to the best of my knowledge, skills, and

7      ability; that I am neither counsel for, related to,

8      nor employed by any of the parties to the action in

9      which this was taken; and, further, that I am not a

10     relative or employee of any counsel or attorney

11     employed by the parties hereto, nor financially or

12     otherwise interested in the outcome of this action.

13

14                                   _Laura Morin_

15                                   LAURA MORIN

16

17

18

19

20

21

22

23

24     Dated: May 7, 2025

25

Page 115

1    DAWSON MORTON, ESQUIRE

2    dawson@dawsonmorton.com

3                      May 7, 2025

4    RE: Garcia-Ramos, Arnulfo, Et Al. v. Southern Valley Fruit &
        Vegetable, Inc, Et Al.

5        4/23/2025, Arnulfo Garcia-Ramos (#7326506)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to

15   Erratas-CS@veritext.com.

16    Return completed errata within 30 days from

17   receipt of testimony.

18     If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22                  Yours,

23                  Veritext Legal Solutions

24

25

Page 116

1    Garcia-Ramos, Arnulfo, Et Al. v. Southern Valley Fruit &

Vegetable, Inc, Et Al.

2    Arnulfo Garcia-Ramos (#7326506)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____     _____

24   Arnulfo Garcia-Ramos                      Date

25

Page 117

1    Garcia-Ramos, Arnulfo, Et Al. v. Southern Valley Fruit &
     Vegetable, Inc, Et Al.

2    Arnulfo Garcia-Ramos (#7326506)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Arnulfo Garcia-Ramos, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   Arnulfo Garcia-Ramos                         Date

13   *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                    _____ DAY OF _____, 20____.

16

17

18                    _____

19                    NOTARY PUBLIC

20

21

22

23

24

25

[& - 30030]

| & | | | |
|---|---|---|---|
| **&**  1:10 2:13,19 6:8 115:4 116:1 117:1 | **12:10**  68:20 | 47:10,17 48:7 | 68:1,7 69:12 |
| | **12:30**  65:1 | 48:22,23 49:4 | 75:5 87:15 |
| | **13th**  15:7 | 50:2,8,8 51:1 | 108:8 |
| | **14**  4:10 | 51:12 52:9,20 | **2025**  1:19 6:9 |
| **0** | **18**  34:18 79:18 | 55:12,18 57:9 | 113:24 114:24 |
| **00054**  1:11 | 79:19 80:1 | 57:11,14,23 | 115:3 |
| | 92:21 102:3 | 58:4,8,9,12 | **21**  22:8,16 |
| **1** | **1808**  2:7 | 61:3,12 62:11 | **22**  5:25 |
| **1**  4:9 5:13,24 | **194.34**  51:2 | 62:15,19 64:19 | **23**  1:19 5:14 |
| 13:24 14:1 | **194.35**  50:3,7 | 65:16 68:7 | 6:9 |
| 20:25 21:2,15 | 51:15,19 | 69:11 75:5 | **24**  5:15 |
| 50:8 | **1986**  15:7 | 78:2,8,8 79:13 | **240-4143**  2:25 |
| **10**  4:3 5:9 | **1:07**  68:23 | 79:17,18 80:18 | **240-4146**  2:24 |
| 77:16,17 | **1:23**  77:9 | 87:15 106:21 | **26**  79:25 |
| **10.95**  78:14 | **1:27**  77:12 | **2019**  4:14 | **26338**  114:14 |
| **10.95.**  78:16 | **1:53**  89:19 | 43:25 61:22,23 | **2:05**  89:22 |
| **100**  4:4 | **1st**  78:3 | 61:23,25 62:4 | **2:30**  100:2 |
| **10:01**  1:20 6:5 | | 78:3,8 | **2:39**  100:5 |
| **10:16**  17:12 | **2** | **2020**  4:16,24 | **2a**  17:25 32:25 |
| **10:21**  17:15 | **2**  4:11 5:15 | 28:4 43:25 | 33:1,3,8,13 |
| **10:25**  20:7 | 34:18,19 | 64:15 84:3 | 37:20,24 39:3 |
| **10:30**  20:10 | **20**  88:2 117:15 | **2021**  4:18 5:5 | |
| **11**  75:18 | **2009**  31:11 | 43:25 62:19 | **3** |
| **110**  4:5 | 75:17 | 84:2,3 | **3**  4:13 5:16 |
| **11:10**  43:7 | **2010**  67:24,25 | **2022**  4:20 | 43:15,16,21 |
| **11:16**  43:10 | 75:17 | 43:25 62:12,17 | 109:21 |
| **12**  58:23,24 | **2016**  16:8 | 66:1,4,17 | **30**  115:16 |
| 59:2,12,15,19 | **2017**  33:16,21 | 79:16 102:8 | **300**  47:19 48:2 |
| 62:23 64:25 | 33:25 | **2023**  5:6 21:22 | 48:23 49:1,3 |
| **1230**  2:20 | **2018**  4:12,23 | 29:20 34:13 | 51:1 52:23 |
| **125**  1:22 6:10 | 29:20 33:6,11 | 38:19 40:11 | 53:2,5,10 62:6 |
| **12:06**  67:12 | 34:13 36:4 | 52:9,20 61:5,6 | 62:21 |
| | 38:15,19 40:10 | 62:11 64:19 | **30030**  1:23 |
| | 46:17 47:2,7 | 65:16 67:19,22 | 6:11 |

| | | | |
|---|---|---|---|
| **30309** 2:21 | **7** | **absent** 6:15 | **add** 14:12 |
| **310** 53:9 | | **absolutely** | 36:11 |
| **33151** 113:16 | **7** 4:21 5:20 | 18:23 | **added** 36:12 |
| **34** 4:12 | 45:9,10,11,13 | **accept** 32:14,21 | **additional** |
| **350** 48:2 49:1 | 45:14,22 51:6 | **accident** 95:19 | 74:10 |
| 53:2,2,5,10 | 52:7 113:24 | **accidents** 95:22 | **additionally** |
| 56:5 62:22 | 114:24 115:3 | 96:1,2 | 6:15 |
| **380** 1:22 6:10 | **7326506** 1:25 | **accuracy** 115:9 | **additions** 117:6 |
| **3:02** 109:24 | 115:5 116:2 | **accurate** 27:6 | **address** 16:18 |
| **3:05** 112:11,13 | 117:2 | 52:18 54:13 | 17:4,19 20:22 |
| **4** | **77** 5:8,9 | 79:7 113:9 | 20:24 21:6 |
| | **7:24** 1:11 | 114:5 | 36:15,17 |
| **4** 4:15 5:17 | **8** | **accurately** | **administer** |
| 43:15,21 | | 20:24 78:1,7 | 6:13 |
| **4/23/2025** | **8** 5:3 45:12,13 | 78:17 | **adverse** 76:10 |
| 115:5 | 45:14,16,19,22 | **acknowledge...** | **aewr** 76:13 |
| **40** 20:18 33:14 | 52:7 | 117:3 | **affect** 13:13 |
| 33:24 | **9** | **acknowledge...** | **age** 22:8 107:4 |
| **400** 62:13 | | 6:13 | **ago** 44:4 48:18 |
| **404** 2:11,24,25 | **9** 5:7 77:15,17 | **acknowledg...** | 67:18 106:18 |
| **43** 4:14,16,18 | **94710** 2:8 | 115:12 | 106:25 |
| 4:20 | **97** 5:16 | **acquaintance** | **agree** 6:14,17 |
| **45** 4:24 5:6 | **98** 5:17 | 56:15 | 23:19,24 27:5 |
| **450** 55:21,24 | **99** 5:18,19,20 | **action** 1:9 | 76:15,20 97:20 |
| 58:15,24 59:11 | **a** | 113:12,16 | **agreed** 75:4 |
| 60:3 | | 114:8,12 | **agreeing** 22:21 |
| **5** | **a.m.** 1:20 6:5 | **actions** 17:6 | **agreement** |
| | 17:12,15 20:7 | **actual** 9:17 | 17:18 19:3 |
| **5** 4:17 5:18 | 20:10 43:7,10 | 16:23 17:5 | 27:23 109:8 |
| 43:15,21 | **ability** 12:20,23 | 52:15 | **agricultural** |
| **590-1295** 2:11 | 13:5 92:1 93:1 | **actually** 13:23 | 18:10 19:14 |
| **6** | 113:10 114:7 | 38:6 | **ahead** 37:12 |
| | **able** 91:21 | **adali** 88:11 | 90:13,14 |
| **6** 4:19 5:19 | 106:8 | | |
| 43:15,16,21 | **above** 22:8 | | |
| | 115:6 117:7 | | |

**air**  37:13
**al**  6:8,9 115:4,4
  116:1,1 117:1
  117:1
**alberto**  98:11
  98:13 99:12
**allegations**
  97:15
**allege**  85:2
**alleges**  46:11
**allotted**  115:19
**allowed**  70:21
  71:14
**america**  47:15
**amisdai**  98:11
  98:13
**amount**  47:10
  48:21 50:13,19
  51:4 52:23
  53:1 76:22
  87:24
**amounts**  51:6
  52:12 78:7
**anna**  52:3
**answer**  11:10
  11:18,25,25
  12:20,24 16:20
  18:2,15,22
  19:5,9,20,23
  20:2 30:3 42:4
  47:25 54:14,23
  55:16 70:14
  71:6 84:25

**answered**
  99:18,22
**answers**  10:19
  12:11 14:17
  54:8
**antonio**  98:16
**anulfo**  16:11
**appeared**  44:15
**appears**  43:22
**appended**
  117:7
**applewhite**
  1:24 6:3 113:2
  113:17
**applicable**  6:21
  115:8
**applications**
  37:23
**applied**  37:19
**appreciate**  54:7
**approved**
  39:13
**approximate**
  16:9 48:24,24
  52:25 53:5
**approximately**
  49:3 51:1 53:3
  57:13 79:25
**approximation**
  49:1 55:23
**april**  1:19 6:9
  78:3,8
**area**  79:15,24
  80:2,6,8,10,11

  80:15 81:1,4,5
  83:19,21,22
  92:2,3,22 93:1
  93:25 94:12,16
  94:17,17,24
  95:1,2,3,5
  101:11
**argue**  27:15
  28:8
**arguing**  42:10
  81:19
**arnulfo**  1:5,18
  2:2 4:12,14,16
  4:18,20 5:7 6:6
  6:7 9:2,9 10:8
  15:5,9 115:4,5
  116:1,2,24
  117:1,2,4,12
**arranged**  60:6
**arrangements**
  60:8,11
**arrive**  35:16
  39:10
**arrived**  80:23
**arriving**  47:11
**arturo**  98:24
**aside**  16:11
  29:10
**asked**  11:12
  59:18 66:15,16
  66:18 74:5
  99:19 102:11
**asking**  27:11,14
  29:9 40:10

