**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

| | | |
|---|---|---|
| **ARNULFO GARCIA-RAMOS,** | ) | |
| **PABLO CASTILLO-OLGUIN, and** | ) | |
| **all others similarly situated,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **CIVIL ACTION FILE** |
| **v.** | ) | |
| | ) | **FILE NO.: 7:24-cv-00054-WLS** |
| **SOUTHERN VALLEY FRUIT &** | ) | |
| **VEGETABLE, INC.; HAMILTON** | ) | |
| **GROWERS, INC.; KENT HAMILTON;** | ) | |
| **HAMILTON PRODUCE, L.P.;** | ) | |
| **KENDA PROPERTIES, L.P.; WK** | ) | |
| **HOLDINGS, LLC; and WKW, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>DEFENDANTS' RESPONSE BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR
29 U.S.C. § 216(B) NOTICE TO SIMILARLY SITUATED WORKERS AND FOR
DISCLOSURE OF CONTACT INFORMATION</u>**

Defendants Southern Valley Fruit & Vegetable, Inc., Hamilton Growers, Inc., Kent

Hamilton, Hamilton Produce, L.P., Kenda Properties, L.P., WK Holdings, LLC, and WKW, LLC

("Defendants") submit this Response Brief in Opposition to Plaintiff's Motion for 29 U.S.C. §

216(B) Notice to Similarly Situated Workers and for Disclosure of Contact Information, showing

as follows:

## I.    INTRODUCTION

Plaintiffs are right about one thing—there is no dispute here that Plaintiffs and opt-in

Plaintiffs were not paid overtime.  However, that is where our agreements end.  Plaintiffs argue

that any employee who claims they are misclassified as exempt from overtime is immediately

capable of receiving conditional certification under 16(b) simply because they contend they should

have been paid overtime.  But that is not the law.  Plaintiffs and opt-in Plaintiffs here are H-2A

agricultural workers working on a farm in Georgia (and during some periods of time, Tennessee), performing agricultural tasks, including assisting with the shipping and moving of produce in interstate commerce, assisting with the produce conveyer systems that move farm grown produce into and through the packing shed to be packed and shipped, and helping to clean up around the packing shed. Plaintiffs ask this Court to approve conditional certification using a lenient, deferential standard, however, they ignore the fact that we have now engaged in substantial discovery in this case—both sides have produced thousands of pages of written materials (Defendants have produced more than 14,000 pages), and depositions were taken of three Plaintiffs and/or opt-in Plaintiffs[1] and a 30(b)(6) deposition of Hamilton Growers was taken by Plaintiffs that lasted a full day. Despite these considerable efforts, Plaintiffs are no closer to suggesting that any of the workers they have identified should be eligible for overtime. In short, the Plaintiffs control their litigation timelines. They chose not to file for conditional certification until after they conducted substantial discovery, and even with the benefit of these considerable discovery efforts, it is abundantly clear that Plaintiffs' claims lack any legal support, and no conditional certification should be granted.

## II.      STATEMENT OF FACTS

### A.      About Defendants[2]

Hamilton Growers is a farming operation located in Norman Park, Georgia. (Jonathan T. Schwalls Decl. ¶ 2) (attached as Exhibit A). The Company grows cucumbers, peppers, squash,

---

[1] The deposition of a fourth deponent, opt-in Plaintiff Alberto Padilla Hurtado, was noticed twice, but, on each scheduled date and time (which were agreed upon by Plaintiff's counsel) he failed to attend. The Court should dismiss his claims, as discussed further below.

[2] The Plaintiffs and opt-in Plaintiffs worked under H-2A visas approved for Defendant Hamilton Growers, Inc. The farm where Plaintiffs and opt-in Plaintiffs worked operates in the agricultural industry under the "Hamilton Growers, Inc." entity, and it sells goods in the produce industry under the "Southern Valley Fruit & Vegetable, Inc." entity.

zucchini, corn, beans, and various other fruits and vegetables in its fields. (Hamilton Growers Dep., Doc. 40-1, 61:2-5.)[3]  The Company relies upon the H-2A program to support its farming operation and, during the years relevant to this matter, has sought and received approval for H-2A workers to work in the fields planting, tending to and picking the produce, as well as other various farm related positions, including positions in its packing shed. (Ex. A - ¶ 3; Doc 40-1, 127:7-12.) These applications identified a rate of pay based on the Adverse Effect Wage Rate ("AEWR"), and all H-2A visa workers, including Plaintiffs and opt-in Plaintiffs, were paid at the AEWR rate associated with their application, region, and year of employment. (Doc. 40-1, 143:5-11; Docs. 37-2 through 37-8.)

