IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

ARNULFO GARCIA-RAMOS,        )
PABLO CASTILLO-OLGUIN, and   )
all others similarly situated,       )
                               )
       Plaintiffs,           )
                               )     **CIVIL ACTION FILE**
v.                           )
                               )     **FILE NO.: 7:24-cv-00054-WLS**
SOUTHERN VALLEY FRUIT &     )
VEGETABLE, INC.; HAMILTON     )
GROWERS, INC.; KENT HAMILTON;  )
HAMILTON PRODUCE, L.P.;      )
KENDA PROPERTIES, L.P.; WK     )
HOLDINGS, LLC; and WKW, LLC,   )
                               )
       Defendants.        )

## DEFENDANTS' RESPONSE BRIEF IN
## OPPOSITION TO PLAINTIFFS' MOTION FOR RULE 23 CLASS CERTIFICATION

Defendants submit this Response Brief in Opposition to Plaintiffs' Motion for Rule 23 Class Certification, stating as follows:

### I.     INTRODUCTION

In a smoke and mirrors fashion, Plaintiffs propose certification of three classes under Rule 23 that are all overly broad and unsupported. They do so by broadly claiming various laws were violated, despite providing no support for their bare conclusions. A meaningful review shows that Plaintiffs' proposed classes fail to demonstrate the required characteristics to qualify for class certification under Rule 23(a), let alone to meet the higher "predominance" requirement under Rule 23(b)(3). By collapsing three distinct job categories (each with "subclasses") into a single class, Plaintiffs create unwieldy classes of separate and distinct sets of workers, each demanding unique factual and legal questions, in a clear effort to achieve sufficient numerosity where it would

otherwise be wanting. Furthermore, the "common questions" proposed by Plaintiffs fall into two categories: either the common question is moot because it is readily apparent there is no supported violation of the law, or the "common question" cannot possibly be resolved by common proof, such as when the Plaintiffs themselves admit that they have no proof as to their travel costs and they are all relying upon "estimates" to support a claim that they were not fully reimbursed for their travel costs.  Simply stated, Plaintiffs attempt to convince this Court to certify a bet-the-Company Class Action with no evidence to support Rule 23 Class Certification. Granting class certification based upon Plaintiffs' unsupported and unprecedented theories (with no meaningful evidence of violations of the FLSA and absolutely no support for a claim that forklift drivers, mechanics and/or sanitation workers are owed an hourly wage higher than AEWR) would represent a radical change to existing law that threatens the survival of Defendants, as well as all other farmers operating within the Eleventh Circuit.  The flaws identified in Plaintiffs' arguments below are precisely the types of individualized inquiries that are inapt for Rule 23 class certification, and Defendants respectfully request that Plaintiffs' Motion be denied.

## II.    STATEMENT OF FACTS

### A.    About Defendants

Hamilton Growers is a farming operation located in Norman Park, Georgia.  (Jonathan T. Schwalls Decl., Doc 42-1, ¶ 2). The Company grows cucumbers, peppers, squash, zucchini, corn, beans, and various other fruits and vegetables in its fields. (Hamilton Growers Dep., Doc. 40-1, 61:2-5.)[1] The Company relies upon the H-2A program to support its farming operation and, during the years relevant to this matter, has sought and received approval for H-2A workers to work in the fields planting, tending to and picking the produce, as well as other various farm related

---

[1] Deposition citations throughout this Response Brief refer to the page numbers of the deposition transcript rather than the page numbers as they appear in exhibits as filed.

positions, including positions in its packing shed. (Doc 42-1, ¶ 3; Doc 40-1, 127:7-12.) These applications identified a rate of pay for the H-2A workers (which is set by the Government) based on the Adverse Effect Wage Rate ("AEWR"), and all H-2A visa workers, including Plaintiffs and opt-in Plaintiffs, were paid at the AEWR rate associated with their application, region, and year of employment. (Doc. 40-1, 143:5-11; Docs. 37-2 through 37-8.)

The ETA-790 form submitted as part of Hamilton Growers' H-2A applications expressly conveyed to the government (and workers) the job duties that would be performed by H-2A visa workers. These job duties included:

> Perform manual labor to plant, cultivate, harvest, grade, sort and pack cucumbers, cabbage, peppers, eggplant, squash, corn, okra, cotton, green beans, watermelons, broccoli, cilantro, pickle cucumbers, tomatillos, lettuce, cauliflower, peanuts, and tomatoes by hand or machine. . . . Operate tractors, tractor-drawn machinery, and self- propelled machinery to plow, harrow, fertilize, apply chemicals, plant, cultivate, or harvest crops. **Operate. repair, and maintain farm vehicles, implements and mechanical equipment**. Repair farm buildings, fences, and other structures. Grade, sort, wash, select, label or pack harvested products into bags or boxes. Crops may be harvested and field packed, or **loaded and transported to the packinghouse for storage and post-harvest treatment of crops**. **Stack boxes onto pallets, transport vehicles or trailers.** Count and check harvested products. Use hammers, wire clippers and other tools to construct trellises and fences. **Clean and maintain all grounds and facilities.** Regulate maintain and repair irrigation systems. Assist with Good Agricultural Practices policies.

(Doc 37-5, p. 27) (emphasis added). There is no dispute that these job duties were approved as H-2A agricultural job duties by the US Department of Labor.

Hamilton Growers ships its fruits and vegetables to customers throughout the region, including customers based in Georgia and customers across the country. (Doc. 40-1, 248:12-21; Arnulfo Garcia-Ramos Dep., Doc. 40-2, 82:6-12; 96:5-9.) Pack Logistics, LLC is a separate LLC that acts as an arm of the Company to fulfill the Company's freight functions by booking, contracting, and executing shipments using the Motor Carrier number under which the Company operates. (Doc 42-1, ¶ 10; Doc. 40-1, 17:10-18:11.) The majority of the produce sold to customers

is grown in fields owned and operated by Hamilton Growers, but, when a customer orders produce that cannot be fully accommodated by what can be grown in the fields at that time (or when a customer seeks additional produce that the Company does not grow), Hamilton Growers may fill the customer order by supplementing with produce grown by other growers.  (Doc 42-1, ¶ 4.) Hamilton Growers is not a packer for other farms, and, when it purchases outside produce, that outside produce typically is not run on a produce line to avoid breaking the cold chain by exposing previously refrigerated produce to the elements.  (Doc 42-1, ¶ 5; Doc. 40-1, 73:14-18; 237:12-19.) If repacking of outside produce must occur due to quality control, there is a designated area of the warehouse that is typically used for repacking apart from any of the mechanical product lines. (Doc. 40-1, 35:3-9.)

During the busiest part of the growing season from May to June and from September to October, the Company employs approximately 200 people to work in its packing shed, and this number goes down to between 40 and 50 workers during the less busy parts of the season.  (Doc. 40-1, 22:13-23:13.)  The workers in the warehouse perform a wide variety of job duties, but the only workers that are relevant to Plaintiffs' claims are the portion of workers that perform forklift operation, sanitation, or maintenance work.  Individuals who perform this work also perform other miscellaneous job duties apart from any of those designations.  (Doc. 40-1, 24:12-21.)