  45:4,24 49:17
  54:11 58:1
  77:4 79:10
  81:21 86:16
  93:23 94:2
  97:7,10 102:7
  111:23
**asserting**
  109:15
**assigned**  6:3
**associates**  65:7
**assume**  11:11
  32:9 112:5
**atlanta**  2:21
**attached**
  115:11
**attendance**  7:3
**attorney**  7:7,8
  7:11,12 29:8
  113:14 114:10
  115:13
**attorneys**  7:3
  97:8,11
**audio**  113:8
  114:3
**authorized**
  6:12
**available**  41:1
  63:25 115:6
**avenue**  1:22
  6:10
**avoid**  32:17
**aware**  12:22
  13:19 26:22

33:11

**b**

**b** 2:17 4:7 5:1
**back** 8:2 17:14
  20:9,13 38:18
  38:23 43:9
  55:1,12 60:4
  62:2 64:10
  68:13,19,23,24
  74:18 77:11
  82:14 89:21
  100:4 101:24
  102:11,12
  109:23
**bad** 82:18
  101:19
**baggage** 55:14
  56:6
**bankruptcy**
  28:22
**barracks** 85:8
  85:12,16,25
  86:15
**based** 70:23
**basis** 13:10
  50:16
**bathroom**
  11:15
**began** 47:14
**beginning** 36:4
**behalf** 2:2,13
  7:7,9

**believe** 13:4
  28:2 69:7 90:2
**berkeley** 2:8
**best** 33:23 44:1
  44:14 76:15,20
  78:10,15 79:10
  103:13 113:10
  114:6
**better** 68:4
**big** 81:16
**bills** 91:21
**birth** 15:6
  72:10
**bit** 52:7 77:20
  80:4 87:6
  96:10
**blue** 103:8
**book** 105:4,6
**border** 55:15
  56:9
**boss** 42:16
**bought** 67:20
**boxes** 80:16,22
  90:5 107:23
**breached** 96:20
**break** 11:14,16
  11:19,19 18:6
  43:3 69:3
**bring** 73:20
**bringing** 96:18
**broader** 58:1
**broke** 109:8
**brother** 56:24
  57:1,7 58:20

60:6
**building** 81:13
  81:14,15,16
  107:20
**bus** 41:1,4,12
  41:20 53:21
  54:25 55:9
**buses** 41:17,23
  42:21 54:3
  55:10
**butcher** 99:9
**buy** 67:17 68:3

**c**

**c** 2:1 3:1 5:11
  6:1 42:24
**ca** 2:8
**cadillac** 67:24
**calculate** 47:20
**call** 10:7 46:12
  46:23 80:5,8,9
  95:2 101:7
  102:24 103:6
  104:1 105:14
**called** 9:3 36:23
  94:12
**calls** 29:23
**camp** 36:24
  37:2,5 87:18
**campo** 36:25
  37:6 84:18
  86:7,19 87:17
**capacity** 93:1

**car** 40:24 41:9
  41:13 42:16
  53:18 61:24
  62:8 63:2,3,7
  63:14,15,16,17
  63:18,19,20,20
  63:25 64:2
  67:15,16,17,23
  68:15
**card** 72:7,18,20
**cars** 68:2
**case** 10:10
  16:22 23:10
  27:24 44:24
  49:13
**cash** 39:25 40:1
**castillo** 1:6 2:3
  3:3 4:23 5:5,16
  8:9,10 97:15
  98:6
**catherine** 3:6
  8:19
**cause** 51:20
  56:5 79:23
**caution** 31:1
  84:20
**cell** 60:21
**certain** 10:19
  12:25
**certainly** 44:25
**certificate**
  72:10 113:1
  114:1

**[certified - conversations]**

| | | | |
|---|---|---|---|
| **certified** 6:18 | **claiming** 24:23 | **communicati...** | **confidential** |
| **certify** 113:4 | 46:22 | 29:8 97:7 98:4 | 37:15 |
| 114:2 | **claims** 24:16 | 98:5 | **confirm** 22:13 |
| **chalchicuautla** | 26:23 96:18 | **company** 30:9 | **confused** 91:9 |
| 21:17 | **clairemont** | 30:13,16 56:11 | **consider** 29:19 |
| **chancla** 102:24 | 1:22 6:10 | 70:20 76:9 | **considered** |
| 103:5,19 | **clarify** 107:8 | 82:8 91:18 | 71:19 |
| **chandler** 3:4 | **clark** 102:25 | 96:20 | **constitute** 6:25 |
| 8:5 | 103:1,4,8,15 | **company's** | **consulate** 38:8 |
| **change** 69:8 | **clear** 53:4 | 79:6 | 38:15,19,24 |
| 116:4,7,10,13 | 64:16 102:6 | **complain** 92:18 | 39:12,12 |
| 116:16,19 | 103:7 106:20 | **complaint** | **cont'd** 3:1 5:1 |
| **changed** 87:2,3 | **clearly** 27:11 | 28:20 85:2 | **contact** 56:23 |
| **changes** 115:10 | 107:5 | 96:11,14,23,24 | 57:1 60:9,18 |
| 117:6 | **clerk** 84:2 | 96:25 97:16 | 60:19 61:15,16 |
| **charge** 56:4 | **client** 16:20 | **complete** 35:13 | **contacted** |
| 85:12 89:15 | 111:20 | 43:20 44:7 | 56:24 58:20 |
| 103:25 105:19 | **columns** 44:22 | 77:2 117:8 | **contained** |
| 110:19 | 44:23 | **completed** | 106:9 |
| **charged** 48:2 | **come** 40:21,22 | 44:15 115:16 | **continue** 30:3 |
| 62:12 | 51:20,21 56:16 | **complied** 96:22 | 32:22 71:2 |
| **chatted** 24:8 | 57:2 69:1 74:6 | **concern** 12:9 | 73:5 |
| **check** 104:1 | 82:6,7,9 90:8 | **concerned** | **continuing** |
| **children** 21:25 | 91:2 101:11 | 16:24 | 32:14 49:16 |
| 22:8,16 88:18 | 107:5 | **concerns** 16:21 | **contract** 34:11 |
| **chose** 41:4 87:5 | **comes** 55:13 | 16:23 17:5 | 36:4 65:18,19 |
| **circulation** | 58:19,21 81:18 | **concluded** | 74:1 96:21,22 |
| 37:13 | 91:22 95:1 | 112:14 | **contracted** |
| **civil** 1:9 9:12 | **comfortable** | **concludes** | 73:22 |
| 11:24 49:20 | 85:10 | 112:10 | **contratado** |
| **claim** 24:24 | **coming** 35:23 | **conclusion** | 73:21 |
| 50:21,22 109:1 | 38:6,9 39:4 | 29:24 | **conversations** |
| 109:7,15 | **communicated** | **condition** 41:24 | 97:5,10 |
| | 23:10,13 | 42:22 68:15 | |

**cooler** 101:8
105:23
**coolers** 100:19
101:25
**copied** 97:8
**copies** 115:14
**copy** 4:21 5:3
35:10 44:9
111:25 112:2
**correct** 27:25
41:14,20 42:16
44:9 49:5
52:20 53:1,21
54:10 60:7
62:24 69:16
70:16 71:24
78:15,18 79:8
81:7,18 82:14
83:12,21,24
85:3 90:22
92:3 93:21
94:19 96:8
97:2 110:17
111:9,21 117:8
**corrections**
117:6
**correctly** 109:9
**cost** 46:19,19
47:5,6 48:6
56:1 59:3 62:3
62:7,10,14,19
63:5,6,25
**costs** 46:13,14
46:18,21,24

47:1,7,10,18
48:6,22 49:5
50:3,7 51:14
51:19 52:8,16
52:17,19 53:6
53:13,13 55:11
55:17 57:17
58:11 60:3
62:4 63:22
64:17 65:12
67:5
**counsel** 9:7
11:23 14:6,17
14:18 17:2
19:2,4 23:2,21
23:25 24:13
29:3,11,14
43:11 48:14
89:23 97:21
98:21 99:3,7
99:16 102:14
113:11,14
114:7,10
115:14
**counsel's** 14:6
**couple** 100:11
**court** 1:1 10:17
27:24 28:14
**cover** 52:15
104:4
**coworkers**
23:22 24:7
88:6

**crew** 110:17,18
110:22 111:4,8
111:9,9
**crops** 90:3
**cross** 95:11
**crx** 67:24,25
**cs** 115:15
**current** 16:17
16:22 17:18,19
18:9,20 19:5,7
19:13,16,24
21:6 25:3
**currently** 17:22
20:15,17
**customers**
101:22
**cv** 1:11

**d**

**d** 4:1 5:11,11
5:22 6:1
**data** 4:21 5:3
**date** 1:19 15:6
15:25 16:3,9
57:11 116:24
117:12
**dated** 113:24
114:24
**dates** 28:13,15
**daughter** 106:3
106:5
**david** 2:18 7:8
65:8

**dawson** 2:4,6,9
7:10 44:21
115:1,2
**dawson's** 110:8
**dawsonmorto...**
2:9,10 115:2
**day** 10:16
40:21 65:6
79:23 83:9
93:4,4 97:18
117:15
**days** 39:7,14,15
39:15 40:18
83:9,9 115:16
**deal** 24:20
**decatur** 1:23
6:10
**december** 70:8
74:19 75:9
**decide** 65:4
**declare** 117:4
**deducted** 71:11
**deemed** 117:6
**deeper** 71:23
**defendant** 7:9
37:19
**defendants**
1:16 2:13 4:9
7:7 10:10 17:6
23:14 24:12
25:4,9 26:7,17
69:23 109:7
**defense** 19:3
23:2

**define** 85:15
**defined** 47:7
**delays** 95:11
**delgado** 98:12
**deliver** 80:15
  80:17
**delivered** 81:17
  83:12
**department**
  28:20 90:11,21
  103:16
**depend** 90:7,7
**deponent**
  115:13 117:3
**deposed** 29:14
**deposing** 27:13
  115:13
**deposition** 1:18
  6:6,23 9:9 10:7
  10:12 22:6
  28:25 29:5,5
  29:10 113:1
**deposition's**
  9:17
**description** 4:8
  5:2,12,23
**desire** 16:25
**destination**
  92:7
**diagnosed** 13:1
**diego** 5:9 15:13
  15:17,22 16:3
  16:12 71:23
  72:8,11,15,21