The ETA-790 form submitted as part of Hamilton Growers' H-2A applications expressly conveyed to the government (and workers) the job duties that would be performed by H-2A visa workers. These job duties included:

> Perform manual labor to plant, cultivate, harvest, grade, sort and pack cucumbers, cabbage, peppers, eggplant, squash, corn, okra, cotton, green beans, watermelons, broccoli, cilantro, pickle cucumbers, tomatillos, lettuce, cauliflower, peanuts, and tomatoes by hand or machine. . . . Operate tractors, tractor-drawn machinery, and self- propelled machinery to plow, harrow, fertilize, apply chemicals, plant, cultivate, or harvest crops. **Operate. repair, and maintain farm vehicles, implements and mechanical equipment**. Repair farm buildings, fences, and other structures. Grade, sort, wash, select, label or pack harvested products into bags or boxes. Crops may be harvested and field packed, or **loaded and transported to the packinghouse for storage and post-harvest treatment of crops**. **Stack boxes onto pallets, transport vehicles or trailers.** Count and check harvested products. Use hammers, wire clippers and other tools to construct trellises and fences. **Clean and maintain all grounds and facilities.** Regulate maintain and repair irrigation systems. Assist with Good Agricultural Practices policies.

(Doc 37-5, p. 27) (emphasis added).

---

[3] Deposition citations throughout this Response Brief refer to the page numbers of the deposition transcript rather than the page numbers as they appear in exhibits as filed.

Hamilton Growers ships its fruits and vegetables to customers throughout the region, including customers based in Georgia and customers across the country.  (Doc. 40-1, 248:12-21; Arnulfo Garcia-Ramos Dep., Doc. 40-2, 82:6-12; 96:5-9.)  Pack Logistics, LLC is a separate LLC that acts as an arm of the Company to fulfill the Company's freight functions by booking, contracting, and executing shipments using the Motor Carrier number under which the Company operates.  (Ex. A - ¶ 10; Doc. 40-1, 17:10-18:11.)  The majority of the produce sold to customers is grown in fields owned and operated by Hamilton Growers, but, when a customer orders produce that cannot be fully accommodated by what can be grown in the fields at that time (or when a customer seeks additional produce that the Company does not grow), Hamilton Growers may fill the customer order by supplementing with produce grown by other growers.  (Ex. A - ¶ 4.) Hamilton Growers is not a packer for other farms, and, when it purchases outside produce, that outside produce typically is not run on a produce line to avoid breaking the cold chain by exposing previously refrigerated produce to the elements.  (Ex. A - ¶ 5; Doc. 40-1, 73:14-18; 237:12-19.)  If repacking of outside produce must occur due to quality control, there is a designated area of the warehouse that is typically used for repacking apart from any of the mechanical product lines. (Doc. 40-1, 35:3-9.)

During the busiest part of the growing season from May to June and from September to October, the Company employs approximately 200 people to work in its packing shed, and this number goes down to between 40 and 50 workers during the less busy parts of the season.  (Doc. 40-1, 27:13-28:13.)  The workers in the warehouse perform a wide variety of job duties, some of which include forklift operation, sanitation, or maintenance, but also include other miscellaneous job duties apart from any of those designations.  (Doc. 40-1, 24:12-21.)

### B.    Forklift Drivers

There are two distinct sides of the packing shed encompassing different sets of job duties for workers who operate forklifts.  (Doc. 40-2, 83:23-25.)  On the receiving side of the packing shed, harvested goods are received from the fields, and these goods are then transported by forklift drivers as needed to the particular produce lines where the harvested goods may be sorted, washed, and/or packed, depending on the type of produce.  (Doc. 40-1, 28:3 – 29:3.)  Plaintiffs admit that forklift drivers on the receiving side generally handle produce grown by Hamilton Growers.  (Doc. 40-2, 91:12-18.)

Forklift drivers who operate on the shipping side of the packing shed load and unload produce after it has been received in the Company's internal tracking system as a finished good.  (Doc. 40-1, 29:4-9.)  The forklift drivers on the shipping side of the packing shed are the only forklift drivers who regularly unload produce purchased from outside growers to be stored in a refrigerated section of the warehouse before subsequent shipment.  (Doc. 40-1, 30:2-7.)  When orders are being fulfilled, forklift drivers in the shipping area take the designated produce from the warehouse locations and load it onto trucks to be delivered to customers.  (Doc. 40-2, 83:10-13.)  Safely loading this produce from the refrigerated section on the Company's trucks for shipping to its final destination is an essential component of a forklift driver's duties when loading produce onto trucks to fulfill orders.  (Doc. 40-2, 96:5-9; Ex. A - ¶ 11.)  Plaintiff Arnulfo Garcia-Ramos, who, for some parts of his employment, worked as a forklift driver in the shipping area, estimates that 18 forklift drivers worked in his section. (Doc. 40-2, 79:18-19.)

The two areas where these groups of forklift drivers work are on opposite sides of the packing shed.  (Doc. 40-2, 81:25.)  The packing shed is located on the farm, and thus all of the forklift work in and around the packing shed occurred on the farm.  (Ex. A - ¶ 2.)  Neither set of

forklift drivers touch produce, including outside produce, directly with their hands, but rather load and unload produce containers or boxes using a forklift.  (Doc. 40-2, 95: 13-16.)