## B.    Forklift Drivers

There are two distinct sides of the packing shed encompassing different sets of job duties for workers who operate forklifts.  (Doc. 40-2, 83:23-25.)  On the receiving side of the packing shed, harvested goods are received from the fields, and these goods are then transported by forklift drivers as needed to the particular produce lines where the harvested goods may be sorted, washed, and/or packed, depending on the type of produce.  (Doc. 40-1, 28:3 – 29:3.)  Plaintiffs admit that

forklift drivers on the receiving side generally handle produce grown by Hamilton Growers. (Doc. 40-2, 91:12-18.)

Forklift drivers who operate on the shipping side of the packing shed load and unload produce after it has been received in the Company's internal tracking system as a finished good. (Doc. 40-1, 29:4-9.) The forklift drivers on the shipping side of the packing shed are the only forklift drivers who are assigned to unload produce purchased from outside growers to be stored in a refrigerated section of the warehouse before subsequent shipment. (Doc. 40-1, 30:2-7.) When orders are being fulfilled, forklift drivers in the shipping area take the designated produce from the warehouse locations and load it onto trucks to be delivered to customers. (Doc. 40-2, 83:10-13.) Safely loading this produce from the refrigerated section on the Company's trucks for shipping to its final destination is an essential component of a forklift driver's duties when loading produce onto trucks to fulfill orders. (Doc. 40-2, 96:5-9; Doc 42-1, ¶ 11.) Plaintiff Arnulfo Garcia-Ramos, who, for some parts of his employment, worked as a forklift driver in the shipping area, estimates that 18 forklift drivers worked in his section. (Doc. 40-2, 79:18-19.)

The two areas where these groups of forklift drivers work are on opposite sides of the packing shed. (Doc. 40-2, 81:25.) The packing shed is located on the farm, and thus all of the forklift work in and around the packing shed occurred on the farm. (Doc 42-1, ¶ 2.) Neither set of forklift drivers touch produce, including outside produce, directly with their hands. (Doc. 40-2, 95:13-16.)

## C.    Maintenance Workers

Hamilton Growers employs maintenance workers in the packing shed to perform miscellaneous duties to clean and maintain the warehouse. These job duties include sweeping, washing bins, painting, changing light bulbs, cleaning and maintaining the conveyor lines where harvested goods are run prior to packing, and other general cleaning and straightening functions.

(Doc. 40-1, 52:1-9.)  Maintenance work is typically designated as work performed *inside* the packing shed.  (Doc. 40-1, 53:1-4.)

Workers under the maintenance designation are tasked with cleaning the lines, as well as replacing high-wear parts on the lines, such as sprockets or chains, during the times of the year when the lines are not running, as well as getting the lines turned on and running at the beginning of a shift.  (Doc. 40-1, 62:3-7; 65:5-14; 66:1-3; Pablo Castillo-Olguin Dep., Doc. 40-3, 41:22-23.) If more substantive repairs need to be performed on the line, the Company hires an external contractor to assess and perform the repair as needed – designated packing shed maintenance team members working under H-2A contracts do not perform electrical work or structural work as might be required of a trained and licensed fabricator, engineer, or machinist.  (Doc. 40-1, 63:12-17.) Hamilton Growers does not utilize packing shed H-2A visa workers to function as mechanics or to perform mechanic work.  (Doc 42-1, ¶ 9; Doc. 40-1, 144:9-10.)

Opt-in Plaintiff Jonathan Castillo Tovar, who worked primarily in a maintenance position, testified that two to four people performed maintenance functions similar to his job duties. (Castillo Tovar Dep., Doc. 42-2, 56:23-25).   Plaintiff Pablo Castillo-Olguin estimated approximately twelve to thirteen individuals performed similar work to him.  (Doc. 40-3, 45:8.) All of the maintenance work in and around the packing shed occurred on the farm.  (Doc 42-1, ¶ 2.)

### D.    Sanitation Workers

Hamilton Growers also employs sanitation workers to clean and maintain the areas located outside and on the periphery of the warehouse.  (Doc. 40-1, 52:22 – 53:4.) These job duties include sweeping, moving bins, dumping trash and other general cleaning and straightening functions. (*Id.*)  Sanitation work is typically designated as work performed *outside* the packing shed.  (Doc.

40-1, 52:18-21.)  The packing shed is located on the farm, and thus all of the sanitation work in and around the packing shed occurred on the farm.  (Doc 42-1, ¶ 2.)

None of the deposed Plaintiffs or opt-in Plaintiffs stated that they performed sanitation work, and, based on the opt-in Plaintiffs' interrogatory responses, none list sanitation as a primary job duty.  Only one of the opt-in Plaintiffs, Rafael Joaquin Guerrero, includes cleaning duties among the work he alleges that he performed, though the first duty listed is forklift operation.  In Joaquin Guerrero's Declaration, he states that he "would sometimes work as part of the sanitation team."  (Doc. 35-4, ¶ 6.)  Plaintiffs have failed to identify a single worker that is interested in joining this lawsuit who primarily worked in this job category.

### E.    Travel To and From Southern Valley

Many of the H-2A workers employed by the Company process their visas in Monterrey, Mexico prior to entering the United States for each season of work for which they are hired.  (Doc. 40-2, 39:8-13).  The Company reimburses workers for expenses and travel costs incurred, as required by law, during their time in Monterrey awaiting completion of visa processing and traveling to the farm in Norman Park, Georgia.  (Doc. 40-2, 52:11-13; Doc. 40-3, 31:23 – 32:4; Doc. 42-2, 31:19 – 32:2.)  The Company provides bus service from Monterrey to the farm in Norman Park, Georgia that is free of charge to workers.  (Doc. 40-2, 41:1-3; Doc. 40-3, 30:4-8). At the end of the season, the Company provides free return travel to Monterrey as long as workers complete their work contracts.  (Doc. 42-2, 33:21 – 34:2.)  Plaintiffs conceded that they were aware that they would not receive any return travel if they left their work contract early in order to go home and spend time with their family prior to the holidays. (Doc. 42-2, 37:1-7.)