73:12
**difference** 7:23
**different** 11:4
  21:4 25:20
  28:15 42:3
  52:8 61:9,9,19
  72:6 81:4
  94:21,22 97:1
**digging** 71:22
**digital** 113:8
  114:3
**directed** 11:25
**directly** 91:13
**disagree** 14:24
  54:8
**disbelief** 54:12
**discovery**
  49:12 97:22
  98:22
**discuss** 18:6
  24:23
**discussed** 46:19
**displaying**
  54:12
**dispute** 28:12
  50:6,12,16
  52:12
**distaste** 54:12
**district** 1:1,2
  5:25 22:25
**division** 1:3
**dlerner** 2:23
**docks** 80:9

**document**
  13:21 14:4
  45:1,4,6,6,25
  46:5,6 49:11
  49:12,17,21
  50:2,13
**documentation**
  71:13 72:17
**documents**
  29:4 34:22,25
  43:14,18,21,25
  44:15 45:21
  77:14,23 79:5
**doing** 75:11,19
  79:8 84:4
  92:23,24 93:4
  93:20 94:4
  103:22 108:22
**dollars** 49:1
  76:16
**domestic** 71:13
**door** 37:11
**draw** 49:22
**drink** 11:15
**drive** 20:16
  57:2,4 61:4
  63:11,15,18
  64:1,2
**driver** 60:7
  83:15 101:5,6
  108:5,8,11
**driver's** 72:14
  83:16

**drivers** 55:9
  61:9 79:14,19
  79:20,22 83:17
  83:24 91:24
  92:1,21 93:18
  94:3 95:5
  100:24 102:3
  105:19,21
  106:1,11 110:9
  110:15,17
**driving** 19:16
  20:15 64:8
  68:15 84:6,10
**drove** 27:13
  55:7 56:10
  58:18 60:20
  61:12,13,21
  64:6,10,11
  80:19 84:5,6
  107:9
**duly** 9:3 113:5
**duties** 90:2

e

**e** 2:1,1 3:1,1 4:1
  4:7 5:1,11,11
  5:11,11,19,22
  5:22,22 6:1,1
  97:13 98:2
  112:4 116:3,3
  116:3
**early** 66:17
  67:4

easier  69:20
77:20
easy  84:24
eat  65:5
eduardo  66:20
66:22
effect  76:10
effective  27:22
either  30:25
40:24 42:21
56:2 61:24
76:14 98:10
110:20,22
electronic  98:3
112:2,3
electronically
97:6
eligible  67:4
emergency
67:8
emma  52:3
106:4
emmanuel  99:4
emotional
12:18
employed  37:6
69:14 70:21
71:14 113:11
113:14 114:8
114:11
employee  71:14
113:13 114:10
employer  16:24
18:11,20 19:5

19:7,14 29:20
30:9,10
employer's
16:25
employment
5:14,15 23:14
23:20 24:12
29:17 31:14
32:11 34:12
ends  94:21,22
english  8:20
13:22 14:4,18
18:25 21:2
enjoyed  87:6
ensure  97:21
entire  37:6
87:14
entitled  46:22
errata  115:11
115:13,16
erratas  115:15
es  113:4
esparza  86:10
89:6,8,10
105:4,9,12
106:3,4
esquire  2:4,5
2:17,18 115:1
essentially
84:13
et  6:8,9 115:4,4
116:1,1 117:1
117:1

evaluated  29:2
evidence  9:13
evidentiary
6:22
exact  16:9
44:25 47:6
48:21 53:10
56:3 62:3 75:7
exactly  49:4
52:19 53:6
55:24 83:20
86:16
examination
4:2 9:10 10:2
100:13 110:6
examined  9:5
example  82:18
108:8
exceeded  51:19
excel  44:25
except  9:16
exchange  73:10
excuse  68:22
exhibit  4:9,11
4:13,15,17,19
4:21 5:3,7,9
13:23,24 14:1
20:25 21:2,15
34:18,19 43:16
43:16,21 45:2
45:14,14,22
51:6 52:7,7
77:15,16,17,17

exhibits  43:15
expect  46:7
expenses  46:12
51:17
expensive
55:13
explain  42:19
92:16 101:6,15
extent  27:20
28:5 107:4
extremely
16:24

**f**

f  5:22 42:24
facebook  5:13
23:7,8,10,12,13
facility  105:16
fact  50:7,12
52:12
fails  115:18
fair  11:10,20
34:10 50:18
51:3 60:3
68:16 70:14
77:4 81:22
83:10 107:24
fairly  82:14
83:1
family  5:24
22:22 31:17
88:14
far  88:2

| | | | |
|---|---|---|---|
| **fare** 50:17 | 21:8 30:5 | 92:21 93:1,18 | 98:19 99:14 |
| 51:10 | 33:19 38:21 | 94:3,24 95:4 | **front** 61:1 |
| **farm** 35:20 | 46:1,25 53:12 | 95:13,17,18 | 79:24 94:24 |
| 75:13,23 76:6 | 54:6,21 60:2 | 100:24 101:5,6 | **fruit** 1:10 2:13 |
| 76:7 94:18 | 63:9 69:9,13 | 102:3 105:19 | 6:8 115:4 |
| **farms** 91:22 | **first** 4:10 8:17 | 105:21,25 | 116:1 117:1 |
| **favor** 56:17 | 9:3 15:14,21 | 106:11 107:9 | **full** 15:3 41:17 |
| **february** 57:16 | 16:2,8 31:7,13 | 108:4,8,10 | 42:21 66:21 |
| 57:16,19 69:11 | 33:2,7 68:3 | 110:9 | 84:21 |
| 70:4,7 71:12 | **fisher** 2:19 | **forklifts** 55:7 | **further** 27:19 |
| 73:16 75:8 | **fisherphillips...** | 79:19 93:2 | 109:25 113:13 |
| **federal** 9:12,13 | 2:22,23 | 100:16 | 114:9 |
| 49:20 | **fit** 44:22 58:22 | **form** 4:11,13 | |
| **fee** 55:14 | 58:23 59:2,13 | 4:15,17,19 | **g** |
| **felt** 87:11,11 | 59:18 62:25 | 9:16 12:10,11 | **g** 6:1 |
| **field** 36:23 | 63:1 | 13:9,10 30:1 | **ga** 1:23 2:21 |
| 81:18 85:18 | **five** 22:4 39:7 | 42:13 54:23 | **garcia** 1:5,18 |
| 87:17 95:1 | 39:14 40:18 | 70:23 101:1 | 2:2 4:12,14,16 |
| 106:18,22,24 | 83:9 | 103:20 104:10 | 4:18,20,22 5:4 |
| **fields** 75:18 | **follow** 110:3 | 104:20 106:13 | 5:7 6:7,7 8:14 |
| 91:13 | **following** 94:14 | 107:11,25 | 9:2,10 15:5,9 |
| **figured** 14:14 | **follows** 9:5 | 109:2,10 | 16:11 100:6,15 |
| **file** 1:10 | **foregoing** | **formal** 28:20 | 115:4,5 116:1 |
| **filed** 25:4 26:6 | 113:3,4 114:4 | **forward** 32:18 | 116:2,24 117:1 |
| 26:16 28:19,22 | 117:5 | **found** 31:17 | 117:2,4,12 |
| 33:7 96:11,15 | **forever** 96:25 | **four** 63:4,19 | **garza** 66:20,22 |
| **fill** 35:4,7,12 | **forget** 9:24 | 87:21 | 66:22 67:3 |
| 44:8 | **fork** 55:7 | **free** 85:12 | **gas** 63:23,24 |
| **filled** 35:2 44:4 | **forklift** 19:17 | **freedom** 87:6 | **gasoline** 47:22 |
| **final** 92:7 | 20:15,16 27:13 | **freezers** 101:25 | **generally** 85:24 |
| **financially** | 55:9 79:14,19 | **freezing** 82:23 | **gentlemen** 8:1 |
| 113:15 114:11 | 79:20,22 80:19 | **frequently** 65:8 | **georgia** 1:2 |
| **fine** 12:5,11 | 83:15,16,17,23 | **friends** 39:20 | 6:10,13 22:9 |
| 14:20 18:21 | 84:6,6 91:24 | 40:14 88:7 | 36:5 40:22 |

46:20 82:10
92:11 113:19
**getting**  97:18
**girl**  88:19,19
**give**  10:23
  18:20 19:4,6
  24:1 35:4,16
  40:4,20 44:8
  44:17,18 48:10
  50:19 51:24
  53:10 54:8
  73:10 97:24
  99:2,6
**given**  111:3
  117:9
**giving**  19:24
**go**  10:16 11:15
  15:21 17:7
  19:20 20:4
  36:1 37:12
  38:3,8,15,23,23
  39:13 42:20
  53:17 57:20
  58:7 61:11
  65:1,17 66:8
  66:12 67:7,9
  74:18 77:6
  80:25 82:18
  88:23 89:17
  90:13,13 92:6
  92:9 96:24
  99:24 105:1
  109:18 111:18
  111:19

**goes**  66:23
**going**  8:16 9:11
  10:14 11:1
  12:9 13:21,22
  13:22,23 16:19
  17:21 18:1,12
  18:15,19 19:4
  19:11 20:2
  27:15 28:8
  34:18 42:2,24
  42:25 43:14
  45:1,1,5,21
  46:16 50:22
  71:3,17 74:6
  76:4 77:14,15
  77:19 82:15
  93:13 97:4
  98:2 99:9
  102:8,10 107:3
**good**  6:2 10:4,5
  41:24 42:22
  68:17 69:1
  87:9 101:18,18
  101:21 103:17
**government**
  72:13
**grimes**  3:4 8:5
  8:5
**grower's**
  104:15
**growers**  1:12
  2:14 4:11,13
  4:15,17,19
  25:8 29:17

31:8,14,24
32:3,10,15,25
33:8,12 35:20
35:23 37:7,18
38:6,9 39:5
41:2 51:13
53:13,14,15,21
55:12,18 57:10
57:14,18,23
58:3,12,18,25
59:4,8,16,16,22
59:22 61:5,13
61:21 64:2,18
65:11,12,16
66:3,16 68:6
68:13 69:15
73:16 75:8,13
76:5 79:8,15
81:7 84:17
85:17 86:20
87:15 90:17,22
91:1 105:16
106:21 108:7
109:7
**grown**  81:6
  90:17,25 94:18
**guerrero**  98:9
  98:10
**guess**  36:3
  41:11 50:11
  107:7 108:13
  108:16
**guests**  68:25