### C.    Maintenance Workers

Hamilton Growers employs maintenance workers in the packing shed to perform miscellaneous duties to clean and maintain the warehouse.  These job duties include sweeping, washing bins, painting, changing light bulbs, cleaning and maintaining the conveyor lines where harvested goods are run prior to packing, and other general cleaning and straightening functions.  (Doc. 40-1, 52:1-9.)  Maintenance work is typically designated as work performed *inside* the packing shed.  (Doc. 40-1, 53:1-4.)

Workers under the maintenance designation are tasked with cleaning the lines, as well as replacing high-wear parts on the lines, such as sprockets or chains, during the slower parts of the season when the lines are not in heavy use, as well as getting the lines turned on and running at the beginning of a shift.  (Doc. 40-1, 62:3-7; 65:5-14; 66:1-3; Pablo Castillo-Olguin Dep., Doc. 40-3, 41:22-23.)  If more substantive repairs need to be performed on the line, the Company hires an external contractor to assess and perform the repair as needed – designated packing shed maintenance team members working under H-2A contracts do not perform electrical work or structural work as might be required of a trained and licensed fabricator, engineer, or machinist.  (Doc. 40-1, 63:12-17.)  Hamilton Growers does not utilize packing shed H-2A visa workers to function as mechanics or to perform mechanic work.  (Ex. A - ¶ 9; Doc. 40-1, 144:9-10.)

Opt-in Plaintiff Jonathan Castillo Tovar, who worked primarily in a maintenance position, testified that two to four people performed maintenance functions similar to his job duties.  (Castillo Tovar Dep. 56:20) (attached as Exhibit B).  Plaintiff Pablo Castillo-Olguin, who also worked primarily in a maintenance position, testified that, in addition to his work cleaning and maintaining the produce line, he would perform different jobs in the packing shed as needed,

including operating a forklift.  (Doc. 40-3, 43:15-20; 44:20-21.)  All of the maintenance work in and around the packing shed occurred on the farm.  (Ex. A - ¶ 2.)

### D.    Sanitation Workers

Hamilton Growers also employs sanitation workers to perform miscellaneous duties to clean and maintain the areas located outside and on the periphery of the warehouse.  (Doc. 40-1, 52:22 – 53:4.)  Like the maintenance crew, these job duties include sweeping, moving bins, dumping trash and other general cleaning and straightening functions.  (*Id.*)  Sanitation work is typically designated as work performed *outside* the packing shed.  (Doc. 40-1, 52: 18-21.)  The packing shed is located on the farm, and thus all of the sanitation work in and around the packing shed occurred on the farm.  (Ex. A - ¶ 2.)

The only opt-in Plaintiff whose primary job duties included sanitation work is Alberto Padilla Hurtado, the same individual who failed to attend two noticed depositions scheduled and agreed upon with Plaintiffs' counsel. Plaintiffs have failed to identify a single other "sanitation" worker that is interested in joining this lawsuit or fits within this category of worker, and Mr. Hurtado's claims should be dismissed as discussed below.

### III.    PROCEDURAL HISTORY

On May 29, 2024, Plaintiffs Garcia-Ramos and Castillo-Olguin filed their Complaint, alleging (amongst other allegations) that the Company failed to pay the Plaintiffs overtime for working over 40 hours in a workweek, ostensibly claiming that these individuals are not exempt from overtime under the FLSA.  (Doc. 1.)  Plaintiffs filed notice of **<u>seven</u>** other individuals joining this matter as opt-in Plaintiffs between June 6, 2024 and June 25, 2024, and since then, only **<u>one</u>** additional opt-in Plaintiff has joined this matter.  No one has joined this lawsuit as an opt-in Plaintiff since October 17, 2024.

On September 11, 2024, the Court entered a phased discovery scheduling order. (Doc. 23.) The first phase of discovery is limited to class issues, however, Plaintiffs could have filed their Motion for Conditional Certification at any time. During the first phase, the parties engaged in substantial discovery. Both parties served written discovery and produced voluminous documents – Plaintiffs produced 2,107 pages of documents (with more expected) and Defendants produced over 14,000 pages of documents. Defendants noticed four depositions and were able to take three of them (one individual did not show up for either his original noticed deposition or his rescheduled deposition). Plaintiff took a full-day 30(b)(6) deposition.

## IV.    LEGAL STANDARD

Certification of an FLSA collective action typically proceeds in two stages: notice and decertification. *Morgan v. Family Dollar Stores, Inc.*, 551 F. 3d 1233, 1261 (11th Cir. 2008). At the notice stage, the plaintiff bears the burden of presenting evidence showing that he is "similarly situated" to the members of the collective and that additional employees "desire to opt-in." *Dybach v. State of Fla. Dep't of Corrs.*, 942 F.2d 1562, 1567-68 (11th Cir. 1991).