All Plaintiff and opt-in Plaintiff deponents testified that they received reimbursement payments for their travel expenses to the farm at the beginning of each season during the relevant period.  (Doc. 40-2, 52:11-13; Doc. 40-3, 31:23 – 32:4; Doc. 42-2, 31:19 – 32:2.)  All three

deponents also testified that they do not maintain receipts of any kind documenting their travel costs, and they could only provide rough approximations of their costs each season. (Doc. 40-2, 64:16-22; Doc. 40-3, 29:7-9; Doc. 42-2, 38:3-6.) Opt-in Plaintiff Jonathan Castillo Tovar could neither remember the costs of his travel nor the method of his travel to the farm each season. (Doc. 42-2, 33:13-17.) All three deponents also testified that they did not present receipts to the Company documenting higher costs than their reimbursement payments, nor did they communicate to any manager or supervisor at the Company that they perceived the reimbursements to be insufficient. (Doc. 40-2, 51:12-17; Doc. 40-3, 32:5-11; Doc. 42-2, 32:3-8.) Hamilton Growers H-2A workers, including the deponents involved in this action, also signed statements confirming that they were fully reimbursed for their travel expenses. (Exhibit A, Acknowledgment of Receipt of Reimbursement Forms with English Translation.) And, with a few exceptions, the three deponents testified that they rarely took advantage of the Company's free bus service, opting instead to travel in their own personal vehicles or to hire a private van service for personal reasons (e.g. – didn't like the free bus). (Doc. 40-2, 56:8-12; 64:3-11; Doc. 40-3, 30:19-25; Doc. 42-2, 30:3-6.)

## F.     Work Performed Between January and February

Plaintiff Arnulfo Garcia-Ramos testified that he continued to work for the Company during the months of January and February, after his H-2A contracts expired, under a different name and using alternate identifying documentation. (Doc. 40-2, 70:3-4.) Plaintiff Garcia-Ramos further testified that not all H-2A workers worked during this time frame. (Doc. 40-2, 75:1-3.) Both Plaintiff Pablo Castillo-Tovar and opt-in Plaintiff Jonathan Castillo Tovar testified that they typically returned to Mexico a week before their contract ended in December to ensure that they could spend the holidays with their families, and neither worked in January or February each year. (Doc. 40-3, 35:13-15; Doc. 42-2, 32:11-20.) There is no credible evidence that the Company was

aware that Garcia-Ramos, or any other individual who otherwise falls into one of the relevant job categories, changed his name and worked in January and February each year.

### III.    PROCEDURAL HISTORY

On May 29, 2024, Plaintiffs Garcia-Ramos and Castillo-Olguin filed their Complaint, alleging that the Company failed to pay the Plaintiffs the required minimum hourly wage and overtime in violation of the Fair Labor Standards Act (Counts I and II); Breach of Contract (Count III); violation of the Agricultural Worker Protection Act (Count IV); and Fraud (Count V). (Doc. 1.)  Plaintiffs move for class certification of Counts III, IV, and V under Rule 23 all alleging failure to pay overtime owed under the FLSA (via a breach of contract claim), failure to pay a higher hourly rate over AEWR (without any explanation as to the basis for this claim), and failure to pay travel expenses.  (Doc. 37-1.)

### IV.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 23, "[t]o proceed as a class action, a case must satisfy a number of well-known prerequisites," including Rule 23(a)'s requirements of (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. *Carter v. City of Montgomery*, 108 F.4th 1334, 1341 (11th Cir. 2024). "Second, and separately, the case must satisfy one of several requirements under Rule 23(b)," and the "predominance" inquiry under Rule 23(b)(3) specifically requires "that the questions of law or fact common to class members predominate over *any* questions affecting only individual members." *Id.* (emphasis in original). The district court "must conduct a 'rigorous analysis' to determine whether a class action satisfies Rule 23." *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1231 (11th Cir. 2016) (quoting *Vega v. T–Mobile USA, Inc.,* 564 F.3d 1256, 1266 (11th Cir. 2009)). "Class representatives bear the burden to establish that their proposed class is adequately defined and clearly ascertainable, and they must satisfy this requirement before the district court can consider whether the class

satisfies the enumerated prerequisites of Rule 23(a)." *Cherry v. Domestic Corp.*, 986 F.3d 1296, 1302 (11th Cir. 2021) (quotation omitted).

The Supreme Court's decisions in *Amgen Inc. v. Conn. Retirement Plans & Trust Funds*, 568 U.S. 455 (2013) and *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) make clear that some inquiry into the merits is appropriate to determine whether the prerequisites of Rule 23 have been satisfied. *See Amgen*, 568 U.S. at 466; *Dukes*, 564 U.S. at 351 (noting that rigorous analysis "will entail some overlap with the merits of the plaintiff's underlying claim"). Specifically, "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule— that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Dukes*, 564 U.S. at 350 (emphasis in original). A court may refer to the evidence and the record to determine whether Rule 23 has been satisfied. "As we have noted, a district court must make the necessary factual and legal inquiries and decide all relevant contested issues prior to certification . . . 'Tough questions must be faced and squarely decided.'" *Sher v. Raytheon Co.*, 419 F. App'x 887, 891 (11th Cir. 2011) (quoting *American Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 817 (7th Cir. 2010)).

## V.    LEGAL ARGUMENT

### A.    Plaintiffs' Proposed Class Definitions Do Not Comport with Their Claims and Fail to Establish Ascertainability

In order to create a façade that their numerosity arguments are stronger, Plaintiffs force together unwieldy proposed classes that are simply not ascertainable.  When viewed closely, key differences within each grouping reflect <u>three</u> classes and <u>six</u> sub-classes and dilute the effectiveness of class action as an appropriate vehicle. Courts in this Circuit have rejected class certification efforts where proposed class definitions lack focus on a singular set of factual and legal issues. *See Arnstein v. Phillips*, No. 21-82516-CIV, 2023 WL 7129909, at *5 (S.D. Fla. Sept.

26, 2023) (proposed class definition "lumps four seemingly distinct categories of putative class members into one proposed class" creating a class that is "unwieldy in its administration and ultimately ill-defined"); *Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 601 F.3d 1159, 1176 (11th Cir. 2010) (rejecting subclasses that "mask a staggering contractual variety"); *Eldridge v. Pet Supermarket, Inc.*, No. 18-22531-CIV, 2019 WL 4694142, at *9 (S.D. Fla. Aug. 21, 2019) ("[T]he creation of several subclasses in a Rule 23(b)(3) suit may defeat the superiority requirement by splintering the proposed class and diminishing the relative value of a class action over other forms of litigation.").

Here, Plaintiffs collapse three separate job categories (forklift, maintenance and sanitation workers) into a single class, but these categories involve different duties and responsibilities, occur in different parts of the warehouse, and, most importantly, require different types of analysis with respect to Plaintiffs' legal claims. Plaintiffs' proposed groupings—eliding the differences emphasized above— ignore the testimony to date. Put differently, Plaintiffs are in fact proposing nine groups roughly defined as follows:

1) All forklift drivers that worked in the packing shed at Hamilton Growers from March 29, 2018 to December 31, 2024 during all workweeks when Hamilton Growers was certified to employ H2A workers;

2) All maintenance workers that worked in the packing shed at Hamilton Growers from March 29, 2018 to December 31, 2024 during all workweeks when Hamilton Growers was certified to employ H2A workers;

3) All sanitation workers that worked in the packing shed at Hamilton Growers from March 29, 2018 to December 31, 2024 during all workweeks when Hamilton Growers was certified to employ H2A workers;

4) <u>All forklift drivers</u> **that were admitted as an H2A worker** and worked in the packing shed at Hamilton Growers from March 29, 2018 to December 31, 2024 during all workweeks when Hamilton Growers was certified to employ H2A workers;

5) <u>All maintenance workers</u> **that were admitted as an H2A worker** and worked in the packing shed at Hamilton Growers from March 29, 2018 to December 31, 2024 during all workweeks when Hamilton Growers was certified to employ H2A workers;

6) <u>All sanitation workers</u> **that were admitted as an H2A worker** and worked in the packing shed at Hamilton Growers from March 29, 2018 to December 31, 2024 during all workweeks when Hamilton Growers was certified to employ H2A workers;

7) <u>All forklift drivers</u> that that worked in January and February (non-H2A workers) in the packing shed from March 29, 2018 to December 31, 2024;

8) <u>All maintenance workers</u> that worked in January and February (non-H2A workers) in the packing shed from March 29, 2018 to December 31, 2024;

9) <u>All sanitation workers</u> that worked in January and February (non-H2A workers) in the packing shed from March 29, 2018 to December 31, 2024.