**guys**  8:2 65:4
  69:1

**h**

**h**  4:7 5:1 17:25
  32:25 33:1,3,8
  33:13 37:20,23
  39:3 116:3
**habits**  65:7
**half**  102:12
**hamilton**  1:11
  1:12,13 2:14
  2:15,15 4:11
  4:13,15,17,19
  25:8 29:17
  30:18,18 31:8
  31:14,24 32:3
  32:10,15,24
  33:8,12 35:20
  35:23 37:7,18
  38:6,9 39:4
  41:2 51:13
  53:13,14,15,21
  55:12,18 57:10
  57:14,18,23
  58:3,12,15,18
  58:25 59:4,8
  59:10,15,16,21
  59:22 61:5,13
  61:21 62:5
  64:2,18 65:11
  65:12,16 66:3
  66:16 68:6,13
  69:15 73:16

| | | | |
|---|---|---|---|
| 75:8,12 76:5 | 15:1,2,20 16:1 | 55:22 57:8 | **help** 10:15 |
| 79:8,15 81:6 | 16:10,16 17:7 | 58:16 60:17 | **hendrick** 3:5 |
| 84:17 85:17 | 17:16 18:4,8 | 62:18 63:9,12 | 8:4,4 |
| 86:20 87:15 | 18:17,21,23 | 64:23 65:2,9 | **hereto** 113:15 |
| 90:17 91:1 | 19:10 20:4,11 | 66:9,14,23 | 114:11 117:7 |
| 104:15 105:15 | 20:12 21:3,5 | 67:2,9,14 | **hire** 37:21 63:7 |
| 106:21 108:7 | 21:13,18 22:5 | 68:16,24 69:2 | 74:7 |
| 109:7 | 22:13,17,20 | 69:19,22 70:1 | **hired** 56:12 |
| **hamilton's** | 23:5 24:4,9,17 | 70:5,22 71:2,5 | 73:20,22 74:19 |
| 86:23 | 24:20 25:1,13 | 71:8,9,21 | 74:21 |
| **hand** 8:15,18 | 26:1,14,21 | 73:23,24 74:8 | **hiring** 57:15 |
| 34:18 39:10,10 | 27:4,16,18,25 | 74:13 75:20 | **hmm** 65:24 |
| 43:14 45:21 | 28:2,11,16,18 | 76:3 77:6,13 | 67:21 91:7,10 |
| 52:4 | 29:22,25 30:5 | 78:6,9,25 79:2 | 102:18 |
| **handed** 35:8 | 30:8,14 31:5 | 81:11,21 82:1 | **holdings** 1:14 |
| 44:5 | 31:12,19 32:8 | 82:24 83:5 | 2:16 30:24 |
| **hands** 95:15 | 32:13,17,21,23 | 84:12,22 86:4 | **home** 20:22,24 |
| **happen** 11:3 | 33:18,22 34:9 | 86:17 87:1,19 | 21:6,20 36:1 |
| 95:20 | 34:17,21 35:9 | 89:4,16,24 | 47:14 53:14,15 |
| **happened** | 35:18 36:14 | 90:1,13,15 | 55:9,18 57:20 |
| 40:19 65:22 | 37:4,12,14,16 | 91:5,7,10,11 | 58:7 61:25 |
| **hard** 85:15 | 38:4,13,17,21 | 93:10,13,16,17 | 65:17 66:3 |
| **head** 10:21 | 39:1 40:9,17 | 93:23 94:1,14 | 74:21,23 102:8 |
| 54:7 103:15 | 41:8,18 42:1,6 | 94:15 95:9 | 102:10 |
| **hear** 48:13 | 42:8,12,14,23 | 99:24 100:6,18 | **homes** 86:12 |
| **heard** 76:13 | 43:2,12,13 | 101:1 102:7,25 | **honest** 29:1 |
| **hearing** 8:12 | 44:6,13,18 | 103:2,20 | **honestly** 30:23 |
| **held** 62:23 | 45:5,11,20 | 104:10,20 | 31:17 57:11 |
| **heller** 2:17 4:3 | 46:1,4 48:12 | 106:13,17,25 | 68:14 |
| 4:5 7:6,6,23 | 48:15,20 49:9 | 107:3,8,11,25 | **hotel** 39:18,19 |
| 9:8,21 10:1,3,6 | 49:15,19 50:1 | 109:2,10 110:2 | 39:22 40:3 |
| 12:5,8,15 13:9 | 51:11 52:24 | 110:7,14 111:1 | **hotels** 40:12 |
| 13:14,20 14:9 | 53:11 54:1,6 | 111:6,15 112:4 | **hour** 70:15 |
| 14:14,20,22 | 54:17,21,24 | 112:8 | 76:16,22 78:14 |

**hours** 20:18
33:14,24 77:2
78:18
**house** 65:17
66:3 87:12,16
89:12
**houses** 86:12
**housing** 85:3
85:25 86:6,19
86:19 88:22
**huh** 10:20
30:15 49:8
84:19
**humorous**
108:19
**hundred** 56:5

**i**

**idea** 16:2 30:19
30:24 59:3
83:6 101:14
**identification**
14:2 34:20
43:17 45:15
77:18
**identify** 7:4
102:15,17
**impact** 12:23
13:5
**important**
95:23 96:6,9
**include** 46:12
**included** 22:10
90:3

**including** 65:8
**incorrect** 69:8
**indicate** 70:11
102:15
**indicates** 48:6
50:13 107:4
**indicating**
51:14 64:17
70:20 71:13
**individual**
60:18,20 61:16
103:19
**individual's**
60:22
**individuals**
102:13
**inform** 67:3
**information**
17:3 22:22
**informed** 34:8
**inside** 104:17
105:17 107:21
**instagram** 23:7
**instruct** 18:2
18:19
**instructing**
19:3
**instructions**
31:6
**insufficient**
52:15
**intended** 6:20
11:17

**interaction**
94:10
**interested**
112:1 113:15
114:12
**interfere** 12:19
16:25
**interpreter** 3:6
8:17,19 12:6
12:13 13:12,18
15:18,24 16:7
16:15 18:14
19:8 20:1
21:16 22:18
24:6,18 25:11
25:23 26:9,12
26:19 27:1,10
30:6,12 31:3
31:10,16 32:6
33:20 34:6,15
35:6,15 36:13
37:3 38:1,14
38:22 40:16
41:6,16,22
42:18 43:4
44:3,11 48:13
48:17 49:7
51:9 52:22
53:8,23 55:20
57:6 58:14
60:16 63:10
64:21 66:6,11
66:25 70:2
71:7,18 73:18

74:4,12 75:16
76:1 78:22
81:9,24 82:21
83:3 84:9 86:2
86:14,22 87:18
89:2 90:12
91:4,6,8 93:15
93:24 94:6
95:7 100:9
101:2 103:1,21
104:11,21
106:14 107:12
108:1 109:3,11
110:4,12,24
111:5
**interrogatories**
4:10 14:5
**interrogatory**
14:10
**invoices** 91:21
**involve** 19:13
19:16 20:15
90:24
**iseal** 99:10,10
**issue** 12:3
**issues** 12:22
13:4

**j**

**james** 7:12
**january** 69:11
70:3,7 71:12
73:16 75:8

**[jasmine - loaded]**

**jasmine** 1:24
  6:3 113:2,17
**jim** 2:5,10
  44:21 54:6
**joaquin** 98:8
  98:10
**job** 1:25 18:9
  19:13,16 20:14
  34:11,11 74:17
  74:18 75:19
  80:20 83:11,14
  83:16 90:2,24
**joint** 32:11
**jonathan** 98:6
  98:7
**jose** 98:16
**judge** 20:5
**jury** 22:10,23
  22:24,25 23:3

**k**

**keep** 35:10
  93:23
**kenda** 1:13
  2:15 30:19,22
**kendra** 30:21
**kent** 1:12 2:14
**kind** 17:2 67:23
**knew** 33:15
  47:3 59:6 92:8
  103:4 111:13
**knoepp** 2:5
  7:12,12 45:10
  45:12,16 54:15

**know** 18:4 21:3
  23:3 24:4
  30:23 34:7
  36:15,17,19
  47:1,4,5,6,8,16
  48:21 49:10
  52:19,23 53:6
  56:3 59:7
  61:17,18,18
  62:3 65:6
  66:10 74:23
  76:10,12 82:4
  82:6,17 84:23
  84:24 85:14,22
  86:5,15,16
  89:12 90:9
  92:5,7,14 93:4
  93:20 94:4
  98:15 102:15
  102:21,21,21
  102:22,23
  104:18,24
  108:18 111:2,7
  111:10,10
**knowledge**
  33:23 37:18,23
  44:14 113:10
  114:6
**known** 16:12

**l**

**l.p.** 1:13,14
  2:15,16

**labeling** 107:23
**labels** 106:9
**labor** 28:20
**lading** 91:21
**lalo** 66:22,23
  88:25
**languages** 11:4
**laura** 114:2,15
**lawfully** 70:21
  71:14
**laws** 6:22 34:8
**lawsuit** 24:3,12
  25:3,3,7,21
  26:6,16 33:7
  46:10,23
  108:21 109:16
**lawyer** 108:14
  108:18
**lawyers** 107:1
**learn** 31:13
  33:2 70:10
**leave** 65:16
  66:17
**left** 20:14 59:10
  59:13,15,21
  60:1 67:4
  106:21 108:7
**legal** 27:14
  29:23 115:23
**lerner** 2:18 7:8
  7:8
**license** 72:14
**life** 20:3

**liked** 72:3
**limited** 17:17
**line** 116:4,7,10
  116:13,16,19
**lines** 101:17
  105:23
**list** 38:2 52:10
**literally** 49:19
**little** 10:16 52:7
  71:22 77:20
  80:4 87:6
  88:19,19 96:10
**live** 37:5 87:3
  87:14,24 88:5
  88:14,18
**lived** 36:15
  84:16,18 85:8
  85:16,21 86:7
  87:20 89:13
**lives** 56:19,24
**living** 36:7
  86:23 87:7,9
  87:16 88:10,16
  88:19
**llc** 1:15,15 2:6
  2:16,16
**llp** 1:21 2:19
**load** 80:17
  83:11 90:4,16
  90:18 96:6
**loaded** 91:14
  91:15 92:6
  95:20,24