Plaintiffs often suggest that this first-stage "conditional" certification is virtually automatic. Predictably, Plaintiffs here make that very same argument. The rationale, however, for the "fairly lenient standard" is that, at the early stages of litigation, plaintiffs have not had time to conduct discovery and marshal their best evidence. *Davis v. Charoen Pokphand (USA), Inc.*, 303 F. Supp. 2d 1272, 1276 (M.D. Ala. 2004). "[T]he rationale for the fairly lenient standard . . . disappears . . . once plaintiffs have had an opportunity to conduct discovery with respect to defendant's policies and procedures." *Ide v. Neighborhood Restaurant Partners, LLC*, 32 F. Supp. 3d 1285, 1291 (N.D. Ga. 2014).

Because the parties have conducted over seven months of discovery prior to requesting conditional certification—including taking depositions, producing documents, and Plaintiffs'

collecting declarations—it is appropriate to apply a stricter, more searching, standard of review. *Mason v. Atlanta Beverage Co.*, 1:17-cv-2293-TWT, 2018 WL 3655374, at *2 (N.D. Ga. Aug. 2, 2018) (utilizing "more searching standard" after plaintiff had time to conduct discovery over a four-month period); *Ide*, 32 F. Supp. 3d at 1290-91 ("[A]s Plaintiff was able to engage in more than eight months of discovery before filing her motion for conditional certification, the undersigned believes that a heightened standard of review is necessary."); *Ledbetter v. Pruitt Corp.*, No. 5:05-CV-329(CAR), 2007 WL 496451, at * 2 (M.D. Ga. Feb. 12, 2007) (employing heightened level of scrutiny post-discovery); *Davis*, 303 F. Supp. 2d at 1276 (applying "more rigorous standard" when plaintiff had time to conduct discovery and file supplemental evidence in support of their motion to facilitate class notification); *White v. Osmose, Inc.*, 204 F. Supp. 2d 1309, 1313 n.2 (M.D. Ala. 2002) (same).

Under the stricter standard, Plaintiff must provide even more evidence that:  (1) there are potential class members who desire to join the lawsuit; (2) the potential class members are similarly situated; and (3) the factual similarities between plaintiff and the potential class members are such as to render them manageable as a class and promote the efficient resolution in one proceeding of common issues of law and fact arising from the same alleged activity, i.e., that providing notice to bring individuals into one case is an efficient way to handle the case.  *See Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 165 (1989).  Here, Plaintiffs have not and cannot establish that they are similarly situated sufficiently to support conditional certification.

## V.    LEGAL ARGUMENT

### A. Plaintiffs Failed to Establish that Members of the Proposed Collective Are Similarly Situated.

To establish that a proposed collective is similarly situated for purposes of conditional certification, a plaintiff must "provide some credible evidence of 'class-wide' violations of the

FLSA, or make some rudimentary showing of the commonality between (their) claims and those of the putative class." *Brooks v. BellSouth Telecomms., Inc.*, No. 1:07-cv-3054-ODE, 2009 WL 10699685, at * 7 (N.D. Ga. Feb. 10, 2009). Plaintiffs here have not done so.

## 1.    Defendant's Policies Are Lawful.

Plaintiffs cannot conditionally certify a collective action under a common policy because the Company's policies were, at all times, lawful. Plaintiffs place significant emphasis on the fact that they were not paid overtime—a point which Defendants concede—without once addressing the critical fact that Plaintiffs were *lawfully* not paid overtime because they are exempt under either the Agricultural exemption, the Motor Carrier exemption, or both.

### a.    Application of the Agricultural Exemption

An employee is exempt from the FLSA's overtime provisions if he or she is "employed in agriculture." 29 U.S.C. § 213(a)(6). The definition of "agriculture" under the FLSA includes:

> [F]arming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities ... and any practices (including forestry or lumbering operations) performed by a farmer or on a farm as incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market.

29 U.S.C. § 203(f). This statutory definition provides for two categories of exempt agricultural practices: "primary agriculture, which includes specific activities like cultivation and tillage of the soil, dairying, and harvesting," and "secondary agriculture," that "includes any practices, whether or not themselves farming practices, which are performed either by a farmer on a farm, incidentally to or in conjunction with 'such' farming operations." *Sariol v. Fla. Crystals Corp.*, 490 F.3d 1277, 1279 (11th Cir. 2007) (quoting *Farmers Reservoir & Irrigation Co. v. McComb,* 337 U.S. 755, 762–63 (1949)). The "secondary agriculture" category of practices has a "broader . . . meaning" than primary agriculture. 29 C.F.R. § 780.105(a). "The definition of secondary agriculture has