Although they try to paint a brush across all workers with the simple titles of forklift driver, maintenance worker and sanitation worker, these facial titles do not get to the heart of the Plaintiffs' claims. Instead, the Court must determine if there is: (1) an ascertainable group of workers that engage in forklift driving that are credibly found to be non-exempt from overtime (or another violation of law for which Plaintiffs' seek certification); (2) an ascertainable group of workers that engage in maintenance work that are credibly found to be non-exempt from overtime (or another violation of law for which Plaintiffs' seek certification); and (3) an ascertainable group of workers that engage in sanitation work that are credibly found to be non-exempt from overtime

(or another violation of law for which Plaintiffs' seek certification). If the answer to each of these questions is yes, then and only then does the court proceed to determine whether these groups, separately, can satisfy the numerosity, commonality, representative and adequacy of class and counsel inquiries.

As Plaintiffs correctly note, the ascertainable nature of each class is a "pre-requisite" to Rule 23 certification. (Doc. 37-1, p. 9.) Here, the Court should never get to the four core inquiries of Rule 23(a) based on the proposed class and sub-class definitions because there is no clear method by which Plaintiffs can ascertain which workers engaged in the sub-categories of work proposed. "As the Eleventh Circuit has made clear, a 'plaintiff cannot establish ascertainability simply by asserting that class members can be identified using the defendant's records; the plaintiff must also establish that the records are in fact useful for identification purposes, and that identification will be administratively feasible.'" *Guarisma v. Hyatt Equities, LLC*, No. 1:17-CV-20931-UU, 2017 WL 6949266, at *6 (S.D. Fla. Sept. 28, 2017) (quoting *Karhu v. Vital Pharm., Inc.*, 621 F. App'x 945, 948 (11th Cir. 2015). "[I]f the putative class contains vague or subjective criteria, then the certifying court cannot ascertain who belongs in the class." *De Ford v. Koutoulas*, 348 F.R.D. 724, 735 (M.D. Fla. 2025) (citing *Cherry*, 986 F.3d at 1302).

Here, Defendants do not maintain records that delineate among the proposed job duties. (Doc. 40-1, 95:15–96:10.) At best, the Company's records may show some individuals that clocked in as completing forklift driving, (Doc. 40-1, 98:3-11), and others who clocked in under a sanitation / maintenance designation.  (Doc. 40-1, 52:10-21.) What these records do not show, and what is critical to ascertaining who may be a potential member of the class, is what job duties they were *actually performing* during a given shift and where in the packing shed those duties were being performed. As the evidentiary record demonstrates, whether, for example, a forklift driver

was working in the shipping or receiving area is critically important to how individualized these claims are, and, without individual testimony from each forklift driver, we cannot know which area they typically worked in, and, by extension, whether they were ever loading and unloading outside produce for shipping, unloading produce grown on the farm (the vast majority of the produce that goes through the packing shed is grown on the farm), and whether those job duties make the worker clearly exempt under the agricultural exemption, under the Motor Carrier Exemption, or as Plaintiffs claim, some form of a non-exempt employee. (Doc. 40-1, 30:2-21.) It is also clear based on testimony that workers do not perform singular types of job duties during a given shift. Plaintiff Castillo Olguin testified that he occasionally drove a forklift in addition to his maintenance duties, (Doc. 40-3, 44:20-21), and Defendants did not expect workers to clock out from one job designation and clock in for another when they performed duties as packing warehouse needs required. (Doc. 40-1, 81:11–82:2.) The payroll data provides only limited information that must be supplemented by individual inquiries that can only be provided by deposition testimony from each worker. If damages are to be awarded based on the performance of particular job duties, there is no record to meaningfully chart when and for how long any individual worker performed those specific job duties during a given work shift, regardless of the designation in a payroll record.

Based on the unwieldy and unascertainable nature of the proposed class and sub-classes, the Court should deny certification before reaching the Rule 23(a) inquiry.

### B.    Plaintiffs Do Not Support A Violation of Law For Purposes of Class Certification

Before addressing Rule 23 inquiries, Defendants believe it is helpful to address Plaintiff's conclusory legal allegations that the Plaintiffs are entitled to overtime (rather than straight time pay) for hours over 40 in a workweek, and their separate claim that workers are entitled to

prevailing wages paid at a rate higher than AEWR for "specialized" work when they are driving a forklift, maintaining farm equipment, or cleaning up outside and around the packing shed.

### 1.    Plaintiffs Are Exempt from Overtime

Plaintiffs replead their 16(b) motion for overtime compensation under the FLSA, refashioned as a breach of contract and/or fraud claim. Rule 23 is an inappropriate vehicle to address claims that, despite their window dressing, clearly sound under the FLSA. Their sole basis for making this claim is their argument that the ETA-790 forms submitted to the DOL stipulated that they would comply with Federal, State and local laws and regulations— and thus, they claim the failure to pay overtime can be pursued both as a 16(b) collective action (Doc. 35), and separately as a class action under Rule 23. But this type of hybrid action undercuts the core purpose of FLSA. *See Luna v. Del Monte Fresh Produce (Se.), Inc.*, No. 1:06-CV-2000-JEC, 2009 WL 10670185, at *10 (N.D. Ga. Mar. 3, 2009), *aff'd*, 354 F. App'x 422 (11th Cir. 2009) (claim based on pre-employment travel and visa costs for H-2A workers would be "appropriately pursued in an FLSA collective action.").

Regardless of whether Plaintiffs present the issue as an FLSA violation, breach of contract, or fraud, the key point remains: Defendants lawfully did not pay overtime because the workers are exempt. Noticeably absent from both their collective action brief and their class certification brief is any meaningful argument otherwise, aside from broad and unsupported conclusory statements.