**[loading - minute]**                                                Page 14

| | | | |
|---|---|---|---|
| **loading** 80:9 | **make** 10:15 | **marty** 7:6 10:6 | **messages** 5:13 |
| 90:3,9,10,20,25 | 11:6 14:22 | 16:21 27:12 | 5:15,16,17,18 |
| 96:3 | 22:9,23 24:21 | 37:10 38:10 | 5:19,20 23:17 |
| **located** 104:16 | 38:2 45:7,12 | 55:19 64:25 | 23:18,20 24:3 |
| **location** 1:21 | 46:1 49:2 | 81:19 | 24:3,11,15,22 |
| **logically** 81:10 | 50:20 60:8,11 | **matter** 6:7 26:7 | 97:14,14,17 |
| **long** 9:15 22:2 | 77:19 94:6,7 | 26:17 27:8,17 | 98:3,3,18 99:1 |
| 65:4 83:6 | 95:23 96:6 | 44:24 54:17 | 99:13 |
| 106:18,25 | 107:15,17 | 97:16 | **messaging** 97:6 |
| **longer** 32:4 | **manager** 66:18 | **matters** 28:3 | 98:7 |
| **look** 61:1 | **manner** 6:23 | **mccabe** 3:6 | **mexico** 20:22 |
| **looked** 79:3,5 | 95:24 | 8:19 | 21:7 35:17,23 |
| **looking** 54:15 | **march** 36:4 | **mean** 14:13 | 36:1 38:12,23 |
| **lopez** 98:11 | 38:9 50:8 | 25:12 27:12 | 39:4 40:5 54:4 |
| **lot** 11:1 52:5 | 57:15 70:8 | 28:13 34:7 | 55:2,12,18 |
| 61:8 | 75:9 78:2,3,8 | 37:21 41:10 | 57:10,14,23 |
| **loud** 21:10 | **mario** 86:10 | 45:3 55:5 | 58:3,8,10,18 |
| **luis** 21:17 | 89:3,3,6,7,10 | 59:24 61:17,18 | 64:10,18 65:17 |
| **luna** 5:9 15:13 | 105:4,9,11 | 73:19 77:3 | 65:19 66:1,3 |
| 15:17,22 16:4 | 106:3 | 82:9 99:13 | 67:7 74:18 |
| 16:12 71:24 | **mario's** 105:14 | 108:16 | 91:6 |
| 72:8,11,15,21 | 110:18 | **meaning** 85:16 | **mheller** 2:22 |
| 73:13 | **mark** 13:22,23 | **means** 6:24 | **microphone** |
| **lunch** 69:3 | 34:18 45:2 | 7:17,19 11:17 | 93:12 |
| **m** | 77:14 105:5 | 101:16 | **middle** 1:2 |
| | **marked** 14:1 | **media** 23:6 | 19:19 |
| **m** 5:11,22 | 34:19 43:15,17 | **medications** | **miles** 68:14 |
| **made** 60:9 | 43:21 45:14,21 | 12:16 | **mind** 17:9 |
| 117:5 | 77:15,16,17 | **member** 31:18 | 27:11 37:10 |
| **mails** 97:13 | **married** 21:23 | **members** 5:24 | 72:2 |
| 98:3 | 22:2,3 | 22:22,23,25 | **mine** 28:15 |
| **maintain** 30:4 | **martin** 2:17 | 88:14 | **minute** 17:8 |
| **majority** 85:16 | 21:17 | **memory** 12:23 | 99:25 100:15 |
| 110:15 | | 13:2,4 | 109:19 |

**[mischaracterizes - need]**                    Page 15

| | | | |
|---|---|---|---|
| **mischaracteri...** 13:8 | **morin** 114:2,15 | 53:7,22 54:5 | **moving** 32:18 |
| **mischaracteri...** 54:20 | **morning** 6:2 10:4,5 | 54:18 55:19 57:5 58:13 | 90:24 95:10,13 100:18,19 |
| **misheard** 89:5 | **morton** 2:4,6 | 60:12 62:17 | 106:7 111:3,7 |
| **mm** 65:24 | 4:4 7:5,10,10 | 63:8 64:20,25 | **n** |
| 67:21 91:7,10 | 7:14,16,25 8:8 | 66:5,13,21 | |
| 102:18 | 9:19,22 12:2 | 68:18 69:17,21 | **n** 2:1 3:1 4:1 |
| **mocked** 65:7 | 13:7,11,17 | 69:24 71:1,3 | 5:11,22,22 6:1 |
| **moment** 7:20 | 14:12,16,21,24 | 71:16 73:17,21 | **name** 5:24 6:2 |
| 48:18 | 15:15,23 16:5 | 74:3,11 75:15 | 10:6 15:3,13 |
| **momentarily** | 16:14,19 18:1 | 75:25 78:4,23 | 15:16,22 16:3 |
| 18:6 | 18:7,12,16,19 | 81:8,19,23 | 18:20 19:4,6 |
| **mondays** | 18:22,24 19:22 | 82:20 83:2 | 19:24 22:7 |
| 104:25,25 | 21:1,11,14 | 84:8,20 86:1 | 31:23 36:20 |
| **money** 63:23 | 22:12,15 23:1 | 86:13,21 89:1 | 43:22 56:13,20 |
| 74:16 | 24:14 25:10,22 | 93:7,22 94:9 | 56:21 58:17 |
| **monterrey** 38:3 | 26:8,11,18,25 | 95:6 100:11,14 | 61:12 69:20 |
| 38:3,5,8,11,16 | 27:9,12,17,24 | 101:4 103:3,23 | 71:23 72:1,3,8 |
| 38:19 39:10,17 | 28:1,8,12 | 104:13,23 | 72:11,15,21,25 |
| 40:3,19,23 | 29:21,23 30:4 | 106:16 107:6 | 73:12 75:23 |
| 46:13,19,20 | 30:11 31:1,9 | 107:14 108:3 | 86:8 88:10 |
| 47:11,12,13,14 | 31:15 32:5,12 | 109:5,13,18,25 | 99:10 102:22 |
| 53:19 56:19,25 | 32:16,19 33:17 | 110:11,23 | 106:6 |
| 57:19,21,25 | 34:5,14 35:5 | 111:17,19,22 | **named** 96:12 |
| 58:2,6,6,12,15 | 35:14 36:11 | 112:1 115:1 | 96:12 106:3 |
| 58:25 59:5,9 | 37:1,10,13,25 | **move** 82:19 | **names** 8:3 15:8 |
| 59:17,23 60:4 | 38:10,20 40:8 | 91:16,17 | 15:11 16:13 |
| 61:5,13,22 | 40:15 41:5,15 | 100:25 101:12 | 52:2 |
| 62:4,5 64:2 | 41:21 42:5,10 | 105:22 110:9 | **naturally** 10:20 |
| 65:13 68:13 | 42:17,25 44:2 | 110:16,20,22 | **ne** 2:20 |
| **month** 88:3 | 44:10 45:3,18 | 111:11 | **necessary** |
| **months** 75:6 | 45:23 48:8 | **moved** 100:21 | 117:6 |
| | 49:6,14,16 | 101:24 110:19 | **need** 11:16 69:8 |
| | 51:8 52:21 | 110:21 | 82:13 106:11 |

**needed** 74:7,18
82:25
**needs** 17:2
**neither** 113:11
114:7
**nephew** 31:23
31:23,24 32:2
33:4
**never** 35:1,8
38:18 44:5
48:19,19 49:10
51:16,17,22
67:6,6 77:2
108:20
**nickname**
36:22 66:24
**nicknames**
56:22
**norman** 36:12
68:10 76:6
**notary** 6:12
113:18 117:13
117:19
**note** 115:10
**noted** 117:7
**notes** 7:21,21
**notice** 9:11
**noticer** 112:5
**november** 15:7
65:25 66:4
79:13,16 102:8
**nuh** 10:20
**number** 45:8
52:8 53:4,10

56:3 60:23
61:18 73:2
87:9

**o**

**o** 5:11,22,22
6:1
**oath** 13:16 69:4
**oaths** 6:13
**object** 18:1
42:9 45:24
48:8 49:15
54:22 70:24
71:17 101:1
103:20 104:10
104:20 106:13
107:3,11,25
109:2,10
**objected** 54:23
**objecting** 18:5
**objection** 6:15
11:23 12:3
13:7,17 15:23
16:5,6,14,19
25:10,22 26:8
26:10,18,25
27:9 29:21,22
30:2,4,11 31:9
31:15 32:5,9
32:14,18,20,22
33:17 34:5,14
35:5,14 37:25
38:20 40:8,8
40:15 41:5,15

41:21 42:5,13
42:17 44:2,10
46:2 49:6,17
49:20,23 51:8
52:21 53:7,22
54:5,19,19
57:5 58:13
63:8 64:20
66:5,13 69:18
69:25 70:23
71:4,6 73:17
74:3,11 75:15
75:25 78:4
81:8,22,23
82:20 83:2
84:8 86:1,13
86:21 89:1
93:22 95:6
110:11,23
**objections** 8:12
9:16 12:10,11
**occupants**
63:19
**occurred** 104:8
**office** 35:21
84:11,13 88:23
104:9,15
105:13,14
107:10,16,18
**officer** 113:1,2
**offices** 35:21
**oh** 8:16 30:12
30:16 37:12
50:15 66:25

76:8 79:18
89:5 91:8
**okay** 7:25 9:15
9:21 10:1,7,14
10:24 11:9,21
11:22 12:7,18
12:22 13:4,15
14:16 15:3,11
15:14,21 16:2
16:11 17:7,21
17:24 18:4,7
18:24 19:2,16
20:4,17,20,24
21:23 22:5,17
23:9,17,19,24
24:2,10,20
25:6,16,20
26:2,22 27:5
27:18 28:11,19
28:22 29:4,7
29:13,16 30:19
31:4,13,20,22
32:8 33:2,6,11
33:23 34:2,10
34:17,24 35:19
35:22,24,25
36:3,7,13,19
37:3,9 38:5,18
39:2,8,14,16,22
40:6,13,18
41:19 42:2,10
42:12,23 43:20
43:24 45:3,19
46:7,7,16,23

**[okay - paid]** Page 17

| | | | p |
|---|---|---|---|
| 47:1,9,17,23,25 | 83:10,14 84:1 | 97:24 | **p** 2:1,1,18 3:1,1 |

47:1,9,17,23,25
48:3,12,21
49:2 50:6,20
50:23,25 51:5
51:12,18,23
52:1,6,11,14
54:2,18 55:4,8
55:11,16,23,25
56:10,13,18
57:1,9,13,17
58:7,11,17,24
60:11,18,22,25
61:4,11,15,21
62:3,7,10,14,19
62:23 63:5,7
63:16,18,22
64:1,5,12,16,24
65:15,21 66:2
66:10 67:1,9
67:17,19,23
68:3,9,12,16,18
69:6,14,24
70:6,10,14
71:1,3,16,22
72:5,10,13,17
72:24 73:3,7
73:12,15,23
74:14,23 75:12
75:23 76:15
77:21 78:1,11
78:13,17,22
79:10,20 80:8
80:12,14,18,22
80:25 82:2,17