three requirements: (1) the 'practice must be performed either by a farmer or on a farm'; (2) it must 'be performed either in connection with the farmer's own farming operations or in connection with farming operations conducted on the farm where the practice is performed'; and (3) it must be 'performed as an incident to or in conjunction with' the farming operations.'" *Rodriguez v. Pure Beauty Farms, Inc.*, 503 F. App'x 772, 774–75 (11th Cir. 2013).  In *Sariol*, for example, the Eleventh Circuit court held that the plaintiff's job duties delivering fuel for farm machinery and performing maintenance and repair services on farm equipment constituted secondary agriculture and thus qualified for the agricultural exemption, even where the machinery serviced was owned by independent contractors rather than the farm itself: "Delivering fuel to farm machinery and maintaining equipment are . . . not only incidental to [Defendant's] operations, but are absolutely necessary. Without these services . . . the farm would grind to a halt." 490 F.3d at 1279–80.  *See also Rodriguez*, 503 F. App'x at 775 (holding that plaintiffs' job maintaining farm plants at their point of sale in a Home Depot store was sufficiently incidental to the farm's farming operations to constitute secondary agriculture); *Taylor v. White Oak Pastures, Inc.*, 454 F. Supp. 3d 1317, 1329 (M.D. Ga. 2020) (holding that the secondary agriculture definition includes "preparation for market" activities and thus exempts farm workers involved in cattle processing activities, including slaughtering, cutting, and grinding); *Hernandez v. B Rd. Assocs., Inc.*, 2010 WL 11622617, at *3 (M.D. Fla. Apr. 22, 2010) (determining that tracking produce inventory and inputting worker payroll information on a farm are exempt agricultural activities and noting that 29 C.F.R. 780.158(a) explicitly recognizes, "secondary" agriculture to include office work performed on the farm).

There is simply no doubt that the worker categories that Plaintiffs seek to certify are engaged in agricultural work under the FLSA.  The work was clearly performed on a farm, and

Plaintiffs do not appear to dispute that the work was an incident to or in conjunction with Defendants' farming operations, nor could they considering that the activities performed in the packing shed fall squarely in the established "preparation for market" subcategory of secondary agricultural work.  Instead, Plaintiffs appear to suggest that the exemption does not apply because Hamilton Growers also purchases produce from other growers that is stored in and then transported out from the packing shed.  What Plaintiffs critically elide, however, is the fact that none of the job duties or job categories they identify implicate handling outside produce.  The one case Plaintiffs' misleadingly claim supports their argument is *Acosta v. Bland Farms Prod. & Packing, LLC*, 767 F. App'x 862, 863 (11th Cir. 2019).  In *Acosta*, workers were not deemed to be employed in agriculture when they processed and packed onions grown on land owned and leased by other growers.  Here, after seven months of discovery, there is not even a bare allegation that any forklift driver, maintenance worker, or sanitation worker ***processed or packed any*** produce (let alone produce grown by anyone other than Defendants).  Instead, Plaintiffs attempt to stretch the definition of this outside produce exemption beyond recognition, asking the Court to certify classes based on the theory that a forklift driver whose forklift tongs touch a box that might contain outside produce is somehow non-exempt—a theory that is unsupported by any case law.  The forklift drivers do not personally touch outside produce, but rather move produce around in the warehouse.  (Doc. 40-2, 95:13-18.)  Even giving deference to Plaintiff's testimony (which is contradicted by the Company), at best, these workers *sometimes* touch outside produce with the tongs of a forklift but work in a packing shed of a farm where they primarily move and load produce grown on that farm.  (Ex. A - ¶ 4; Doc. 40-2, 91:12-18.)  Further, the outside produce purchased by Defendants is typically not run on any line in the packing shed to avoid breaking the cold chain, and thus it would not typically be encountered by the sanitation workers or maintenance workers, nor would

it typically be handled by a forklift driver in the receiving area. (Ex. A - ¶ 5; Doc. 40-1, 56:1-11; 73:5-18). Plaintiff Castillo Olguin testified that most of the produce that was run on the lines in the warehouse was grown by Hamilton Growers. (Doc. 40-3, 42:19-25.). Again, at best, Plaintiff's testimony is that outside produce sometimes was placed on the produce lines. (Doc. 40-3, 42:19-25; Ex. B - 54:18-23; 55:18-22.). Plaintiffs have not (and cannot) cite a single case that says this results in the loss of the agricultural exemption for someone who cleans below that produce line or works on the bearings and sprockets repairing that line. That is because the result would be absurd: if Plaintiffs were right, a worker whose broom touches a single leaf of produce from another farm would be non-exempt, and of course, that is not the law. Simply stated, Plaintiffs have failed to demonstrate that they are similarly situated with respect to an unlawful policy because there is no unlawful policy.