The facts, however, show these workers all are exempt. The statutory definition of agriculture, 29 U.S.C. § 203(f), has been construed to provide two categories of exempt agricultural practices: "'primary' agriculture, which includes specific activities like cultivation and tillage of the soil, dairying, and harvesting," and "secondary agriculture," that "includes any practices, whether or not themselves farming practices, which are performed either by a farmer on

a farm, incidentally to or in conjunction with 'such' farming operations." *Sariol v. Fla. Crystals Corp.*, 490 F.3d 1277, 1279 (11th Cir. 2007) (quoting *Farmers Reservoir & Irrigation Co. v. McComb,* 337 U.S. 755, 762–63 (1949)). The "secondary agriculture" category of practices has a "broader . . . meaning" than primary agriculture.  29 C.F.R. § 780.105(a). "The definition of secondary agriculture has three requirements: (1) the 'practice must be performed either by a farmer or on a farm'; (2) it must 'be performed either in connection with the farmer's own farming operations or in connection with farming operations conducted on the farm where the practice is performed'; and (3) it must be 'performed as an incident to or in conjunction with' the farming operations.'" *Rodriguez v. Pure Beauty Farms, Inc.*, 503 F. App'x 772, 774–75 (11th Cir. 2013). Preparatory jobs that are incidental to agriculture, even if performed outside of "field work," are widely interpreted to fall within the agricultural exemption based on the more inclusive secondary agriculture definition. *See Sariol*, 490 F.3d at 1279–80 (holding that delivering fuel to farm machinery is "not only incidental to [Defendant's] operations," but is "absolutely necessary"); *Rodriguez*, 503 F. App'x at 775 (holding that plaintiffs' job maintaining farm plants at their point of sale in a Home Depot store was sufficiently incidental to the farm's farming operations to constitute secondary agriculture); *Taylor v. White Oak Pastures, Inc.*, 454 F. Supp. 3d 1317, 1329 (M.D. Ga. 2020) (holding that the secondary agriculture definition includes "preparation for market" activities and thus exempts farm workers involved in cattle processing activities, including slaughtering, cutting, and grinding); *Hernandez v. B Rd. Assocs., Inc.*, No. 2:09-CV-63-FTM-29SPC, 2010 WL 11622617, at *3 (M.D. Fla. Apr. 22, 2010) (tracking produce inventory and inputting worker payroll information on a farm are exempt agricultural activities and 29 C.F.R. 780.158(a) explicitly recognizes, "secondary" agriculture to include office work performed on the farm).

In each of the job categories delineated by Plaintiffs, there is no legitimate dispute that the work was performed on a farm and in connection with Defendants' farming operations. It is also clear based on the caselaw that the work performed in the packing shed—cleaning and sorting produce along produce lines, boxing produce, and processing produce for delivery—also falls squarely in the established "preparation for market" subcategory of secondary agricultural work. For their breach of contract claim, Plaintiffs suggest that, because the ETA 790 forms refer to general field work, that all workers hired under those applications must work in the field to avoid a violation. But this assertion critically ignores the more expansive job duties section included in each of the relevant ETA 790 forms. This list contains tasks related to field work as well as work performed in the packing shed and precisely the tasks performed and testified to by forklift operators, maintenance workers, and (sanitation workers), including: "Operate. repair, and maintain farm vehicles, implements and mechanical equipment," "Crops may be harvested and field packed, or loaded and transported to the packinghouse for storage and post-harvest treatment of crops, "Stack boxes onto pallets, transport vehicles or trailers," "Count and check harvested products," "Clean and maintain all grounds and facilities." (Doc 37-5, p. 27.) The employment contract approved by the DOL thus expressly contemplates secondary agricultural activities that Plaintiffs now allege constitute specialized work.

In addition, the forklift drivers who work on the receiving side and load and unload outside produce are exempt from overtime payments under the Motor Carrier exemption to the FLSA, and Plaintiffs do not even attempt to dissuade this Court from this conclusion. "The Motor Carrier Exemption, . . . prevents FLSA's requirements from applying to 'any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49.'" *Aguilar v. Grupo Medex, Inc.*,

No. 07-23290-CIV-KING, 2008 WL 11409044, at *5 (S.D. Fla. Dec. 8, 2008) (citing 29 U.S.C. § 213(b)(1) (2000)). Pack Logistics, LLC, an arm of the Company, fulfills the Company's freight functions and uses the motor carrier number under which the Company operates. (Doc. 42-1, ¶ 10.) This corporate relationship situates Defendants as "carriers" under the Motor Carrier Act subject to the Secretary's jurisdiction, and, thus, its employees as exempt to the extent they engage in activities affecting the safety of operation of motor vehicles in interstate commerce. Plaintiff Arnulfo Garcia-Ramos testified that he worked on the shipping side of the packing shed, and that, in this role, he loaded produce into trucks for shipment to customers. (Doc. 40-2, 83:10-16.) He acknowledged both that the customers were often across state lines thus satisfying the "interstate commerce" aspect of the exemption, and he further stated that safety was a core focus of the position. (Doc. 40-2, 82:6-12; 96:5-9; Doc. 42-1, ¶ 11.) Because these forklift drivers are exempt, there is no breach of contract or fraud by compensating such forklift drivers at straight time rates and in accordance with the job duties listed in the clearance order.

## 2.    Plaintiffs Were Properly Compensated at the AEWR Rate

Plaintiffs argue that the workers were paid an improper wage when they were paid the AEWR rate for the year and jurisdiction where they performed work, claiming (without legal authority and contrary to existing law) that they should have been paid a higher wage for "specialized" work, and that they were improperly paid the rate for "agricultural field work." This is misleading based on the language of the ETA 790 forms and inaccurate with respect to the law.

The Immigration and Nationality Act allows U.S. employers to hire temporary, foreign agricultural workers where the Secretary of Labor certifies two things: (1) a sufficient number of "able, willing, and qualified" U.S. workers are not available to perform the work; and (2) the employment of the foreign workers will not "adversely affect the wages and working conditions"

of U.S. workers "similarly employed." 8 U.S.C. § 1188(a)(1).  The Secretary of Labor, through the H-2A "Certifying Officers" ("CO"), accomplishes the goal of avoiding "adverse effect" by reviewing the job duties for which the applying employer needs workers and assigning an "adverse effect wage rate." 20 C.F.R. § 655.120.