83:10,14 84:1
84:5,16,23
85:19 87:2,5
87:14,23 88:1
88:5,9,14,21
89:7,12 90:5,9
91:4,5,8 92:5
92:18 93:10
94:8 95:2,4
96:5,10,17,20
96:23 97:4,8
97:13,20 98:1
98:8,11,16,20
98:24 99:2,6,8
99:9,12,15,21
99:24 100:10
102:2 103:4,7
103:18 104:3
104:14,18
105:2,8,11,15
105:18,21,25
106:7 107:15
107:22 108:7
108:10,13,16
108:21 109:18
110:20 111:2
111:15,17,18
**olguin** 1:6 2:3
3:3 4:23 5:5,16
8:9,10 97:15
**ones** 44:16 45:8
51:24 55:6
59:10 60:12
61:9,19 92:2,2

97:24
**open** 37:11
**operated** 76:6
**operating** 93:2
**opportunity**
31:14 41:19,23
53:20
**opted** 41:7 87:8
**option** 18:18
**oral** 9:10
**order** 34:11
35:13 44:8
92:10 111:25
**orders** 90:7
**original** 112:6
**outcome**
113:16 114:12
**outside** 17:9
**outwardly**
54:12
**overbroad** 24:5
**oversee** 93:20
**overtime** 20:17
33:14,24 34:4
92:14,19 96:19
109:1
**own** 63:17,18
63:20 67:15,25
68:7 87:7
**owned** 63:19
86:12,19,20
89:12

**p** 2:1,1,18 3:1,1
6:1
**p.m.** 67:12
68:20,23 77:9
77:12 89:19,22
100:2,5 109:21
109:24 112:11
112:13
**pablo** 1:5 2:3
3:3 8:9 97:15
97:24
**pack** 101:17
**packed** 81:6
**packing** 94:18
**padilla** 99:12
**page** 4:2,8 5:2
5:12,23 21:14
49:3 116:4,7
116:10,13,16
116:19
**paid** 20:17
33:14,24 34:3
39:23 46:22
48:6,22 50:3,7
50:13,14 51:1
51:2,6,7,10
52:9,12,13
59:6,8,11
60:13 70:6,7
70:15 73:6,6
76:16,17,21,22
76:22 78:7,13

78:14 79:7
85:3 88:22,25
89:10 92:14,19
104:19 109:16
**pallets** 90:6
**paper** 51:25
**paperwork**
25:19,24 39:11
70:20 71:19
72:5,14
**park** 36:12
68:10 76:6
**part** 14:14
34:12 39:3
46:10,22 49:12
60:15 80:20
83:10 85:25
90:2 91:20
**participant**
28:3
**participate**
25:5 39:3 65:6
**participated**
27:20
**parties** 6:14,16
113:12,14
114:8,11
**party** 25:2
**passed** 60:9
**passport** 39:11
72:14
**pay** 4:22 5:4
40:24 44:19
55:14 56:7,8

58:24 62:6
64:5,9 67:6
70:6,11,12
71:11 73:3,9
74:10 78:7
86:6,10 87:4
87:23 88:2,24
89:5,7,11
104:25 105:1
109:9
**paying** 51:3
86:24 104:6,8
**payment** 25:6,7
25:17 26:5,6
26:15,16,23,24
28:4,6 73:8
105:3
**payments**
77:25 78:2,11
**paystubs** 76:17
76:23
**peachtree** 2:20
**pending** 11:18
**people** 51:24
52:4,5 55:7
58:20,21,22
59:13,15,18,21
59:25 62:23,25
63:1 64:5 65:5
74:23 75:1,2
83:20 85:14,16
85:20,24 87:20
93:2 97:7
101:13 103:25

111:11
**perfect** 17:20
22:17
**performed**
83:15
**period** 29:20
65:15 69:11,15
70:8 71:11,15
107:8
**permission**
65:20 66:15,16
66:18 67:7
102:7
**permitted** 6:20
9:12
**person** 56:8
61:4
**person's** 61:12
**personal** 12:19
20:3 34:3
37:17,23 58:7
**personally** 64:1
**phillips** 2:19
**phone** 60:19,21
60:22,25 61:2
61:18
**physical** 12:18
**physically**
95:14
**pick** 69:20
80:19
**picked** 81:6
**picks** 58:19,21

**picture** 49:22
**place** 95:16
101:10 107:18
**placing** 82:3
**plaintiff** 3:3 8:7
17:4 19:23
108:23,25
**plaintiffs** 1:8
2:2 7:11,13
17:1,6 96:12
**please** 7:3 8:3
8:14,18 71:7
76:19 98:20
99:2
**point** 11:14
12:10 60:3
66:4 68:1,17
84:1,5 87:2
108:5,13
**pointing** 21:14
**pool** 22:10 23:4
**poor** 65:7
**pose** 11:23
**position** 32:10
51:5,18 52:14
105:18 111:14
**positions**
103:14
**possible** 11:4
66:2 95:12
**posted** 23:9,12
23:15
**potential** 22:10
22:23,24

**potosi** 21:17
**preference**
    41:13 42:15,20
    42:20,22
**preferred** 41:9
    85:24
**preparation**
    29:5,10
**prepare** 28:24
**prepared** 29:2
    114:3
**present** 3:2
    17:4 97:11
**presented**
    70:19 71:12
**previous** 25:7
    26:6,16,23
    27:7,21 28:3
    69:6
**previously** 32:3
    45:25
**prior** 27:24
    28:9,10 29:4
    35:25 38:5,9
    65:17 67:25
    68:1 113:5
**private** 5:13
    23:17,18,20
    40:24 41:13
    53:18 61:24
    62:8 63:1,3,7
    63:14
**privately** 86:12
    86:19

**privilege** 24:16
    24:24
**privileged**
    24:23
**problem** 37:14
**problems** 12:19
    13:2
**procedural**
    6:21
**procedure** 9:12
    11:24 49:21
**proceed** 43:11
    89:23
**proceeding** 6:4
    6:19 112:10,14
    114:4
**proceedings**
    113:3,5,6,9
    114:6
**process** 39:3,4
    39:6,8 40:3
    101:6 104:5
    106:7
**produce** 1:13
    2:15 80:16
    81:5,16,17
    82:3,4,13,17,25
    83:6,8,11
    90:10,16 92:5
    94:17 95:1,13
    95:14,20,23
    96:6 100:19
    101:7,12,18,18
    101:19,21,21

101:24 104:1
    110:9,16 111:8
**produced** 6:18
    44:23 49:12
    97:23
**product** 82:16
    83:8 90:19,21
    90:25 91:2,12
    91:15,22
    100:19,21,25
    101:7 105:22
    106:7
**production**
    23:21 24:13
**program** 32:25
    33:3,9,13
    37:20,24
**properties** 1:14
    2:15 30:20
**provide** 17:3
    22:7,21 23:21
    23:24 51:12,13
    73:7 97:20
    98:20 99:15
**provided** 24:13
    34:11,12,24
    41:1 43:24
    53:21 72:24
**public** 113:18
    117:19
**pull** 80:15
**purchase** 112:5
**purposes** 9:11
    12:8 17:17

18:3 22:6
    44:20
**pursuant** 9:10
    17:25 33:8,13
**put** 9:14 23:15
    63:24 68:14
    79:4 93:11
    95:16 101:10
    101:18

**q**

**qas** 104:2
**qualified** 113:7
**question** 9:17
    10:22 11:5,8
    11:11,12,18,23
    12:12 18:6
    19:6,11,19,20
    19:23 20:14
    21:4 26:4
    27:11 30:3
    41:12 42:2,8
    46:2 48:1,16
    50:11 54:9,10
    54:11,13,22
    55:17 58:1
    59:14 68:4
    70:24 71:6
    76:4 79:5,11
    90:19 91:19
    93:8,14 95:25
    96:2,5 98:1
    104:5 109:12

**questions** 10:11 11:2 12:20,24 27:20 44:24 77:20 81:22 95:12 97:5 98:2 99:19,22 100:8,12 104:14 110:1 111:16
**quick** 48:9 69:3 89:17 104:5
**quicker** 10:16
**quickly** 82:14 83:1

**r**

**r** 2:1 3:1 5:11 5:22,22 6:1 116:3,3
**radford** 1:21
**rafael** 98:8,10
**raise** 8:14,18 12:10
**raised** 97:16
**ramos** 1:5,18 2:2 4:12,14,16 4:18,20,22 5:4 5:7 6:7,8 8:14 9:2,10 15:5,9 16:11 100:7 115:4,5 116:1 116:2,24 117:1 117:2,4,12

**randomly** 72:2
**rate** 70:6,15 76:11,21 78:14
**rates** 78:13
**rather** 74:16
**raul** 88:10
**read** 9:23 34:10 34:16,16 106:8 111:20 115:9 117:5
**reading** 101:13
**real** 15:25 16:21 17:5 34:7,8 39:21 40:12 42:4 48:9 56:21 64:14 66:7 89:17
**really** 42:22 54:7 62:1 111:13
**reason** 50:6,12 52:11 115:11 116:6,9,12,15 116:18,21
**recall** 31:7 35:13 57:22 58:3
**receipt** 48:3,4 51:16 64:22 115:17
**receipts** 40:2,4 40:5 48:10,19 55:25 56:2

64:17
**receive** 25:15 26:5,15,20 27:3 28:5 44:7 74:9
**received** 25:6 25:17,18 27:2 27:2 28:4 35:19 78:2 94:18 108:20
**receiving** 26:23 26:24 35:13 79:15 80:2,5 80:13,14 93:3 93:19 94:2,3,7 94:13,17,20,25
**recognize** 34:22 43:18,19 77:22,24
**recollection** 28:14 44:1 78:10,15 79:11
**recommended** 33:5
**record** 6:4,5,16 7:4 9:15 12:9 14:10,23 15:4 17:8,12,13,15 19:21 20:5,7,8 20:10,13 21:2 21:10,11 23:2 24:10,15 27:19 28:5 32:9 37:2 38:11 43:3,7,8

43:10 45:24 46:3 48:5 49:24 67:9,12 67:13 68:20,21 68:23,25 76:15 76:20 77:7,9 77:10,12 78:24 79:4 89:17,18 89:20,22 94:11 99:25 100:1,3 100:5 109:19 109:20,22,24 111:19,19 112:11 113:9 114:5
**recorded** 6:23 7:5,17,18,22 105:3 113:6
**recording** 6:18 10:18,22 113:8 114:4
**records** 27:8 28:14,17 51:14 52:8 56:1 64:17 70:11 78:8 79:6 88:21
**red** 36:23,24 37:2,5 87:16 87:17,18
**redirect** 110:8
**reduced** 113:7
**referenced** 115:6