### b.  Application of the Motor Carrier Act Exemption

The forklift drivers who work on the receiving side and load and unload outside produce are also exempt from overtime payments under the Motor Carrier exemption to the FLSA. "The Motor Carrier Exemption, . . . prevents FLSA's requirements from applying to 'any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49.'" *Aguilar v. Grupo Medex, Inc.*, 2008 WL 11409044, at *5 (S.D. Fla. Dec. 8, 2008) (citing 29 U.S.C. § 213(b)(1) (2000)). The Eleventh Circuit employs a two-part test, determining Motor Carrier Exemption applicability if employees, "(1) are employed by carriers whose transportation of passengers or property by motor vehicle is subject to the Secretary's jurisdiction under the Motor Carrier Act; and (2) engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate

or foreign commerce within the meaning of the Motor Carrier Act." *Baez v. Wells Fargo Armored Serv. Corp.*, 938 F.2d 180, 182 (11th Cir. 1991). The second part of this definition includes not only drivers, but also *loaders* whose work similarly affects the safety of motor vehicles transporting property in interstate commerce. In *Lewis v. Eskridge Trucking Co.*, 449 F. App'x 780, 781 (11th Cir. 2011), the plaintiff loader was exempt from overtime under the Motor Carrier exemption where his duties included the proper loading of vehicles to ensure that loads were balanced.

Pack Logistics, LLC, an arm of the Company, fulfills the Company's freight functions and uses the motor carrier number under which the Company operates. (Ex. A - ¶ 10.) This corporate relationship situates Defendants as "carriers" under the Motor Carrier Act subject to the Secretary's jurisdiction, and, thus, its employees as exempt to the extent they engage in activities affecting the safety of operation of motor vehicles in interstate commerce. Plaintiff Arnulfo Garcia-Ramos testified that he worked on the shipping side of the packing shed, and that, in this role, he loaded produce into trucks for shipment to customers. (Doc. 40-2, 83:10-16.) He acknowledged both that the customers were often across state lines thus satisfying the "interstate commerce" aspect of the exemption, and he further stated that safety was a core focus of the position. (Doc. 40-2, 82:6-12; 96:5-9; Ex. A - ¶ 11.) Because these forklift drivers are clearly exempt, Plaintiff has not and cannot establish a policy or practice violating the FLSA.

## B.    Plaintiffs Cannot Show Commonality Between Their Claims and Those of Putative Class Members

Where discovery uncovers overt distinctions among the job duties of putative class members, a collective action is an inappropriate vehicle for resolution. *Bradford v, CVS Pharmacy, Inc.*, 308 F.R.D. 696, 699-700 (N.D. Ga. 2015) ("[t]he differences in the duties performed by the various Plaintiffs . . . will make individualized inquiries inevitable when

determining whether a particular FLSA defense applies."); *Thrower v. Peach Cnty. Sch. Dist.*, 2009 WL 10675081, at *3 (M.D. Ga. Apr. 28, 2009) (refusing to conditionally certify a collective action where Plaintiffs did not show common issues of law or fact that would effectuate collective resolution and where "discovery and trial . . . will require each individual Plaintiff to testify as to hours worked and hours compensated on particular days and for particular activities").

Here, even the basic job positions in this action vary widely across putative class members, with Plaintiffs attempting to certify a class encompassing forklift operators, maintenance workers and sanitation workers.[4]  (Ex. A - ¶ 6.)  And, within each of these subgroups, individualized inquiries related to job duties will be necessary to resolve questions of liability as to every potential class member.  Specifically, Plaintiffs' theory of liability is premised on the degree to which the putative class members handled outside produce, but, as noted above, they do not allege, nor could they, that any putative class member was actually involved in packing operations.  Instead, Plaintiffs implicitly suggest, for example, that a forklift operator is owed overtime for any occasion when the tongs of a forklift touch outside produce or when a maintenance operator replaces a sprocket on a line that might infrequently move outside produce.  The Company does not maintain records to document which forklift operators lift outside produce and when, nor does it record

---

[4] The class of sanitation workers should be dismissed altogether upon the justifiable dismissal of Alberto Padilla Hurtado for his failure to participate in the discovery process.  In addition, the class of maintenance workers should be dismissed because opt-in Plaintiff Castillo Tovar testified that only four individuals worked in the packing shed as maintenance workers while Plaintiff Castillo Olguin set a maximum of 12 to 13 workers in this capacity.  (Ex. B - 56:20; Doc. 40-3, 45:8.) "Section 216(b) class actions are not subject to the numerosity requirements of Federal Rule of Civil Procedure 23, but still require a *class*—not merely multiple parties." *Raskin v. Am. Bankers Life Assurance Co. of Fla.*, No. 1:20-CV-25094, 2021 WL 2915084, at *2 (S.D. Fla. July 12, 2021) (citing *Prickett v. DeKalb Cnty.*, 349 F.3d 1294, 1297 (11th Cir. 2003) (emphasis in original). Even Plaintiff Castillo Olguin's larger estimate is insufficient to justify collective action.  *See, e.g., Zuliani v. Santa Ana, LLC*, No. 17-CIV-62080, 2018 WL 1894723, at *6 (S.D. Fla. Mar. 14, 2018) ("A potential class of twelve employees simply is not large enough to justify class treatment.").