Plaintiffs attempt to mislead the Court regarding Defendants' characterization of the work as "farmworker" positions, rather than forklift, maintenance and sanitation related positions. In fact, it is the DOL Certifying Officer that is responsible for the ultimate and final assignment of an occupational code (although employers may submit their proposed job title or code) based on the array of job duties set forth in the job order. The CO applies a single Standard Occupational Classification code ("SOC code") to the panoply of duties encompassed by a job order, and on the balance of job duties included in Hamilton Growers' job order (quoted *supra*), the CO chose to assign or approve the 45-2092 "farmworker" SOC code, knowing full well that the work included the use of equipment and machinery and packing and cleaning duties. *See* 88 Fed. Reg. 12760, 12779-80 (Feb. 28, 2023) (detailing how DOL makes SOC code assignment decisions). With that SOC code assignment, the CO assigned an adverse effect wage rate to the work, pursuant to 20 C.F.R. § 655.120.[2] Plaintiffs do not contend that Hamilton Growers failed to pay the CO-assigned wage rate; only that Plaintiffs would prefer that a different, higher wage rate have been applied instead. The labor certifications issued by the Department of Labor to Hamilton Growers are final determinations by the Secretary of Labor that employing H-2A workers to perform any of the job

---

[2] The current Section 655.120 on "Offered wage rate" took effect on March 30, 2023.  88 Fed. Reg. 12760 (Feb. 28, 2023).  Prior to the 2023 rule change, a single DOL-set AEWR applied to all H-2A positions in a given state or group of states, regardless of individual job duties, so the SOC code assignment by the CO had no bearing on wage rates.  In other words, the Plaintiffs' argument is even more perplexing prior to March 30, 2023.

duties listed at the rate of pay set by the Department would not "adversely affect" the wages of similarly employed U.S. workers.

As noted herein, there is a lengthy recitation of multiple job duties (which includes Plaintiffs' job duties) within the H-2A job order. This practice promotes flexibility in the workforce and transparency to potential job applicants, ensures DOL is aware of the broad array of job duties that will be performed, and is entirely permissible.

As for Plaintiffs' claim that somehow they should have been paid a "prevailing wage" higher than the DOL-set AEWR, Plaintiffs are essentially seeking a BLS-created "prevailing wage" as that term is used in the H-2B visa program. 20 C.F.R. §§ 655.5, 655.10. That is an entirely separate visa program from the H-2A program Plaintiffs worked under, with a separate application and certification process. Employers and visa holders may not simply "change status" between the two programs; they must apply for and be certified for a specific visa category within that "silo." "Prevailing wage" is a defined term-of-art in the H-2A regulations: "A wage rate established by the OFLC Administrator for a crop activity or agricultural activity and, if applicable, a distinct work task or tasks performed in that activity and geographic area ***based on a survey conducted by a State that meets the requirements in § 655.120(c).***" 20 C.F.R. § 655.103(b). The OFLC Administrator formally publishes all applicable "prevailing wages" from surveys conducted by the various states.[3] Dating back to 2008, the one and only "prevailing wage" finding by the State of Georgia was a January 2023 finding that planting greens was to be paid at the hourly rate of $11.99 (which was far less than the AEWR in Georgia for many years, including 2023 to the present). There is no record of the State of Georgia ever conducting a survey of "forklift,"

---

[3] All of the findings are publicly available here: https://www.dol.gov/agencies/eta/foreign-labor/wages/agriculture

"mechanic," or "sanitation" positions, and as a result, Plaintiffs' attempt to enforce some wage rate above the DOL-assigned AEWR has absolutely no legal basis.

### C.    The Proposed Class Lacks Sufficient Numerosity

To satisfy the Rule 23(a)(1) numerosity requirement, plaintiffs must show that joinder of all members is impracticable. "Plaintiffs 'generally must proffer some evidence or a reasonable estimate of the number of members comprising the purported class.'" *Rhodes v. Cracker Barrel Old Country Store, Inc.*, 213 F.R.D. 619, 674 (N.D. Ga. 2003) (quoting *In re Disposable Contact Lens Antitrust Litig.,* 170 F.R.D. 524, 529 (M.D. Fla.1996)). The Eleventh Circuit has consistently held that "generally less than twenty-one is inadequate, more than forty adequate, with numbers between varying according to other factors." *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986). The standard is typically higher when the plaintiff relies on heavily speculative methodology to establish the class size. *Kuehn v. Cadle Co., Inc.*, 245 F.R.D. 545, 547-50 (M.D. Fla. 2007). And, dovetailing with the preliminary ascertainability inquiry, "A second element of the numerosity requirement is that the proposed class meet a minimal standard of identifiability. . . .The class simply must meet a 'minimum standard of definiteness which will allow the trial court to determine membership in the proposed class.'" *Rhodes,* 213 F.R.D. at 674 (quoting *Earnest v. Gen. Motors Corp.,* 923 F. Supp. 1469, 1473 & n. 4 (N.D. Ala.1996)).

As noted above, Plaintiffs are really seeking nine different classes and/or subclasses, and each is highly individualized and carries with it different defenses and proof that cannot be litigated as a class. There simply is not numerosity sufficient to support certification where these classes are inadequate under the thresholds recognized in this Circuit or are otherwise highly speculative.

Here, Plaintiff Garcia-Ramos was the only Plaintiff made available for a deposition that considered himself a forklift driver.[4] Plaintiff Garcia-Ramos testified that eighteen individuals worked as forklift drivers on the shipping side of the warehouse. (Doc. 40-2, 79:18-19.) Plaintiffs Pablo Castillo-Olguin and Jonathan Castillo-Tovar testified that they worked as maintenance personnel in the packing shed. They had very inconsistent recollections as to the number of workers in the same position. Castillo-Olguin testified that "12 or 13 people" performed maintenance work, (Doc. 40-3, 45:8), and Castillo Tovar, on the other hand, testified that only two to four people (he, Castillo-Olguin, and their two assistants) performed this work. (Doc. 42-2, 56:23-25.) Regardless, both individuals clearly agreed that there were nowhere near 21 or more individuals in this position, let alone 40 or more to satisfy the numerosity requirement of either job category. Finally, we have no testimony regarding sanitation workers. The only opt-in Plaintiff who even refers to duties resembling sanitation work also operated a forklift and does not claim that sanitation work constituted his primary job duty.  (Doc. 35-4, ¶ 6.) This class has no meaningful member or estimated number of workers for the purpose of this inquiry.

None of the "sub-classes" here, which all require some unique type of proof or evidence, have sufficient numbers of individuals to support a class. "A subclass . . . must independently meet all of [R]ule 23's requirements for maintenance of a class action." *Usry v. EquityExperts.org, LLC*, No. CV 116-010, 2019 WL 1140236, at *4 (S.D. Ga. Mar. 12, 2019) (quoting *Johnson v. Am. Credit Co. of Ga.*, 581 F.2d 526, 532 (5th Cir. 1978)). Plaintiffs' only argument around this is to try to aggregate these classes together, however, these individuals worked different jobs, are subject to different defenses and are not properly lumped together simply to meet the numerosity

---

[4] Notably, although he did work as a forklift driver during some of his employment with Hamilton Growers, he admitted he also spent a substantial portion of time during the relevant period of this action as a shipping clerk working in the office and not driving a forklift.  (Doc. 40-2, 84:1-15.)

requirements. Moreover, Plaintiffs' estimated numbers are based on payroll records that do not accurately reflect the actual performance of job duties during a given shift, do not capture the meaningful difference between working on the shipping or receiving side of the warehouse, and are inconsistent with Plaintiffs' own testimony.