**referred**  103:19
**referring**  46:18
  105:9
**reflect**  21:11
  78:1,7,17
**reflected**  51:6
**reflecting**
  88:21
**reflection**  27:6
  69:7 79:7
**reflects**  50:2
**refrigerated**
  81:1
**refrigeration**
  81:3 82:4,22
**regarding**
  97:15
**reimbursed**
  46:11
**reimbursement**
  51:22
**related**  23:20
  24:3,11 25:20
  113:11 114:7
**relationship**
  22:4
**relative**  23:3
  113:13 114:10
**release**  27:6,21
  27:22 28:6
**released**  26:23
**releases**  27:14
**relevant**  33:7

**remained**  69:14
**remains**  69:25
**remember**
  12:25 31:11,20
  31:21 34:23
  36:17,20,22
  39:21 40:12,13
  49:4 50:9 52:2
  56:21 57:11,13
  58:5,9 59:24
  59:25 60:24
  61:8,12,14,25
  62:1 64:4,12
  64:14,15 65:21
  66:7,15 72:25
  88:2,9
**rent**  63:16
  86:24 89:11
  104:6,8,19
  105:2
**rented**  47:21
**renters**  105:1
**repack**  110:10
  110:16 111:8
**repackage**
  101:12,14,15
**repackaging**
  103:16
**repeat**  76:18
**rephrase**  11:7
**reported**  1:24
**reporter**  6:2,3
  7:15,18 8:1,6
  8:11,21 9:6

10:17 17:11,14
20:6,9 43:6,9
45:9,13 67:11
68:19,22 77:8
77:11 89:18,21
93:11 100:1,4
109:20,23
111:18,24
112:3,7,9
**represent**
  10:10 14:3
  44:21 49:11
**representative**
  3:4,5
**representatives**
  16:23
**represented**
  20:25
**requested**
  113:21
**requests**  97:22
  98:22
**require**  65:6
  106:8
**required**
  117:13
**reserve**  9:16,23
**reserved**
  112:12
**reshipped**  83:1
**residence**  58:8
  87:7
**resolve**  12:3

**resolved**  28:4
**respect**  93:18
**response**  10:23
**responses**  4:9
  14:5,7,11,19,25
**responsive**
  97:22 98:22
**result**  25:7 26:6
  26:16,22 27:7
**retaliation**
  16:22 18:3
**return**  26:24
  62:4,20 65:12
  67:5 73:8
  102:10 108:4
  115:13,16
**returned**  69:3
  74:24 108:6
**returning**
  68:25
**review**  29:4,6
  91:21 96:14
  113:21 115:7
**reviewed**  96:16
  98:21
**reyes**  5:17
  98:17
**right**  8:15,18
  9:23 10:15
  14:3,18,24
  16:17 17:17
  18:9 20:13,20
  21:9 22:5 23:6
  24:2 25:2

28:19 29:7,16
29:18,19 30:1
31:7 32:12,24
33:6,16 37:5
37:17 42:23
43:12 44:12,18
44:20 45:18
49:10 50:21
51:2 52:6
53:12 54:9
60:4 65:15
68:24 69:10
70:18 71:25
72:22 73:1,1
73:25 77:6,14
77:19,22 79:3
79:21 80:4,7
80:14,19 81:1
81:4,13,14,15
82:7,11,19
83:15,17,23
84:18 85:2,6
85:17 88:6
89:16,16 91:12
91:22,25 92:9
92:13 93:4,13
94:5,21,22
95:5,15,17
96:10 99:18
100:6 101:20
103:8 106:20
107:2 110:2,8
111:24 112:9

**rivera**  98:16
**roja**  86:7
**rojo**  36:25 37:6
84:18 86:19
87:17
**room**  110:10,16
**rough**  16:2
**roughly**  80:1
92:23
**rules**  6:22 9:12
9:13 10:14
11:24 49:20

**s**

**s**  2:1 3:1 4:7 5:1
5:11,11,22 6:1
116:3
**safe**  95:24
**safely**  96:6
**san**  21:17,17
**sanchez**  98:24
99:4
**sandoval**  99:10
**save**  95:12
**savings**  39:24
**saying**  10:18
32:9 50:25
84:24 85:15
**says**  39:12 52:3
78:14 96:25
**school**  108:18
**scott**  1:21
102:24

**sealed**  17:2
**season**  35:25
55:2
**second**  21:14
45:16,18 67:10
77:7
**seconds**  17:10
**section**  93:19
94:4
**security**  72:7
72:18,20 73:11
**see**  50:4,5
98:21 111:12
111:13
**seems**  64:3
88:13 108:19
**seen**  45:25 46:5
46:6 49:10,18
95:19 105:25
**select**  72:1
**sell**  82:19
**send**  99:1
101:21
**sent**  25:19
97:14,17 98:2
98:7,18 99:13
101:7 115:14
**separate**  45:7
81:10 107:19
**separately**
24:21 51:21
85:21
**service**  56:11
56:12,14 58:17

**serving**  108:25
**settlement**  25:7
26:5,15 27:7
27:21 28:9,10
**setup**  80:5
**seven**  39:15
40:18 48:18
**several**  24:7
47:24 52:4
**shake**  54:7
**shaking**  10:21
**shed**  94:19
**sheet**  35:16
115:11
**sheets**  34:16
**shipped**  82:13
92:6
**shipping**  80:11
80:12,13,14
83:22 84:2,4
90:10,21 92:3
92:22 93:25
94:12,13,16,20
94:25 96:7
107:10
**shirt**  103:8
**show**  13:21
44:22 52:8
**showing**  40:2
**shown**  28:14
**shows**  44:22
**sic**  67:24,25
**side**  93:3
105:20 110:19

| | | | |
|---|---|---|---|
| **sign**  9:23 43:20 111:21 115:12 | 87:18 89:5 90:12,13,19 95:10 110:5 111:5 | **stack**  90:5 **standing**  32:20 32:21 69:17,25 | **steps**  35:23 **stipulate**  14:9 14:17 22:7,15 22:21 27:18 28:10 |
| **signature** 112:12 113:16 114:14 | **sort**  35:22 65:3 88:7 101:21 | **start**  71:22 **started**  9:14 75:17 86:23 | **stipulation** 6:25 17:18 |
| **signed**  4:11,13 4:15,17,19 43:22 115:19 | **sound**  10:23 11:20 | **starting**  7:3 **state**  15:3 16:17 21:1 | **stop**  11:16 **stopped**  84:6 **stopping**  68:17 |
| **similarly**  1:7 | **southern**  1:10 2:13 3:4,5 6:8 | 24:10 32:8 38:10 45:23 | **store**  82:19 92:6 |
| **simply**  101:13 | 25:8,24 30:18 | 71:4,5 82:9 | **stores**  83:12 |
| **single**  59:7,12 75:4 | 37:18 76:2,6 104:15 105:16 | 92:12 113:19 **stated**  27:22 | **strawberry** 82:18 |
| **sir**  93:12 | 106:21 109:8 | **statement**  5:8,9 | **street**  2:7,20 |
| **sit**  83:7 | 115:4 116:1 | 66:22 | 36:19,20 |
| **sitting**  102:14 | 117:1 | **states**  1:1 17:22 | **strike**  20:21 |
| **situated**  1:7 | **spanish**  3:6 8:8 | 17:24 18:10 | 38:7 46:9 |
| **six**  39:15 40:18 | 8:20 14:13,15 | 46:14 47:15 | 57:18 59:13 |
| **sixth**  2:7 | 14:17 18:13 | 53:14,20 54:4 | 65:10 |
| **skill**  91:24 106:12 | 60:14 78:21 | 55:1 70:21 71:15 | **stub**  77:5 **subject**  24:15 |
| **skills**  113:10 114:6 | **speaking**  7:21 8:8 11:4 18:13 | **stay**  39:16,20 70:3,3,4 73:15 | 27:17 28:6 **submitted**  14:6 |
| **skillset**  91:20 | 60:14 78:21 | 73:19 74:7 | **subscribed** |
| **social**  23:6 72:7 72:18,20 73:10 | **specifically** 46:17 | 75:6 85:25 87:5,8 | 117:14 **subsistence** |
| **solutions** 115:23 | **speed**  52:6 **spend**  47:22 | **stayed**  39:22 40:2,7,14 74:5 | 46:14,21 **suite**  1:22 6:10 |
| **somebody**  23:3 | **spent**  40:19 | 74:9 | **super**  37:15 |
| **someone's** 63:17,18 | **spoken**  97:4 **spouse**  5:24 | **staying**  46:13 46:19 | **supervise**  93:3 **supervisor**  30:7 |
| **sorry**  8:16,17 26:9,12 45:17 60:16 76:18 77:19 78:4,25 | 22:7,22 **spreadsheet** 4:21 5:3 44:19 44:21,23 | **stenographic** 6:24 7:17,19 | 93:5,9 104:3 |

**supervisors**
103:11
**support** 56:1
**sure** 11:6 14:22
22:9,23 24:21
35:3 38:13
40:6 49:2
50:20 66:10
69:21 71:8
93:8 94:6,7
95:23 96:6
107:15,17
109:14
**surprise** 70:10
**swear** 6:14
8:12,16,22
**sworn** 6:16
8:19 9:3 113:5
117:14

**t**

**t** 4:7 5:1,11,11
5:22,22 116:3
116:3
**table** 102:14
**take** 6:4,12 9:7
11:2,14,19,19
39:11,14 41:4
41:12,13,19
42:15 53:20
54:3 56:17
63:15 65:3
68:12 70:13
80:25 83:11

96:25 101:18
**taken** 9:10,11
10:12,21 70:19
81:5 101:17
113:3,12 114:9
**talk** 20:2 29:9
29:16 53:12
69:10 80:4
84:16 96:10
**talked** 90:9,20
102:3,7 105:22
106:17 107:8
110:9
**talking** 26:2
38:11 78:5
79:23 81:22
107:17
**tapia** 99:10
**taxes** 70:13,15
70:19 71:10
**tell** 9:4 10:15
11:6 21:6,8
22:20,25 25:16
29:7,13 39:8
47:17,20 50:22
51:23 65:10,11
102:20 103:13
105:11
**telling** 54:13
85:23
**tend** 10:20
**tennessee** 75:21
75:24 76:7

**term** 80:9
85:15
**terms** 28:9
**terrerito** 21:17
**terrible** 68:4
**testified** 9:5
94:23 97:1
100:18
**testify** 13:5
45:4
**testifying** 17:4
113:5
**testimony** 54:2
54:25 55:8
69:7 115:9,17
117:8
**texas** 82:10
**text** 24:2 97:13
98:3
**thank** 8:6,11,21
9:6,8 11:1
20:11 21:19,23
36:13 37:3
48:14 66:25,25
78:20 82:2
84:1 85:11,23
89:24 91:9
93:15 95:10,19
100:7,10 103:1
111:22 112:9
**thing** 11:3 26:3
79:21 83:18
92:23 94:20
99:2,6,15