when outside produce moves on a given produce line, let alone which operators are staffing a particular line at any given time. (Ex. A - ¶ 7, 8; Doc. 40-1, 34:10-13.) So, putting aside the fact that this theory has no statutory or legal foundation, it will require depositions of every opt-in Plaintiff to determine: which forklift operators lifted outside produce and during which workweeks they lifted outside produce; which maintenance workers worked on a produce line that moved outside produce and during which workweeks they performed this work; and which sanitation workers cleaned around a line that moved outside produce and during which workweeks they performed this work. This is an impossible task that renders the desired efficiency of collective action a nullity. As the deposition testimony established, the job positions at issue here do not set one's job duties in stone, but rather workers in the packing shed perform a variety of tasks as seasonal needs demand. (Ex. A - ¶ 6; Doc. 40-3, 44:20-21; Doc. 40-1, 24:12-17.) In fact, Garcia-Ramos, the named Plaintiff representing forklift operators, was employed in another position altogether as a Shipping Clerk during most of the years at issue, and he rarely operated a forklift in this role. (Doc. 40-2, 84:1-12.) Given the varying job duties of even the few deposed individuals, it stands to reason that a larger collective of workers in these subgroups will diverge further from anything resembling a manageable group of similarly situated workers.

### C.    Plaintiffs Failed to Show That a Manageable Class Exists

Collective actions must be an "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged (unlawful) activity." *Hoffmann-LaRoche Inc.*, 493 U.S. at 170. Before granting a motion for conditional certification, a court must consider "whether as a matter of sound class management . . . a manageable class exists." *Hall v. Guardsmark, LLC*, 2012 WL 3580086, at *9 (W.D. Pa. Aug. 17, 2012). There must be "evidence that the Plaintiffs would present a single claim that if resolved for one, would be resolved for all." *Rutledge v. Claypool Elec., Inc.*, 2013 WL 435058, at *5 (S.D. Ohio Feb. 5, 2013).

- 16 -

Here, numerous individual inquiries are necessary to determine liability and potential damages. These include, among other things: (i) calculating what proportion of a given shift was given over to forklift driving, maintenance, and/or sanitation activities; (ii) identifying shifts and/or workweeks where Plaintiffs handled or processed produce grown by outside growers (if any); (iii) correlating shipping data and forklift assignments, to the extent possible, to identify shipments loaded by Plaintiffs; and (iv) determining variations in job duties during different parts of the growing season. In short, every single opt-in will have to be deposed, and the analysis for each claim is very different. Some will be covered by the Motor Carrier Act. Some may not. Some will never or very rarely have a job that involves outside produce. This is not one policy—this is a slew of different jobs, a multitude of ways the exemptions likely apply, and in the end, Plaintiffs' allegations implicate, at best, several different and unrelated individual lawsuits rather than a single policy adequate to support a viable collective action. In sum, Plaintiffs' claims are inappropriate for collective certification. *See Williams v. Accredited Home Lenders, Inc.*, 2006 WL 2085312, at *4 (N.D. Ga. July 25, 2006) (denying certification because "there must be a fact-specific, individualized inquiry into each Plaintiff's day-to-day activities" to determine whether violations existed); *see also Castle v. Wells Fargo Fin., Inc.*, 2008 WL 495705, at *5 (N.D. Ca. Feb. 20, 2008) (denying certification because "individual issues predominate such that the employees are not similarly situated" in off-the-clock cases); *Diaz v. Elecs. Boutique of Am., Inc.*, 2005 WL 2654270, at *2-5 (W.D.N.Y Oct. 17, 2005) (denying conditional certification because issues were too individualized).

### D.    Opt-in Plaintiff Alberto Padilla Hurtado Should Be Dismissed

Defendants noticed the deposition of opt-in Plaintiff Hurtado to be deposed remotely via videoconference on May 7, 2025, but he did not attend, and Plaintiffs' counsel was not able to reach Padilla Hurtado during this time. The Parties agreed to reschedule his remote deposition for

May 14, 2025, but Hurtado, once again, failed to arrive or communicate with counsel on the date of his re-noticed deposition.   After 30 minutes awaiting his arrival, the proceedings were suspended with Plaintiffs' counsel stating that they did not know his whereabouts.   (Padilla Hurtado Dep. 5:14-17) (attached as Exhibit C).

An opt-in Plaintiff who fails to participate in the discovery process should be dismissed. *Sullivan v. PJ United, Inc.*, 2017 WL 10575860, at *12 (N.D. Ala. Oct. 16, 2017) (failure by multiple opt-in Plaintiffs to appear for depositions constitutes abandonment of the litigation and warrants dismissal). Here, Padilla Hurtado's failure to attend two scheduled depositions more than justifies his dismissal as a conditional member of the collective action.   In addition, because Padilla Hurtado represents the only opt-in Plaintiff who Plaintiffs' counsel has identified as a worker with a "Sanitation" designation, his dismissal should result in dismissing this entire group of workers.