### D.    The Proposed Class Claims Cannot Be Resolved by Common Proof

To satisfy the commonality prerequisite of 23(a)(2), a plaintiff must establish questions of law or fact that are common to the entire class. "The commonality requirement of Rule 23(a)(2) 'looks not to the raising of common questions . . . but rather the capacity of a classwide proceeding to generate common answers apt to derive the resolution of the litigation.' Even a single common question may be sufficient to satisfy the commonality requirement, but *the issues must be susceptible to class-wide proof*." *Stone v. U.S. Sec. Assoc., Inc.*, No. 1:16-CV-0371-MLB-JSA, 2018 WL 3745051 (N.D. Ga. May 31, 2018) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50 (2011) (emphasis added)). While a lower bar than the predominance standard under Rule 23(b), "the common issue must be 'of such a nature that it is capable of classwide resolution— which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Id.* (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).

Here, Plaintiffs make overarching arguments that completely ignore the individualized nature of their claims, arguing to this Court that Defendants treated each proposed job category of warehouse workers the same for the purpose of the alleged violations, and claiming there are common answers that will drive the litigation. This simply is not the case.

Plaintiffs identify the following common questions: (a) whether the class members were improperly paid a "field" wage rather than a specialized wage; (b) whether the class members were improperly paid AEWR for all hours worked, as opposed to Plaintiffs claim that they are non-

exempt and should be paid overtime; (c) whether Defendants somehow committed fraud upon the government when the job duties were disclosed in the ETA 790 forms; (d) whether inbound and outbound travel was reimbursed appropriately; and (e) whether the failure to pay overtime and prevailing wage rates during January and February violated AWPA (same arguments—different time frame and different groups of workers). (Doc. 37-1, p. 13.)

As to the claim that the Defendants misled the government by claiming that all workers were "field" workers, evidence and testimony shows that it is Plaintiffs who are misleading this Court by ignoring the list of job duties contained in the clearance order. Regardless, Plaintiffs claim that "resolution of the issue will not depend on any individual inquiries regarding individual warehouse workers," (Doc. 37-1, p. 14), but this is simply not accurate. As Plaintiffs testified, they performed different duties than the job categories at issue in this proposed class definition, (Doc. 40-2, 84:13-15; Doc. 40-3, 44:20-21), and, in the case of forklift operation, the designation does not capture the distinction that potentially connects the position to outside produce (i.e. – shipping vs. receiving).  Each worker must individually prove what "specialized" job duties they performed, during what shifts, and, if and when those job duties involved direct contact with outside produce for the purposes of even beginning to argue that there could be liability. *See, e.g., Rabelo-Rodriguez v. Mayorkas*, No. 21-CV-23213, 2021 WL 5746478, at *7 (S.D. Fla. Dec. 2, 2021) (holding that plaintiffs failed to demonstrate commonality where they did not differentiate between distinct subgroups in a proposed class that invited separate questions of law and fact).

Plaintiffs next group all of the fraud, AWPA and breach of contract analysis together by claiming that these workers should be paid overtime and that this analysis turns on whether overtime wages were owed, rather than individual facts or job duties of any warehouse worker. To the extent that Plaintiffs' theory is based on particular job duties, the questions of law or fact will

not be common across the class as a whole, but rather, at best, unique to the job duties performed on each day by each individual because agricultural workers are exempt from overtime. To the extent that Plaintiffs' theory relies on each worker encountering outside produce during a shift, the inquiries than become even more granular and difficult to prove. There is *no payroll designation at all* to indicate whether a forklift operator lifted or moved outside produce or whether a maintenance worker changed a sprocket on a line that moved outside produce. (Doc. 40-1, 34:10-13.) It is undisputed that Hamilton Growers grows its own produce and primarily relies upon its own produce to ship products to its customers, so any claim that an individual was moving outside produce can only be established based on individual testimony. (Doc. 42-1, ¶ 4.) Thus, the job duties performed by each prospective class member are central to determining if such overtime or wages are warranted under Plaintiffs' "common questions," and even to determine whether the separate exemption (motor carrier acct) will apply to each forklift driver. *See Klay v. Humana, Inc.*, 382 F.3d 1241, 1264 (11th Cir. 2004) (holding that, even where there is a common legal question, commonality is not satisfied where that question "is dwarfed by the individualized issues of fact to be resolved").

Finally, Plaintiffs argue that whether or not a worker was reimbursed appropriately for inbound and outbound travel can be resolved by common proof. What they ignore, however, is there is no dispute that workers here were paid for their travel and subsistence costs, (Doc. 40-2, 52:11-13; Doc. 40-3, 31:23 – 32:4; Doc. 42-2, 31:19 – 32:2), and workers signed an acknowledgment confirming to Hamilton Growers that they were fully reimbursed (admitting they did not ever inform the Company that they were not reimbursed properly).[5] Now, Plaintiffs are

---

[5] Examples of signed acknowledgements documenting receipt of travel reimbursements for the deposed Plaintiffs and opt-in Plaintiffs are attached as Exhibit A. These documents are in Spanish. An example of the English translation is included at the end of Exhibit A.

trying to argue ex post facto that they should have been paid more for their travel expenses. At best, this is a hodge podge of individuals claiming they think they were inadequately reimbursed, without actually providing any facts, evidence or even credible testimony to support these claims. The Plaintiffs here testified that they could provide only estimates of their travel costs from their homes to Monterrey, Mexico; estimates of lodging and other expenses while staying in Monterrey awaiting visa processing; and estimates of travels costs to and from the farm. (Doc. 40-2, 64:16-22; Doc. 40-3, 29:7-9; Doc. 42-2, 38:3-6.) No records of travel expenses have been provided, whatsoever. Moreover, there does not appear to be commonality even among the three deponents as to methods of travel. Plaintiff Garcia Ramos used a rented van service that he arranged with coworkers; Plaintiff Castillo Olguin used the free bus offered by Defendants during one or two seasons of the relevant period and otherwise used his own car (his personal preference); and, though Castillo Olguin testified that he traveled with Castillo Tovar each year, they each offered contradictory testimony about how they traveled to the farm each year. (Doc. 40-2, 56:8-12; 64:3-11; Doc. 40-3, 30:19-25; Doc. 42-2, 30:3-6.) Assuming, *arguendo*, that Plaintiffs establish a legal claim based on the question of travel expense liability, this testimony makes it abundantly clear that this claim cannot be quantified without significant individualized inquiries, wild estimations in the absence of receipts, and a broad array of travel methods to account for, all of which undercut the common proof needed to establish this question.

### E.    The Byzantine Framework of the Proposed Class Definitions Renders the Class Representatives Insufficiently Typical

In order to satisfy the typicality element of Rule 23(a)(3), "[T]here must be a nexus between the class representative's claims or defenses and the common questions of fact or law which unite the class. A sufficient nexus is established if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal

theory." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984). "The Supreme Court has explained that the commonality and typicality prerequisites 'tend to merge,' and that '[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Reid v. Lockheed Martin Aeronautics Co.*, 205 F.R.D. 655, 666 (N.D. Ga. 2001) (quoting *General Tel. v. Falcon,* 457 U.S. 147, n.13 (1982)).