107:7
**things** 12:25
46:18 74:6
87:3 102:6
**think** 12:2
15:15,16 16:8
18:3,4 26:2
27:14 28:12
42:3 49:3
50:22,25 54:10
60:3 74:14
79:14 84:2,3
92:21,22 96:20
99:21 102:25
109:19
**three** 61:2 83:9
87:22
**time** 1:20 7:2
8:12 9:17 11:3
11:16 12:4
16:8 20:20
21:19,21 25:14
26:11 29:20
33:11 35:16
36:8,16 37:6
39:16 57:22
58:2 59:16,22
61:10,20 64:3
64:4,11 65:15
65:20 69:10,15
70:8 71:11,15
73:25 77:1
78:15 84:14
87:14 93:21

94:5 95:12
106:18,24,25
108:5 110:15
111:3 115:18
**timeframe**
40:10 115:8
**times**  11:22
12:25
**timothy**  3:5 8:4
**today**  10:7,11
11:2,4,22
12:16 13:16
29:14 97:1,2
99:19 100:7
102:13
**today's**  28:24
29:5,10 111:25
**together**  51:21
97:19
**told**  51:18
52:25 65:14
97:2
**took**  42:7 51:17
55:1 62:8
70:15
**topic**  110:3
**torture**  11:17
**total**  47:10
**totally**  81:4,12
**touching**  95:14
**tovar**  98:6
**training**  108:10
108:14,17,20

**tran**  112:4
**transcriber**
114:1
**transcript**  6:18
22:6 111:25
113:21 114:3,5
115:6,19 117:5
117:8
**transcriptionist**
113:8
**translate**  8:20
9:25 19:1
22:19 78:23
94:11
**translated**  37:2
48:11 60:15
73:21,22 93:8
**translation**
15:16 31:2
48:9 84:21
**transporting**
90:3
**travel**  4:22 5:4
41:7 44:19
46:12,17,21,23
47:1,6,9,18
48:6,22 49:4
50:3,7 51:14
51:19 52:8,16
52:19 53:6,13
53:16 55:11,17
55:18 57:9,17
57:18,19 58:11
58:25 59:3,4,8

60:4 62:4,20
64:17 65:12
67:4,5
**traveled**  57:14
57:21,24 58:5
58:10 59:16,22
59:25 66:2
**traveling**  46:13
46:20 53:19
57:22 58:3
**treatment**  64:7
**trip**  56:5,5
**truck**  95:21
**trucks**  80:15,23
82:3 83:12
96:3,7
**true**  113:9
114:5 117:8
**truth**  9:4,4,5
97:2
**truthfully**
12:20,24 13:6
99:19
**try**  10:22 11:2
77:19
**trying**  50:20
60:2 74:2
95:11
**twelve**  62:25
**two**  8:1 17:9,10
45:7 67:18
68:2 73:14
75:6,17 77:14
79:5 87:21

94:21,22 96:12
102:6,13
104:14
**type**  75:7
**typewriting**
113:7
**typically**  83:7

| u |
|---|

**u**  5:11,11,22
**u.s.**  28:20
**uh**  10:20,21
49:7 84:19
**unclear**  78:5
**under**  6:21
11:24 13:15
49:20 69:4
71:23 72:7,11
72:15 74:1
**understand**
6:17 11:5,6,7
11:11 12:1
13:15 33:18
35:3 46:10
49:23 50:21
60:2 69:4,19
74:15 84:23
85:5,11 101:14
103:13 107:22
108:15,25
109:6,15
**understanding**
25:17 26:3
34:2,3 70:18

71:10 76:5
86:11,18 96:17
101:20 102:16
103:10,15,18
**understood**
28:16 70:1
76:8 95:25
99:21
**unfair**  23:2
51:7
**unfairly**  109:16
**unit**  82:4
**united**  1:1
17:22,24 18:10
46:13 47:15
53:14,20 54:3
55:1 70:21
71:14
**unload**  80:22
90:16 95:16
101:9
**unloaded**  81:2
**unloading**  82:2
90:10,21,25
95:3,4,5
**uno**  13:24
**unsafe**  95:21
96:3
**urtado**  5:20
99:12
**use**  9:18 15:21
32:14 37:23
39:25 45:1
80:10 82:15

109:14
**used**  16:3,8
18:3 87:10
115:19
**uses**  6:20
**using**  44:20
**usually**  7:19

**v**

**v**  1:9 115:4
116:1 117:1
**valdosta**  1:3
**valid**  30:1
49:20
**valley**  1:10
2:13 3:4,5 6:8
25:8,24 30:18
37:19 76:2,6
104:15 105:16
106:22 109:8
115:4 116:1
117:1
**van**  40:25 41:9
41:13 42:15
47:21,23 48:1
53:17 56:8,11
57:4 58:19,22
58:23 59:3,13
59:19,20 60:7
60:20 61:12,24
62:2,8,23,25
**vast**  110:15
**vegetable**  1:11
2:14 6:8 115:4

116:1 117:1
**vehicle**  68:1,7,9
68:13
**verbal**  10:23
**verbatim**  7:20
7:22
**verify**  115:9
**veritext**  6:4
115:23
**veritext.com.**
115:15
**versus**  42:16
**video**  10:19
**villareal**  5:18
5:19 98:25
99:4
**visa**  17:25
32:25 33:1,3,8
33:13 37:20
39:4,6,13 40:3
40:20
**vs**  6:8

**w**

**wage**  5:7,9
76:10,16 79:6
**wages**  76:21
**wait**  26:11 31:2
84:21
**waiting**  39:17
**waiver**  27:6,21
27:22
**walk**  35:22

**walking**  17:9
**want**  11:14
14:22 17:4
22:18 24:21
28:5 31:1 43:1
43:2 48:8,15
54:22 65:1
69:10,22 70:25
73:15 79:3
84:16,20 96:24
108:16
**wanted**  61:15
63:15 74:9
87:3 100:15
102:6,14
106:20 107:7
107:15,16,17
109:14
**wants**  43:1
68:14
**warehouse**
36:9,10 55:6
75:18 81:5
85:20,24 94:22
95:20 96:7
100:16,22,25
104:16,17,19
105:17,23
106:8 107:19
107:21
**water**  43:1
**way**  19:6 21:4
36:3 52:9
54:11 55:13

[way - yeah]                                                    Page 27

| | | | |
|---|---|---|---|
| 72:6 85:9 | 31:10,16 32:6 | **wls** 1:11 | **working** 17:22 |
| 95:21 105:2 | 33:20 34:6,15 | **word** 94:7 | 18:10 19:13 |
| **we've** 99:13 | 35:6,15 38:1 | **work** 4:11,13 | 31:7 33:12,24 |
| **wearing** 103:8 | 38:14,22 40:16 | 4:15,17,19 | 73:15 77:1 |
| **wednesday** | 41:6,16,22 | 20:18 31:14,24 | 79:14,24 83:21 |
| 1:19 6:9 | 42:11,18 43:4 | 32:2,25 33:8 | 84:17 102:24 |
| **week** 88:3,4 | 44:3,11 45:4 | 33:21 36:4 | 106:17 107:18 |
| 102:11 | 45:24 48:17 | 65:18 72:23 | 107:23 |
| **weird** 65:5 | 49:7,17 51:9 | 73:1,1 74:7 | **works** 32:4 |
| **went** 38:18 | 52:22 53:8,23 | 75:6,7,12,13,21 | 105:13 |
| 57:20 61:9 | 54:8,14 55:20 | 79:8 88:6 93:1 | **workweek** |
| 62:2,12 65:19 | 57:6 58:14 | 93:20 95:5 | 20:18 33:25 |
| 65:23,25 66:1 | 63:10 64:21 | 96:9 100:25 | **worried** 74:20 |
| 74:21,23 | 66:6,11 70:2 | 102:10 105:12 | **would've** 35:19 |
| **whatsapp** 5:15 | 71:18 73:18 | 106:22 | 40:7 79:25 |
| 24:3,11 60:19 | 74:4,12 75:16 | **workbook** | **write** 88:24 |
| 97:14 98:3 | 76:1 81:9,20 | 44:25 | 108:21 |
| **whatsoever** | 81:24 82:21 | **worked** 31:25 | **written** 4:9 |
| 48:5 | 83:3 84:9,21 | 32:2,3,24 | 6:25 14:5,10 |
| **wife** 88:16,17 | 86:2,14,22 | 33:14,16 55:6 | **wrote** 14:18 |
| **willing** 14:16 | 89:2 93:24 | 68:6 71:23 | 43:22 |
| 17:3 | 94:13 95:7 | 73:25 75:11,17 | **x** |
| **withdraw** 18:5 | 100:9 101:2 | 75:24 76:7 | **x** 4:1,7 5:1 |
| **witness** 6:14,16 | 103:21 104:11 | 78:18 80:1,2 | 113:21 |
| 6:17 8:13,22 | 104:21 106:14 | 85:10,17 87:15 | **y** |
| 9:3 12:6,13 | 107:12 108:1 | 92:22 93:19 | **yeah** 7:24 9:19 |
| 13:12,18 15:18 | 109:3,11 110:4 | 94:3 102:4 | 13:11 14:21 |
| 15:24 16:7,15 | 110:12,24 | 106:24 110:17 | 15:1 21:3,13 |
| 18:14 19:8 | 113:4 115:8,10 | **worker** 59:8 | 28:1,1 37:12 |
| 20:1 21:12,16 | 115:12,18 | 84:13 107:10 | 37:22 50:11 |
| 24:6,18 25:11 | **wk** 1:14 2:16 | **workers** 37:19 | 58:1 59:7 62:5 |
| 25:23 26:19 | 30:24 | 54:3 55:1 59:4 | 63:6 68:2 71:8 |
| 27:1,10 30:6 | **wkw** 1:15 2:16 | 85:18 104:19 | 75:1 76:20 |
| 30:12 31:2,3 | | 109:9 | |

**[yeah - yucatan]** Page 28

78:25 81:2
82:6,12,15
83:16,22 84:13
84:24 85:9
86:15,15,18
87:11 89:11
90:18,20 91:14
91:17 92:10,11
93:6,16 94:2
97:24 99:13
103:2 104:4,17
105:17
**year**   22:3 33:7
38:6 39:5 40:7
44:15,17 46:9
46:14,17 47:7
47:17 48:7
50:2,8 52:15
52:20 55:17
58:10 62:11,15
62:15 64:12
65:13 74:24
75:4,10,10
76:17 80:19
**years**   22:4
43:25 48:18
61:2,24 62:21
64:19 67:18
69:11 75:17
87:9
**yesterday**
97:18
**young**   106:25

**younger**   107:5
**yucata**   91:2
**yucatan**   91:3,3
  91:4

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.