## VI.    PLAINTIFF'S PROPOSED NOTICE IS DEFICIENT

If this Court grants conditional certification, Plaintiffs' notice is deficient.   First and foremost, the temporal scope of the notice period is March 29, 2022 to the present.   The notice period, however, should be limited to 3 years back from the date any conditional certification notice is mailed (taking into account any tolling agreed to by the parties in this case).   *Sellers v. Sage* Software, 2018 WL 5631106, at *5 (N.D. Ga. May 25, 2018) ("the Court agrees with Defendants…the temporal scope of the class shall be 3 years preceding the notice mailing date"); *Olmstead v. DRJE, Inc.*, 2017 WL 3769331, at *5 (N.D. Ga. Aug. 31, 2017) (temporal scope is 3 years from mailing date); *Reece v. United Home Care of N. America, Inc.*, 2013 WL 895088, at *6 (N.D. Ga. Mar. 8, 2013) (same).

In addition, although notice via mail and either email or text message may be appropriate, both email and text message are not appropriate, nor is a landing page on a website.   *Sellers*, 2018 WL 5631106 at *5 ("the court agrees with Defendants that sending notice via text message is

unnecessary and potentially costly for the recipients"); *Miller v. JAH, LLC*, 2018 WL 305819, at *3 (N.D. Ala. Jan. 5, 2018) (questioning sending notice via text message).

Similarly, reminder notices are not appropriate here. *Moxley v. OS Restaurant Services, LLC*, 2022 WL 3268289, at *3 (M.D. Fla. July 5, 2022); *Sellers,* 2018 WL 5631106 at *6; *Trentman v. RWL Communications, Inc.*, 2015 WL 2062816, at *5 (M.D. Fla. May 4, 2015) (noting that reminder is unnecessary and redundant).

Furthermore, a 90-day notice is excessive given the number of ways Plaintiffs propose to disseminate the notice to Plaintiffs. A 60-day notice is more appropriate if notices are being sent both via mail and electronically. *Sellers*, 2018 WL 5631106, at *6.

There also are several issues with the notice itself, including that it does not inform Plaintiffs of the fact that they may have to sit for a deposition and respond to written discovery, uses excessive bolding and underlining that appears to be coercive to attempt to convince individuals to join the lawsuit, and fails to inform the employees that they may be responsible for a portion of any bill of costs if this Court later finds that this claim lacks merit. If conditional certification is granted, Defendants respectfully request that this Court order the parties to confer to address these issues and submit a joint (or if agreement cannot be reached, separate) proposed notices to the Court within fourteen (14) days of any Order granting conditional certification.

Finally, Plaintiffs ask that this Court order Defendants to provide the names, addresses (U.S. and Foreign), email addresses, telephone numbers (U.S., foreign, cellphone and WhatsApp) of all workers covered by their requested notice within 14 days of any order. First, as noted above and as will be further explained in response to Plaintiffs' Rule 23 Motion, attempting to identify those individuals who worked as forklift drivers, maintenance workers and or sanitation workers during the notice period is a nearly impossible task and Defendants seek at least 30 days to fully

determine the best way to give Plaintiffs the most accurate information. Furthermore, as noted above, the information should be limited to names, home address (in either Mexico, or if they are a domestic employee, in the US), and either one personal email or their personal cell phone number, if known.

### VII.    CONCLUSION

For the reasons stated herein, Plaintiff's Motion for 29 U.S.C. § 216(B) Notice to Similarly Situated Workers and for Disclosure of Contact Information, should be denied.

Respectfully submitted this 3rd day of July, 2025.

*s/Martin B. Heller*
Martin B. Heller
Georgia Bar No. 360538
David Lerner
Georgia Bar No, 853678
**FISHER & PHILLIPS LLP**
1075 Peachtree Street NE, Suite 3500
Atlanta, Georgia 30909
Telephone: (404) -231-1400
Facsimile: (404) 240-4249
mheller@fisherphillips.com
dlerner@fisherphillips.com

Attorneys for Defendants

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day electronically submitted the foregoing **DEFENDANTS' RESPONSE BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR 29 U.S.C. § 216(B) NOTICE TO SIMILARLY SITUATED WORKERS AND FOR DISCLOSURE OF CONTACT INFORMATION** by electronic mail to the following counsel of record:

> Dawson Morton, Esq.
> Dawson Morton, LLC
> 1003 Freedom Blvd.
> Watsonville, CA 95076
>
> James M. Knoepp
> Dawson Morton, LLC
> 1612 Crestwood Drive
> Columbia, SC 29205

This 3rd day of July, 2025.

*s/Martin B. Heller*
Martin B. Heller
Georgia Bar No. 360538