The claims of the representative parties here cannot be construed as typical because the breadth of diverse factual and legal questions required to resolve the claims of the representative parties will only be further multiplied if extended to potential class members. Plaintiff Garcia Ramos is a class stand-in for potential forklift operators, but, as his deposition testimony demonstrated, he himself did not work as a forklift driver for much of the relevant time period, and he primarily worked on only one side of the packing shed. (Doc. 40-2, 84:13-15.) And Plaintiff Castillo Olguin, the class stand-in for maintenance workers, conceded that he regularly performed job duties that were not related to maintenance work. (Doc. 40-3, 44:20-21.) Put simply, Plaintiffs cannot show that they performed that same tasks among each other to establish liability under common questions of fact and law, let alone to demonstrate sufficient typicality to represent the class as a whole. Moreover, both plaintiffs testified to an assortment of travel arrangements, from utilizing the free bus service offered by Defendants, hiring a private van to travel to and from the farm, and traveling in a personal vehicle maintained at the farm throughout the season. (Doc. 40-2, 56:8-12; 64:3-11; Doc. 42-2, 30:3-6.) The individualized inquiries to determine potential liability for travel diverge even among the Plaintiffs, to say nothing of the inevitable further divergence as applied to the class. The hurdle for typicality cannot be satisfied where the

microcomplexities among the Plaintiffs undercuts the singularity of the claims – in short, every single potential plaintiff would need to be deposed to determine whether they have a claim, and if so, the appropriateness of the claim for this matter.

**F.    Plaintiffs Do Not Meet the Heightened Predominance Requirements Under Rule 23(b)**

In addition to satisfying each of the Rule 23(a) criteria, Plaintiffs seeking class certification must also meet one of the requirements under Rule 23(b). Plaintiffs here seek to certify under the Rule 23(b)(3) predominance requirement, an inquiry that is similar to the commonality analysis under 23(a)(2) but "far more demanding." *Sacred Heart Health Sys., Inc.*, 601 F.3d at 1175 (quoting *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 624 (1997)). "A class action may be certified under subsection (b)(3) if the court finds that the question of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1357 (11th Cir. 2009) (quotation omitted). "Common issues of fact and law predominate if they have a *direct impact of every class member's entitlement to injunctive and monetary relief*, and on every class member's effort to establish liability." *Lawson v. Life of the South Ins. Co.*, 286 F.R.D. 689, 696 (M.D. Ga 2012) (quotations omitted) (emphasis in original). "To determine whether common issues predominate, a district court must first identify the parties claims and defenses and their elements and then classify these issues as common questions or individual questions by predicting how the parties will prove them at trial. *Common questions are ones where the same evidence will suffice for each member.*" *Sellers v. Rushmore Loan Mgmt. Serv., LLC*, 941 F.3d 1031, 1040 (11th Cir. 2019) (quotation omitted) (emphasis added). In Plaintiffs' Reply brief supporting their 16(b) Motion, Plaintiffs repeatedly argue that the individualized analysis and inquiries are premature at that stage,

while seemingly conceding that these issues may be more fulsomely reviewed in another context. (Doc. 55, pp. 3-6.) The "demanding" standard of the Rule 23(b)(3) inquiry provides just such a context, allowing this Court to address the exact problems with their class arguments that Plaintiffs forego in their motion for an FLSA collective action.

Plaintiffs concede that damages are individualized here, though they claim that damages can be resolved on a classwide basis by using "simple math." As established in the commonality discussion, this is far from the case. Rule 23(b)(3) requires that "damages are capable of determination via class-wide proof—just like the theory of liability." *In re Takata Airbag Prod. Liab. Litig.*, 677 F. Supp. 3d 1311, 1329 (S.D. Fla. 2023). The predominance requirement is not satisfied when, "computing damages would be so complex, fact-specific, and difficult that the burden on the court system would be simply intolerable, or when individual damages are accompanied by significant individualized questions going to liability." *Signor v. Safeco Ins. Co. of Ill.*, No. 19-61937-CIV, 2021 WL 1348414, at *8 (S.D. Fla. Feb. 18, 2021) (quotations omitted).

Even assuming that Plaintiffs establish the viability of their claims, in order to show damages, the Plaintiffs must show which weeks they are or could have been performing the allegedly specialized job duties, exactly what job duties they were performing that week, which alleged prevailing wage job function that falls into, and why and how it is not simply agricultural work or otherwise covered by the motor carrier act exemption. Only after wading through all of those individualized inquiries, can a worker apply some type of math formula to their damages. And even then, the math is further complicated by the potential impact of the outside produce analysis. To the extent that Plaintiffs' argument for overtime liability hinges on outside produce, this analysis will require even more inquiry into weekly job duties to account for weeks when workers did or did not encounter outside produce for damages calculations. *See Santos v.*

*Healthcare Revenue Recovery Grp., LLC*, No. 19-23084-CIV, 2021 WL 7500317, at *5 (S.D. Fla. Oct. 27, 2021) (predominance requirement is not satisfied where "individual discovery would be required for each class member" undercutting efficient resolution of issues); *Monroe v. Am. Int'l Grp., Inc.*, No. 04-61621-CIV, 2006 WL 8433451, at *8 (S.D. Fla. Aug. 9, 2006) (predominance requirement fails where "an individual inquiry to determine the amount of damages to award that particular class member must be made")

The potential travel reimbursement calculations are even more of a minefield.  Each individual's travel expenses will have to be individually assessed and compared to what they were already paid for their travel.  Based on the testimony of the deponents, the class participants are not likely to be able to introduce a single receipt to document their costs.  There is simply no means to calculate travel reimbursements for the damages alleged without individualized testimony, and, even then, the accuracy of these calculations will be highly suspect.

## VI.    CONCLUSION

For the reasons stated herein, Plaintiffs' Motion for Class Certification Pursuant to Rule 23 should be denied.

Respectfully submitted this 28th day of July, 2025.

<div style="margin-left:50%">

*s/Martin B. Heller*
Martin B. Heller
Georgia Bar No. 360538
David Lerner
Georgia Bar No, 853678
**FISHER & PHILLIPS LLP**
1075 Peachtree Street NE, Suite 3500
Atlanta, Georgia 30909
Telephone: (404) -231-1400
Facsimile: (404) 240-4249
mheller@fisherphillips.com
dlerner@fisherphillips.com

Attorneys for Defendants

</div>

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day electronically submitted the foregoing

**DEFENDANTS' RESPONSE BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR**

**RULE 23 CLASS CERTIFICATION** by electronic mail to the following counsel of record:

> Dawson Morton, Esq.
> Dawson Morton, LLC
> 1003 Freedom Blvd.
> Watsonville, CA 95076
>
> James M. Knoepp
> Dawson Morton, LLC
> 1612 Crestwood Drive
> Columbia, SC 29205

This 28th day of July, 2025.

<div align="right">

<u>*s/Martin B. Heller*</u>
Martin B. Heller
Georgia Bar No. 360538

</div>